# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **RINAT AKHMETSHIN**, | |
| Plaintiff, | |
| v. | Case No. 1:18-cv-01638-EGS |
| **WILLIAM BROWDER**, | |
| Defendant. | |

## DEFENDANT WILLIAM BROWDER'S MOTION TO DISMISS THE COMPLAINT

Defendant William Browder, by and through the undersigned counsel, hereby moves to dismiss Mr. Akhmetshin's Complaint, with prejudice, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) for lack of personal jurisdiction and failure to state a claim. Mr. Browder submits the attached Memorandum of Points and Authorities in support of this Motion.

Dated: November 30, 2018

Respectfully submitted,

By: /s/ Michael J. Gottlieb
Michael J. Gottlieb (D.D.C. Bar No. 974960)
Melissa Shube (D.D.C. Bar No. 241034)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
mgottlieb@bsfllp.com
mshube@bsfllp.com

*Attorneys for Defendant William Browder*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RINAT AKHMETSHIN**, | |
| Plaintiff, | |
| v. | Case No. 1:18-cv-01638-EGS |
| **WILLIAM BROWDER,** | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT WILLIAM BROWDER'S MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ...........................................................................................iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 6

    A.    Mr. Browder Champions the Magnitsky Act After the Tragic Murder of Sergei Magnitsky. ...................................................................................................... 6

    B.    Mr. Akhmetshin Teams Up with a Kremlin-Connected Lawyer to Lobby to Repeal the Magnitsky Act. ............................................................................. 7

    C.    Hermitage Files a Complaint with the Department of Justice and Senator Grassley Investigates. ................................................................................... 8

    D.    Mr. Akhmetshin Publicly Admits Attending the Trump Tower Meeting and Touts His Experience as a Soviet Counterintelligence Officer. . ............... 10

    E.    Mr. Browder Comments on the Public Controversy Created by Mr. Akhmetshin. ......................................................................................... 12

    F.    Mr. Browder Has Faced Ongoing Persecution and Harassment. ............... 15

STANDARD OF REVIEW .......................................................................................... 16

ARGUMENT ................................................................................................................ 17

  I.    The Court Lacks Personal Jurisdiction Over Mr. Browder. . .......................... 17

    A.    The Allegedly Defamatory Statements Were Not Made or Published In D.C. ..... 19

    B.    Mr. Browder's Lobbying and Testifying Cannot Form the Basis for Jurisdiction. ................................................................................................ 20

    C.    Appearances on Television, on the Radio, and at Events Do Not Confer Jurisdiction. ................................................................................................ 23

    D.    The Court Lacks General Jurisdiction. . ...................................................... 25

  II.    Mr. Akhmetshin Has Failed to State a Claim. .................................................. 26

    A.    Akhmetshin Is A Limited-Purpose Public Figure........................................ 26

B.     Mr. Akhmetshin Has Failed to Plead Actual Malice. . ........................................... 32

III.  The Challenged Statements Are Not Actionable. . ............................................................. 37

A.     The Statements Are Not Actionable Under the Opinion Doctrine. . ...................... 38

1.     The Business Insider Statement .................................................... 39

2.     The CBS This Morning Statement ................................................ 40

3.     The Two Twitter Statements ......................................................... 41

B.     The Challenged Statements Are Substantially True. . ........................................... 42

CONCLUSION ......................................................................................................................... 44

## TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

*Abbas v. Foreign Policy Grp., LLC,*
  975 F. Supp. 2d 1 (D.D.C. 2013) ........................................................ 37, 40

*Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.,*
  691 F. Supp. 379 (D.D.C.1987) ............................................................ 24

*Armstrong v. Thompson,*
  80 A.3d 177 (D.C. 2013) ...................................................................... 42

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .............................................................................. 15

*Atlantigas Corp. v. Nisource, Inc.,*
  290 F. Supp. 2d 34 (D.D.C. 2003) .............................................. 18, 19, 21

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .............................................................................. 15

*Benic v. Reuters Am., Inc.,*
  357 F. Supp. 2d 216 (D.D.C. 2004) ...................................................... 41

*Bigelow v. Garrett,*
  299 F. Supp. 3d 34 (D.D.C. 2018) .................................................. 24, 25

*Boley v. Atl. Monthly Grp.,*
  950 F. Supp. 2d 249 (D.D.C. 2013) .................................................. 33, 43

*Buckley v. Littell,*
  539 F.2d 882 (2d Cir. 1976) .................................................................. 39

*Burman v. Phoenix Worldwide Indus., Inc.,*
  437 F. Supp. 2d 142 (D.D.C. 2006) ...................................................... 24

*Capital Bank Int'l Ltd. v. Citigroup, Inc.,*
  276 F. Supp. 2d 72 (D.D.C. 2003) .............................................. 15, 16, 18

*Competitive Enter. Inst. v. Mann,*
  150 A.3d 1213 (D.C. 2016) .................................................................. 32

*Daimler AG v. Bauman,*
  571 U.S. 117 (2014) .............................................................................. 24

*Deripaska v. Associated Press*,
  282 F. Supp. 3d 133 (D.D.C. 2017) ........................................................................ 32

*Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*,
  355 A.2d 808 (D.C. 1976) ........................................................................ 17, 20, 21

*Fairbanks v. Roller*,
  314 F. Supp. 3d 85 (D.D.C. 2018) ........................................................... 1, 32, 33, 37

*Farah v. Esquire Magazine*,
  736 F.3d 528 (D.C. Cir. 2013) ........................................................................ 1, 16

*Forras v. Rauf*,
  812 F.3d 1102 (D.C. Cir. 2016) ........................................................................ 19

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1967) ........................................................................ 26

*Guccione v. Hustler Magazine, Inc.*,
  800 F.2d 298 (2d Cir. 1986) ........................................................................ 43

*Guilford Transp. Indus., Inc. v. Wilner*,
  760 A.2d 580 (D.C. 2000) ........................................................................ 37

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989) ........................................................................ 32

*Hayes v. FM Broad. Station WETT*,
  930 F. Supp. 2d 145 (D.D.C. 2013) ........................................................................ 21, 22

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984) ........................................................................ 17

*Hinton v. Corr. Corp. of Am.*,
  624 F. Supp. 2d 45 (D.D.C. 2009) ........................................................................ 8

*Hourani v. Psybersolutions LLC*,
  164 F. Supp. 3d 128 (D.D.C. 2016) ........................................................................ 23, 32

*In the Matter of Dalnyay Stepl. LLC and the Cross-Border
  Insolvency Regulations 2006 and the Insolvency Act
  1986* [2017] EWHC 3153 (Ch) ........................................................................ 15

*Jankovic v. Int'l Crisis Grp.*,
  822 F.3d 576 (D.C. Cir. 2016) ........................................................................ *passim*

*Jung v. Ass'n of Am. Med. Colleges*,
  300 F. Supp. 2d 119 (D.D.C. 2004) ........................................................................ 23

iv

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
856 F.3d 106 (D.C. Cir. 2017) ....................................................................... 26, 31

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) ............................................................................. 15

*Lane v. Random House, Inc.*,
985 F. Supp. 141 (D.D.C. 1995) .................................................................... 40, 41

*Lewy v. S. Poverty Law Ctr., Inc.*,
723 F. Supp. 2d 116 (D.D.C. 2010) .................................................................... 23

*Liberty Lobby, Inc. v. Anderson*,
746 F.2d 1563 (D.C. Cir. 1984) ......................................................................... 42

*Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*,
838 F.2d 1287 (D.C. Cir. 1988) ................................................................. *passim*

*Livnat v. Palestinian Auth.*,
851 F.3d 45 (D.C. Cir. 2017) ............................................................................. 15

*Lohrenz v. Donnelly*,
350 F.3d 1272 (D.C. Cir. 2003) ..................................................................... 32, 34

*McFarlane v. Esquire Magazine*,
74 F.3d 1296 (D.C. Cir. 1996) ........................................................................... 22

*McFarlane v. Sheridan Square Press Inc.*,
91 F.3d 1501 (D.C. Cir. 1996) ......................................................... 31, 32, 34, 35

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) ................................................................................... 37, 39, 40

*Moldea v. New York Times Co.*,
22 F.3d 310 (D.C. Cir. 1994) ............................................................ 37, 40, 41, 42

*Moncrief v. Lexington Herald-Leader Co.*,
807 F.2d 217 (D.C. Cir. 1986) ........................................................................... 19

*Montgomery v. Risen*,
197 F. Supp. 3d 219 (D.D.C. 2016) .................................................................... 32

*Moss v. Stockard*,
580 A.2d 1011 (D.C. 1990) ................................................................................ 41

*N.Y. Times v. Sullivan*,
376 U.S. 254 (1964) ...................................................................................... 25, 31

v

*Naartex Consulting Corp. v. Watt*,
    722 F.2d 779 (D.C. Cir. 1983) ......................................................................... 21

*Nurriddin v. Bolden*,
    818 F.3d 751 (D.C. Cir. 2016) ......................................................................... 15

*Parsi v. Daioleslam*,
    595 F. Supp. 2d 99 (D.D.C. 2009) ................................................................... 39

*Parsi v. Daioleslam*,
    890 F. Supp. 2d 77 (D.D.C. 2012) ................................................................... 36

*Pearson v. District of Columbia*,
    644 F. Supp. 2d 23 (D.D.C. 2009) ..................................................... 2, 14, 16

*Purdue Research Found. v. Sanofi-Synthelabo, S.A.*,
    332 F. Supp. 2d 63 (D.D.C. 2004) ................................................................... 15

*Ralls Corp. v. Terna Energy USA Holding Corp.*,
    920 F. Supp. 2d 27 (D.D.C. 2013) ............................................................. 18, 21

*Robo-Team NA, Inc. v. Endeavor Robotics*,
    313 F. Supp. 3d 19 (D.D.C. 2018) ............................................................. 18, 21

*Rosen v. Am. Israel Pub. Affairs Comm., Inc.*,
    41 A.3d 1250 (D.C. 2012) .......................................................................... 38, 39

*Sandza v. Barclays Bank PLC*,
    151 F. Supp. 3d 94 (D.D.C. 2015) ............................................................... 1, 16

*Savage v. Bioport*, Inc.,
    460 F. Supp. 2d 55 (D.D.C. 2006) ................................................................... 18

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) .......................................................................................... 32

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) .................................................................... 26, 36

*The Urban Inst. v. FINCON Servs.*,
    681 F. Supp. 2d 41 (D.D.C. 2010) ................................................................... 24

*United States v. Ferrara*,
    54 F.3d 825 (D.C. Cir. 1995) ..................................................................... 16, 17

*United States v. Prevezon Holdings Ltd.*,
    839 F.3d 227 (2d Cir. 2016) ............................................................................ 14

*United Therapeutics Corp. v. Vanderbilt Univ.*,
  278 F. Supp. 3d 407 (D.D.C. 2017) ........................................................................................ 23

*Washington Post v. Robinson*,
  935 F.2d 282 (D.C. Cir. 1991) ................................................................................................. 1

*Weyrich v. The New Republic, Inc.*,
  235 F.3d 617 (D.C. Cir. 2001) ........................................................................................ 37, 41

**STATUTES**

D.C. Code § 13-422 ................................................................................................................ 24

D.C. Code § 13-423 ..................................................................................................... 17, 19, 22

**TREATISES**

Restatement (Second) of Torts (1977) ................................................................................ 41, 42

## INTRODUCTION

Defendant William Browder is a British foreign national who resides and works in the United Kingdom.  Mr. Browder is a leading advocate for the Magnitsky Act, a law designed to sanction Russian officials who the U.S. Government believes have engaged in corruption and human rights violations.  As described in the Complaint, at all times relevant to this action, Mr. Browder's only significant contacts with the District of Columbia have been his well-publicized efforts to petition the United States Government to adopt and enforce the Magnitsky Act.

Plaintiff Rinat Akhmetshin is a dual citizen of Russia and the United States who, according to press reporting, has openly touted his experience as a Soviet intelligence officer. His Complaint alleges that he has lobbied to undermine the Magnitsky Act, lobbying which he alleges he personally proposed, in order to "challenge Browder's allegations" relating to the Magnitsky Act.  Compl. ¶¶ 5, 33.  This lawsuit is part and parcel of Mr. Akhmetshin's efforts to undermine the Magnitsky Act.

On July 14, 2017, Mr. Akhmetshin publicly confirmed that he had attended the infamous June 2016 "Trump Tower meeting" between members of then-candidate Donald Trump's presidential campaign and Russian nationals.  Also in attendance was Natalia Veselnitskaya, a "Kremlin-connected lawyer" who has also worked to repeal the Magnitsky Act.  The revelation attracted prominent coverage by many reputable U.S. and international media outlets.[1]  The

---

[1] "[I]n determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (citation omitted).  Courts may take judicial notice of the existence of newspaper articles. *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 113 (D.D.C. 2015) (citing *Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (a "court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area that publicized" certain facts)). *See also Fairbanks v. Roller*, 314 F. Supp. 3d 85, 88 n.1 (D.D.C. 2018) ("On a motion to dismiss

barrage of reporting involved substantial public discussion of Mr. Akhmetshin's alleged ties to

Russian intelligence, as well as his prior involvement in lobbying against the Magnitsky Act,

which was purported to be the principal subject discussed at the Trump Tower meeting.[2]

---

for failure to state a claim, a court may take judicial notice of statements made on the internet when a party relies on them 'not for their truth, but merely to show that those statements were made.'") (citation omitted).  In addition, Courts "may take judicial notice of public documents, such as court records."  *Pearson v. District of Columbia*, 644 F. Supp. 2d 23, 45 n.19 (D.D.C. 2009), *aff'd*, 377 F. App'x 34 (D.C. Cir. 2010).

[2] The Court may take judicial notice of the following newspaper articles, as well as all remaining newspaper articles in the motion.  Stephanie Kirchgaessner, *Who is Rinat Akhmetshin? The mystery man at Trump Jr's Russia meeting*, The Guardian (July 14, 2017), available at https://www.theguardian.com/us-news/2017/jul/14/rinat-akhmetshin-russia-intelligence-donald-trump-jr; Jacob Pramuk & John W. Schoen, *Who is Rinat Akhmetskin, the Russian-American lobbyist at the Donald Trump Jr. meeting?*, CNBC (July 14, 2017), available at https://www.cnbc.com/2017/07/14/who-is-rinat-akhmetshin-the-lobbyist-at-the-donald-trump-jr-meeting.html; Zack Beauchamp, *Rinat Akhmetshin, the potential Russian spy who met Donald Trump Jr., explained*, Vox (July 14, 2017), available at https://www.vox.com/world/2017/7/14/15972770/rinat-akhmetshin-explained; Rosalind S. Helderman & Tom Hamburger, *Russian American lobbyist was present at Trump Jr.'s meeting with Kremlin-connected lawyer*, Wash. Post (July 14, 2017), available at https://www.washingtonpost.com/politics/russian-american-lobbyist-was-present-at-trump-jrs-meeting-with-kremlin-connected-lawyer/2017/07/14/1b96f25a-68aa-11e7-9928-22d00a47778f_story.html; Brian Naylor, *Donald Trump Jr. Meeting Included Russian Lobbyist,* NPR (July 14, 2017), available at https://www.npr.org/2017/07/14/537219554/donald-trump-jr-meeting-included-second-russian?t=1535560131329; Isaac Arnsdorf, *Who Is the Russian Lobbyist Who Met With Donald Trump Jr.?* ProPublica (July 14, 2017), available at https://www.propublica.org/article/who-is-the-russian-lobbyist-who-met-with-donald-trump-jr; Kevin Poulsen, Katie Zavadski, & Nico Hines,  *Trump Team Met Russian Accused of International Hacking Conspiracy*, The Daily Beast (July 14, 2017), available at https://www.thedailybeast.com/trump-team-met-russian-accused-of-international-hacking-conspiracy; Steve LeVine, *Meet the ex-Soviet intel officer at Don Jr.'s Trump Tower meeting*, Axios (July 14, 2017), available at https://www.axios.com/meet-the-ex-soviet-intel-officer-at-don-jrs-trump-tower-meeting-1513304200-f52f2e6f-bf14-418a-a913-03b77a8c05c2.html; Aidan Quigley, *Donald Trump Jr. Meeting Participant Probed by Judiciary Committee*, Newsweek (July 14, 2017), available at https://www.newsweek.com/senate-judiciary-committee-very-interested-rinat-akhmetshin-reviewing-dhs-637162; Aidan Quigley, *Who is Rinat Akhmetshin, Former Soviet Intelligence Officer in Donald Trump Jr. Meeting?*, Newsweek (July 14, 2017), available at https://www.newsweek.com/who-rinat-akhmetshin-former-soviet-intelligence-officer-donald-trump-jr-637050; Jonathan Easley & John Solomon, *Russian lobbying that touched Trump tied to Moscow figures*, The Hill (July 14, 2017), available at http://thehill.com/homenews/administration/342097-russian-lobbying-that-touched-trump-tied-

Well before the news of the Trump Tower meeting broke, and before Mr. Browder made

any of the challenged statements, Mr. Akhmetshin's alleged connections to Russian interests had

been widely reported and discussed,[3] including in public letters sent to senior Executive Branch

---

to-moscow-figures; Chris Geidner, *The Russian Lawyer And The Lobbyist From The Trump Jr. Meeting Had A Busy Month In America Last Summer*, BuzzFeed News (July 14, 2017), available at https://www.buzzfeednews.com/article/chrisgeidner/the-russian-lawyer-and-the-lobbyist-from-the-trump-jr#.wq2ZdRaP7; Ken Dilanian, Tracy Connor & Kenzi Abou-Sabe, *Rinat Akhmetshin: Who Is the Russian Lobbyist Who Met the Trump Team?*, NBC News (July 14, 2017), available at https://www.nbcnews.com/news/us-news/rinat-akhmetshin-who-russian-lobbyist-who-met-trump-team-n783161; Marshall Cohen, Tal Kopan & Adam Chan, *The new figure in the Trump-Russia controversy: Rinat Akhmetshin*, CNN Politics (July 15, 2017), available at https://www.cnn.com/2017/07/15/politics/who-is-rinat-akhmetshin/index.html; Andrew Higgins & Andrew E. Kramer, *Soviet Veteran Who Met With Trump Jr. Is a Master of the Dark Arts*, N.Y. Times (July 15, 2017), available at https://www.nytimes.com/2017/07/15/world/europe/rinat-akhmetshin-donald-trump-jr-natalia-veselnitskaya.html; Terence Cullen, *Rinat Akhmetshin, lobbyist at Trump Jr. meeting, has been trying to repeal a major sanctions bill*, NY Daily News (July 15, 2017), available at http://www.nydailynews.com/news/politics/lobbyist-trump-jr-meeting-lifting-russia-sanctions-article-1.3326774; Ben Schreckinger, *The Hill Staffer at the Center of the Russia Intrigue*, Politico (July 20, 2017), available at https://www.politico.com/magazine/story/2017/07/20/the-hill-staffer-at-the-center-of-the-russia-intrigue-215396; Sharon LaFraniere, David D. Kirkpatrick & Kenneth P. Vogel, *Lobbyist at Trump Campaign Meeting Has a Web of Russian Connections*, N.Y. Times (Aug. 21, 2017), available at https://www.nytimes.com/2017/08/21/us/rinat-akhmetshin-russia-trump-meeting.html; Jonathan Chait, *That Russian Guy Who Attended the Trump Tower Meeting Is Almost Definitely a Spy*, N.Y. Mag. (Aug. 21, 2017), available at http://nymag.com/daily/intelligencer/2017/08/russian-who-attended-trump-meeting-almost-definitely-a-spy.html; Katrina Manson, *Russian lobbyist Rinat Akhmetshin on that notorious meeting at Trump Tower*, Financial Times (Sept. 1, 2017), available at https://www.ft.com/content/540354a4-8e4c-11e7-a352-e46f43c5825d.

[3] Stephanie Saul & Louise Story, *At the Time Warner Center, an Enclave of Powerful Russians*, The N.Y. Times (Feb. 11, 2015), available at https://www.nytimes.com/2015/02/12/nyregion/russia-time-warner-center-andrey-vavilov.html; Nick Rummell, *Mining Company Says Law Firm Hacked It, Courthouse News Service* (Nov. 16, 2015) available at https://www.courthousenews.com/mining-company-sayslaw-firm-hacked-it/; Michael Weiss, *Putin's Dirty Game in the U.S. Congress,* The Daily Beast (May 18, 2016) available at https://www.thedailybeast.com/putins-dirty-game-in-the-us-congress; Isaac Arnsdorf, *FARA complaint alleges pro-Russian lobbying,* Politico (Dec. 8, 2016) available at https://www.politico.com/tipsheets/politico-influence/2016/12/fara-complaint-alleges-pro-russian-lobbying-217776; Mollie Hemingway, *Top Senator: Wait, The Firm Behind Trump Dossier Was Funded By Russia?*, The Federalist (May 3, 2017) available at http://thefederalist.com/2017/05/03/top-senator-wait-the-firm-behind-trump-dossier-was-funded-

officials by U.S. Senator, and Chair of the Senate Judiciary Committee, Charles Grassley.[4] Against that backdrop, much of the commentary following Mr. Akhmetshin's confirmation that he attended the Trump Tower meeting discussed Mr. Akhmetshin's alleged ties to Russian intelligence, as well as his lobbying on behalf of Russian interests.[5]

Mr. Akhmetshin's participation in the Trump Tower meeting was first reported on July 14, 2017. That morning, NBC News published a story which stated that the meeting was attended by "a Russian-American lobbyist – a former Soviet counterintelligence officer who is suspected by some U.S. officials of having ongoing ties to Russian intelligence."[6] That same

---

by-russia/; Michael Weiss, *US Congressman talks Russian money laundering with alleged ex-spy in Berlin*, CNN Politics (May 4, 2017) available at https://edition.cnn.com/2017/05/04/politics/rohrabacher-prevezon/index.html; Sam Thielman, *Inside The Russian Lawyer's And An Accused Spy's 'Adoption' Crusade, Talking Points Memo* (July 13, 2017) available at https://talkingpointsmemo.com/muckraker/rinat-akhmetshin-natalia-veselnitskaya-magnitsky-act ; Isaac Arnsdorf & Benjamin Oreskes, *Putin's Favorite congressman*, Politico (Nov. 23, 2016), available at https://www.politico.com/story/2016/11/putin-congress-rohrabacher-trump-231775.

[4] Letter from Charles Grassley, Chairman, Senate Judiciary Comm., to Dana Boente, Acting Deputy Attorney Gen., U.S. Dept. of Justice (Mar. 31, 2017) ("Mar. 2017 Grassley Ltr."), available at https://www.judiciary.senate.gov/imo/media/doc/2017-03-31%20CEG%20to%20DOJ%20(Anti-Magnitsky%20FARA%20violations)%20with%20attachments.pdf; Letter from Charles Grassley, Chairman, Senate Judiciary Comm., to John Kelly, Sec'y, Dept. of Homeland Sec. (April 4, 2017)("Apr. 2017 Grassley Ltr.") available at https://www.judiciary.senate.gov/imo/media/doc/2017-04-04%20CEG%20to%20DHS%20(Akhmetshin%20Information)%20with%20attachment.pdf; Letter from Charles Grassley, Chairman, Senate Judiciary Comm., to John Kelly, Sec'y, Dept. of Homeland Sec. and Rex W. Tillerson, Sec'y, Dept. of State 2 (July 11, 2017) ("July 2017 Grassley Ltr."), available at https://www.judiciary.senate.gov/imo/media/doc/2017-07-11%20CEG%20to%20DHS%20+%20State%20(Russian%20lawyer%20visa).pdf. The Court may take judicial notice of these letters as "public documents." *Pearson*, 644 F. Supp. 2d at 45 n.19.

[5] *See supra* note 2.

[6] Ken Dilanian, Natasha Lebedeva & Hallie Jackson, *Former Soviet Counterintelligence Officer at Meeting With Donald Trump Jr. and Russian Lawyer,* NBC News (July 14, 2017), Ex. A. The article is also available at https://www.nbcnews.com/news/us-news/russian-lawyer-brought-ex-soviet-counter-intelligence-officer-trump-team-n782851.

day, Mr. Akhmetshin confirmed his attendance to the Associated Press, which reported that the meeting was "billed as part of a Russian government effort to help the Republican's White House campaign," and which further stated that "Akhmetshin has been identified in media reports as a former officer in Russia's military intelligence service known as the GRU."[7] Extensive press coverage unfolded over July 14 and 15, *see supra* note 2, including a report from Newsweek stating that Mr. Akhmetshin had "openly described his years as an officer in the Soviet GRU, the military intelligence arm, serving in Afghanistan,"[8] and another from ProPublica reporting that Mr. Akhmetshin had admitted that he had once "worked for military intelligence" in the Soviet Union and had "retired from that work, but some American officials suspect he still has ties to Russian intelligence."[9]

Mr. Akhmetshin now claims that he has never been "a Russian GRU officer, intelligence asset, or spy for the Russian Federation or former Soviet Union."  Compl. ¶ 53.  Yet Mr. Akhmetshin has brought no claims against any of the numerous entities that published reports about his alleged contacts with Russian intelligence, or any of the other individuals who stated the same allegations, whether before, on, or after July 14, 2017.  Instead, Mr. Akhmetshin has singled out Mr. Browder, and Mr. Browder alone, as the sole defendant in a defamation suit in a district where *none* of the relevant conduct alleged in the Complaint occurred.  In sum, this lawsuit amounts to targeted harassment of a non-resident for commenting on ubiquitous

---

[7] Desmond Butler & Chad Day, *Russian-American lobbyist joined Trump's son's meeting, too*, Associated Press (July 14, 2017), Ex. B. The article is also available at https://apnews.com/dceed1008d8f45afb314aca65797762a.

[8] Quigley, *Who is Rinat Akhmetshin, Former Soviet Intelligence Officer in Donald Trump Jr. Meeting? supra* note 2.

[9] Arnsdorf, *Who Is the Russian Lobbyist Who Met With Donald Trump Jr.? supra* note 2.

accusations that Mr. Akhmetshin has publicly admitted, in substantial part if not entirely, over the course of many years.

In addition to being frivolous, this lawsuit constitutes naked retaliation against Mr. Browder for his global public advocacy efforts. While this is the first lawsuit Mr. Akhmetshin has filed against Mr. Browder, it is the latest in a line of meritless claims made against Mr. Browder by opponents of the Magnitsky Act. In line with those prior efforts, this suit seeks to enlist the Judicial Branch in Plaintiff's global lobbying and public-relations campaign for the purpose of thwarting Mr. Browder's pursuit of justice for Sergei Magnitsky.

This suit should be dismissed for at least three reasons. *First,* the Court lacks personal jurisdiction over Mr. Browder. The Complaint contains no plausible factual allegation that Mr. Browder made the allegedly defamatory statements in the District of Columbia, Mr. Browder does not reside in District of Columbia, and his only meaningful contacts with the District of Columbia during the period relevant to the Complaint have been his efforts to petition the United States Government on policy issues of public importance, which cannot form the basis for jurisdiction under D.C. law. *Second,* Mr. Akhmetshin has failed to state a claim on the merits because the Complaint contains no allegations that could support a finding of actual malice. *Third,* the statements at issue, consisting of two Tweets, a televised interview and a quote in an article published on the internet, are constitutionally protected under the opinion doctrine, and in any event are not actionable because they are substantially true.

## **BACKGROUND**

A.  <u>Mr. Browder Champions the Magnitsky Act After the Tragic Murder of Sergei Magnitsky.</u>

Mr. Browder is the founder of Hermitage Capital Management, which is an investment advisor to the Hermitage Fund. Compl.¶ 18. In 2008, Russian authorities arrested and detained

Sergei Magnitsky, an auditor for Hermitage's law firm. *Id.* ¶ 19. Mr. Magnitsky died in custody under suspicious circumstances. *Id.* ¶ 20. Mr. Browder believes that "Russian prison guards killed Magnitsky because Magnitsky discovered that Russian government officials and members of organized crime had perpetrated a tax fraud scheme using the identities of several Hermitage portfolio companies." *Id.* ¶ 21.

According to the Complaint, following Mr. Magnitsky's death, Mr. Browder "engaged numerous lobbying and public relations firms in Washington D.C.; met with members of Congress and their staff, including Senators Benjamin Cardin and John McCain in Washington D.C., and testified in congressional hearings" to discuss the brutal murder of Magnitsky and to advocate for the passage of the Magnitsky Act. *Id.* ¶¶ 22-24. His lobbying resulted in the passage of the Magnitsky Act in 2012. *Id.* ¶ 24. The Magnitsky Act authorizes the President to impose sanctions against Russian officials responsible for human rights violations, including but not limited to the individuals responsible for Mr. Magnitsky's death and those who have benefited financially from his death. *Id.* ¶ 26.

      B.    <u>Mr. Akhmetshin Teams Up with a Kremlin-Connected Lawyer to Lobby<br>to Repeal the Magnitsky Act.</u>

In or around early 2016, Mr. Akhmetshin began a campaign to lobby against the Magnitsky Act and to discredit Mr. Browder. *Id.* ¶¶ 32-37. Mr. Akhmetshin began working for the Human Rights Accountability Global Initiative ("HRAGI"), and began lobbying against the Magnitsky Act by attending meetings with Members of Congress and their staff, and holding the screening of an Anti-Magnitsky Act documentary. *Id*. ¶¶ 34-37. As a lobbyist, he challenged Mr. Browder's position that Russian prison guards killed Mr. Magnitsky because he discovered that Russian government officials and members of organized crime had perpetuated a tax fraud scheme, and instead accused Mr. Browder of committing tax fraud. *Id*. ¶¶ 21, 36.

Mr. Akhmetshin did not act alone in his quest to undermine the Magnitsky Act.  As Mr. Browder stated in the CBS This Morning interview that is one of the challenged statements on which Plaintiff bases his defamation claim, Natalia Veselnitskaya "was taking money from a Russian oligarch, who is close to Vladimir Putin, to try to overturn the Magnitsky Act."[10]  Ms. Veselnitskaya was involved in this lobbying campaign with Mr. Akhmetshin.[11]

C.  Hermitage Files a Complaint with the Department of Justice and Senator Grassley Investigates.

In 2016, Hermitage filed a Complaint with the Department of Justice under the Foreign Agents Registration Act ("FARA") (hereinafter "FARA Complaint"), which the instant Complaint refers to in detail as the "Hermitage Letter" and therefore incorporates by reference. Compl. ¶¶ 39-42.[12]  The FARA Complaint charged Mr. Akhmetshin with violating the FARA by failing to register notwithstanding his work for Russian interests in a campaign to oppose the Magnitsky Act and the Global Magnitsky Act, an Act designed to expand the reach of the Magnitsky Act beyond Russia.[13]  The FARA Complaint also alleged that "Mr. Akhmetshin is a former member of the Russian military intelligence services (GRU)."[14]

In early 2017, Senator Grassley sent and published a number of letters linking Mr. Akhmetshin with the GRU and Russian Intelligence, making similar or identical allegations to those challenged in the Complaint.  On March 31, 2017, Senator Grassley wrote a letter to the

---

[10] Interview with Bill Browder on CBS This Morning (July 18, 2017), Ex. D.  The interview is also available at https://www.cbsnews.com/news/bill-browder-donald-trump-jr-russian-lawyer-meeting/.

[11] Higgins & Kramer, *Soviet Veteran Who Met With Trump Jr. Is a Master of the Dark Arts*, *supra* note 2.

[12] Ex. E.  The Court may take judicial notice of the FARA Complaint as document "upon which the plaintiff's complaint necessarily relies' even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Hinton v. Corr. Corp. of Am.,* 624 F. Supp. 2d 45, 46 (D.D.C. 2009) (citation omitted).

[13] *Id.*

[14] *Id.*

acting Deputy Attorney General of the United States stating that Mr. Akhmetshin "has admitted having been a 'Soviet counterintelligence officer'" and that "it has been reported that he worked for the GRU and allegedly specializes in 'active measures campaigns,' *i.e.*, subversive political influence operations often involving disinformation and propaganda."[15]   Senator Grassley published the letter on his Senate webpage.   The letter referenced Hermitage's 2016 FARA Complaint and questioned whether Mr. Akhmetshin should have registered as a foreign agent.[16]

Importantly, Senator Grassley's letter cited public sources, all pre-dating Mr. Browder's statements, and including the same content about which Mr. Akhmetshin now complains.  Those sources included: (1) a 2016 Politico article noting that "Akhmetshin used to spy for the Soviets" and that "Akhmetshin acknowledged having been a Soviet counterintelligence officer"; (2) a January 2017 Daily Caller article stating that Mr. Akhmetshin "was affiliated with GRU, Russia's main intelligence directorate"; (3) a 2007 book describing how a Kazakh politician that had served as a KGB officer hired a "former Soviet Army counter-intelligence officer named Rinat Akhmetshin," who "burrowed in with Washington reporters, think tank experts, administration bureaucrats, and key political figures"; and (4) a 2015 lawsuit alleging that "Akhmetshin is a former Soviet military counterintelligence officer who moved to Washington, D.C. to become a lobbyist."[17]  Describing "Mr. Akhmetshin's history and reputation," the letter cited "press accounts" that Mr. Akhmetshin "is known in foreign policy circles as a key pro-Russian operator" and quoted from another press report characterizing Mr. Akhmetshin as a "Russian 'gun-for-hire' who lurks in the shadows of Washington's lobbying world."[18]

---

[15] Mar. 2017 Grassley Ltr. at 4, *supra* note 4.
[16] *Id.*
[17] Mar. 2017 Grassley Ltr. at 4 n.15, *supra* note 4,
[18] *Id.* at 4 (footnote calls and brackets omitted).

On April 4, 2017, Senator Grassley wrote to the Secretary of Homeland Security seeking additional information on Mr. Akhmetshin, again stating that he "has admitted having been a 'Soviet counterintelligence officer" and describing him as "apparently [having] ties to Russian Intelligence."[19]   The letter requested information related to Mr. Akhmetshin's immigration history as part of the Judiciary Committee's investigation into any potential FARA violations. Senator Grassley published the letter on the Senate Judiciary website.

On July 11, 2017, Senator Grassley wrote to the Secretary of Homeland Security and the Secretary of State seeking information about Ms. Veselnitskaya.  The letter cited the same four sources (as cited in his earlier letter) in support of the senator's statement that Mr. Akhmetshin "was reportedly a former Russian GRU counterintelligence officer specializing in active measures campaigns[.]"[20]  Senator Grassley published the letter on his Senate webpage.

D.    Mr. Akhmetshin Publicly Admits Attending the Trump Tower Meeting
and Touts His Experience as a Soviet Counterintelligence Officer.

On July 14, 2017, NBC News published a story with the headline "Former Soviet Counterintelligence Officer at Meeting with Donald Trump Jr. and Russian Lawyer."[21]   The article referred to the Trump Tower meeting attendee (Mr. Akhmetshin) as "a Russian-American lobbyist—a former Soviet counterintelligence officer who is suspected by some U.S. officials of having ongoing ties to Russian intelligence."[22]  That same day, Mr. Akhmetshin confirmed to the Associated Press that he had attended the Trump Tower meeting.[23]

---

[19] Apr. 2017 Grassley Ltr. at 1, *supra* note 4.
[20] July 2017 Grassley Ltr. at 2 & n.3, *supra* note 4.
[21] Ex. A.
[22] *Id.* The article also references Senator Grassley's April 4, 2017 letter requesting information from senior Executive Branch officials regarding Mr. Akhmetshin's Magnitsky Act lobbying activities, in which the Senator alleged that Mr. Akhmetshin was working on behalf of Russian interests.
[23] Ex. B.

After the news broke that Mr. Akhmetshin attended the Trump Tower meeting, he was the center of a media blitz that included descriptions of his role in anti-Magnitsky Act lobbying. *See supra* note 2.   That reporting focused, in part, on his alleged connections to Soviet Intelligence and Russian interests, with numerous reports citing Mr. Akhmetshin's own admissions.   Axios reported that "Akhmetshin openly described his years as a military counter-intelligence officer, serving in Afghanistan."[24]   The New York Times reported that "Mr. Akhmetshin talked openly about how he had worked with a counterintelligence unit while serving with the Red Army after its 1979 invasion of Afghanistan" and that "[h]e was, he said, drafted as a young man to serve in a military unit performing counterintelligence functions during the Soviet-Afghan war."[25]   The Washington Post reported that Mr. Akhmetshin "said that he did serve in the counterintelligence unit of the Soviet military."[26]   Other reporting highlighted Mr. Akhmetshin's alleged *current* ties to the Kremlin, including that Mr. Akhmetshin had submitted an op-ed column to the Washington Times on behalf of Viktor Ivanov, then "the director of Russia's anti-narcotics police," a "longtime veteran of Russian security services,[27] and previously "a top aide" to Russian President Vladimir Putin.[28]

---

[24] Steve LeVine, *Meet the ex-Soviet intel officer at Don Jr.'s Trump Tower meeting*, *supra* note 2.

[25] Higgins & Kramer, *Soviet Veteran Who Met With Trump Jr. Is a Master of the Dark Arts*, *supra* note 2.

[26] Aaron Blake, *Another shoe drops in the White House's burgeoning Russia scandal*, Wash. Post (July 14, 2017), available at https://www.washingtonpost.com/news/the-fix/wp/2017/07/14/another-shoe-drops-in-the-white-houses-burgeoning-russia-scandal/.

[27] Higgins &. Kramer, *Soviet Veteran Who Met With Trump Jr. Is a Master of the Dark Arts*, *supra* note 2; Philip Bump, *What we know about the Trump Tower meeting*, Wash. Post (Aug. 7, 2018), available at https://www.washingtonpost.com/news/politics/wp/2018/08/07/what-we-know-about-the-trump-tower-meeting/.

[28] LaFraniere, Kirkpatrick & Vogel, *Lobbyist at Trump Campaign Meeting Has a Web of Russian Connections*, *supra* note 2.

E.      Mr. Browder Comments on the Public Controversy Created by Mr. Akhmetshin.

On July 14 and 18, 2017, Mr. Browder shared two news stories and offered public comments on Mr. Akhmetshin's confirmation.  As relevant to the Complaint, Mr. Browder sent two public messages from his personal Twitter account that shared and commented on news stories published by third parties, offered a quote in one news article, and appeared on one television program.  These four statements, summarized below, make up the entirety of Mr. Akhmetshin's claim for defamation.

On the morning of July 14, Mr. Browder shared the NBC News article "Former Soviet Counterintelligence Officer at Meeting with Donald Trump Jr. and Russian Lawyer" on his personal Twitter account, writing: "Huge development in the Veselnitskaya/Trump Jr story. Russian GRU officer Rinat Akhmetshin was also present."  Compl. ¶ 48; Ex. A.  Although the Complaint omits the reference to the hyperlinked article, the Tweet itself (reproduced below, *see* Ex. A) links to the NBC News story, and accordingly the Complaint incorporates the NBC News story by reference.



Later that day, Mr. Browder posted a message on Twitter, which stated that "Russian intelligence asset Rinat Akhmetshin confirms he was in the meeting with Trump Jr," and which linked to an Associated Press article.  Compl. ¶ 49; Ex. B.  Although the Complaint omits the reference to the hyperlinked news story, Mr. Browder's Tweet (reproduced below, *see* Ex. B) shows that his commentary addressed the AP story, and the Complaint accordingly incorporates the AP story by reference.



That same day, Mr. Browder was quoted in a Business Insider article entitled:  "A Soviet military officer turned lobbyist attended the Trump Jr. meeting – and there may have been a 6th person, too."[29]  Compl. ¶ 50; Ex. C.  In pertinent part, that article reads:

> NBC News initially declined to name Akhmetshin as the lobbyist who attended with Veselnitskaya.  But William Browder, the founder of the investment advisory firm Hermitage Capital who spearheaded the Magnitsky Act, told Business Insider that there was "only one person" who fit the profile described by NBC News. Browder added that Akhmetshin's presence was highly significant. "In the world of Russian intelligence, there is no such thing as a 'former intelligence officer,'" he said.  "So in my opinion you had a member of Putin's secret police directly meeting with the son of the future next president of the United States asking to change US sanctions policy crucial to Putin."[30]

On July 18, 2017, after several days after of ubiquitous reporting had taken place on the Trump Tower meeting, Mr. Browder appeared on CBS This Morning to discuss the Trump Tower meeting.  Compl. ¶ 51; Ex. D.  In the interview, he stated that Veselnitskaya hired Rinat Akhmetshin, "who is a, um, by all accounts, some kind of shady former Soviet spy, current spy,

---

[29] Natasha Bertrand, *A Soviet military officer turned lobbyist attended the Trump Jr. meeting – and there may have been a 6th person, too*, Business Insider UK (July 14, 2017), Ex. C. The article is also available at http://uk.businessinsider.com/donald-trump-jr-meeting-natalia-veselnitskaya-rinat-akhmetshin-2017-7?r=US&IR=T
[30] *Id.*

14

operator in Washington, and he then organizes a full-on lobbying campaign hiring the top lobbyists, the top law firms, the top PR firms, to try to get rid of this Magnitsky Act."[31]

At no point following these statements did Mr. Akhmetshin send a retraction demand or otherwise request that Mr. Browder correct any alleged misstatements of fact. Just short of one year later, on July 12, 2018, Mr. Akhmetshin filed the instant suit.

F.    Mr. Browder Has Faced Ongoing Persecution and Harassment.

As a result of his lobbying for the Magnitsky Act, Mr. Browder has experienced a pattern of persecution and harassment by the Russian government. Given Plaintiff's citation of his lobbying campaign against Mr. Browder and the Magnitsky Act, and his reliance on that history to establish his claims against Mr. Browder, this Court may take judicial notice of publicly-reported decisions relating to that campaign.[32] For example, in *United States v. Prevezon Holdings Ltd., et al*, which the Complaint references directly, Compl. ¶¶ 28-31, the Second Circuit described the persecution Mr. Browder has faced following the death of Mr. Magnitsky. *United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 234, 238, 240 (2d Cir. 2016). Along the same lines, in a recent action brought against Mr. Browder, the Chancellor of the High Court of Justice of England and Wales acknowledged that there was a "long-running, high profile and extremely public dispute between various representatives of the Russian State" and the "Hermitage parties," including Mr. Browder, and stated that the "Campaign against the Hermitage Parties is unlikely to stop." *In the Matter of Dalnyay Stepl. LLC and the Cross-Border Insolvency Regulations 2006 and the Insolvency Act 1986* [2017] EWHC 3153 (Ch).

---

[31] Ex. D.

[32] The Court may take judicial notice of these proceedings as court records. *Pearson,* 644 F. Supp. 2d at 45 n.19.

This case is not the first, and will likely not be the last lawsuit filed and maintained for the purpose of stymying Mr. Browder's efforts to advance global Magnitsky Acts.

## STANDARD OF REVIEW

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over the defendant." *Capital Bank Int'l Ltd. v. Citigroup, Inc.*, 276 F. Supp. 2d 72, 74 (D.D.C. 2003). The "plaintiff must allege specific facts on which personal jurisdiction can be based; it cannot rely on conclusory allegations." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 332 F. Supp. 2d 63, 66 (D.D.C. 2004).

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts must "assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in a plaintiff's favor." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (citations omitted). Courts "need not, however 'accept inferences drawn by [a] plaintiff[ ] if such inferences are unsupported by the facts set out in the complaint.'" *Id.* (citing *Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994)); *see also Livnat v. Palestinian Auth.,* 851 F.3d 45, 57 (D.C. Cir. 2017) (courts "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts"). "Nor must we accept legal conclusions couched as factual allegations." *Nurriddin*, 818 F.3d at 756. "Bare allegations and conclusory statements are insufficient." *Capital Bank Int'l Ltd.,* 276 F. Supp. 2d at 74 (internal citations omitted).

In assessing "whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (citations omitted). Even at the motion to dismiss stage, courts may take judicial notice of the existence of newspaper articles, *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 113 (D.D.C. 2015), as well as other public records such as court documents, *Pearson*, 644 F. Supp. 2d at 45 n.19.

## ARGUMENT

### I.   The Court Lacks Personal Jurisdiction Over Mr. Browder.

Mr. Browder resides and works in the United Kingdom; he does not reside or transact business in the District of Columbia. The Complaint alleges that Mr. Browder has done business in D.C. by engaging lobbying and public relations firms, attending meetings, and testifying before Congress and other agencies to urge passage of the Magnitsky Act. Compl. ¶¶ 12, 23. Those contacts, considered separately or in concert, fall within the governmental contacts exception to the District of Columbia's long-arm statute, and cannot form the basis of a finding of personal jurisdiction here. The Complaint's additional cursory allegations that Mr. Browder attended think tank events and NGO gatherings in D.C. fall under the same exception, and in any event are insufficient to satisfy the long-arm statute. Compl. ¶ 61.

"A personal jurisdiction analysis requires that a court determine whether jurisdiction over a party is proper under the applicable local long-arm statute and whether it accords with the demands of due process." *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995), amended (July 28, 1995). "The Due Process Clause of the Fourteenth Amendment operates to limit the power of a State to assert in personam jurisdiction over a nonresident defendant." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14 (1984).

The District of Columbia's long-arm statute provides, in relevant part:

> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—
>
> > (1) transacting any business in the District of Columbia; . . .
> >
> > (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; [or]
> >
> > (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; . . .
>
> (b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

D.C. Code § 13-423(a)-(b).  Under the D.C. long-arm statute, a close analysis of the nature of a defendant's alleged contacts is required because of the "unique character of the District as the seat of national government and in the correlative need for unfettered access to federal departments and agencies for the entire national citizenry."  *Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.,* 355 A.2d 808, 813 (D.C. 1976).

To avoid having this District transformed into a nationwide forum reaching everyone who interacts with the federal government, courts have recognized an exception to the D.C. long-arm statute for "government contacts."  *Id.*; *see also Ferrara,* 54 F.3d at 831 (describing the governmental contacts exception).  "The government contacts principle establishes that entry into the District by nonresidents for the purpose of contacting federal governmental agencies cannot serve as a basis for personal jurisdiction."  *Savage v. Bioport*, Inc., 460 F. Supp. 2d 55, 62 (D.D.C. 2006) (citations omitted).  Lobbying and interacting with Congress falls squarely within this exception, as working with "regulatory agencies[] and with members of Congress and

18

congressional committees, in connection with federal regulatory and legislative matters" is "precisely the type of activit[y] protected by the 'government contacts' exception." *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 44–45 (D.D.C. 2003) (quotation marks omitted); *see also Robo-Team NA, Inc. v. Endeavor Robotics,* 313 F. Supp. 3d 19, 24–25 (D.D.C. 2018) (lobbying members of Congress cannot confer personal jurisdiction due to governmental contacts exception); *Ralls Corp. v. Terna Energy USA Holding Corp.,* 920 F. Supp. 2d 27, 31 (D.D.C. 2013) ("[S]ubmitting documents to and meeting with government officials in the District does not establish personal jurisdiction.").

### A.   The Allegedly Defamatory Statements Were Not Made or Published In D.C.

With the exception of allegations that Mr. Browder engaged in government lobbying and testifying, which cannot form the basis for personal jurisdiction in the District of Columbia, Mr. Akhmetshin has failed to offer a single non-conclusory allegation that connects Mr. Browder to the District of Columbia.  That alone requires dismissal.  "The plaintiff must allege specific facts connecting the defendant with the forum.  Bare allegations and conclusory statements are insufficient."  *Capital Bank Int'l Ltd.*, 276 F. Supp. 2d at 74 (internal citation omitted).

Specifically, the Complaint fails to allege any facts that would allow a plausible inference that Mr. Browder published either of the two allegedly defamatory Tweets, uttered his allegedly defamatory quote, or appeared on the allegedly defamatory television appearance, from within the District of Columbia.  Although the Complaint asserts that "Browder published in the District of Columbia," Compl. ¶ 12, this claim amounts to a naked legal conclusion that this Court may not accept without a plausible factual allegation to support it.  *See Atlantigas Corp.,* 290 F. Supp. 2d at 42 ("[P]laintiff must allege specific facts

19

on which personal jurisdiction can be based; it cannot rely on conclusory allegations"). Because the Complaint does not offer any plausible factual allegation that the challenged statements were published in the District, there can be no finding of jurisdiction pursuant to D.C. Code § 13-423(a)(3).

Further, Plaintiff's allegation that the defamatory statements were directed at the District of Columbia does not confer jurisdiction under D.C. Code § 13-423(a)(3). As the D.C. Circuit has explained, "Subsection (a)(3) 'is a precise and intentionally restricted tort section * * *, which stops short of the outer limits of due process, * * * and which confers jurisdiction only over a defendant who commits an act in the District which causes an injury in the District, without regard to any other contacts." *Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016) (quoting *Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 221 (D.C. Cir. 1986)). "[P]ublishing defamatory or otherwise tortious statements within the District that were made outside the District falls short of what subsection (a)(3) requires." *Id.* (affirming dismissal of claim where challenged statements were made in New York but directed at D.C. resident); *see also Moncrief,* 807 F.2d at 221 (affirming dismissal of claim where challenged statements were made outside of D.C. but mailed into the District of Columbia).

**B. Mr. Browder's Lobbying and Testifying Cannot Form the Basis for Jurisdiction.**

The complaint fails to allege any factual basis for exercising personal jurisdiction over Mr. Browder in D.C. under any other provision of the D.C. Code. The Complaint appears to rely exclusively on the theory that Mr. Browder has "engage[d] in any other persistent course of conduct," D.C. Code § 13-423(a)(4), by engaging in lobbying activities in the District, including his appearances in the District to testify before Congress and other United States government agencies. Specifically, the Complaint alleges the following:

- Mr. Browder "engaged numerous lobbying and public relations firms in Washington D.C.; met with members of Congress and their staff, including Senators Benjamin Cardin and John McCain, in Washington, D.C.; and testified in congressional hearings," a lobbying effort that "culminated" in the passage of the "Sergei Magnitsky Rule of Law Accountability Act of 2012" on December 14, 2012.  Compl. ¶¶ 23, 24.

- Mr. Browder provided fact testimony before government agencies and Congress, including the United States Helsinki Commission in 2009, the Tom Lantos Human Rights Commission of the U.S. House of Representatives in 2012, and the Committee on Foreign Affairs, Subcommittee on Africa, Global Health, Global Human Rights, and International Organizations, of the U.S. House of Representatives in 2015, and the Senate Judiciary Committee and the United States Helsinki Commission in 2017. Compl. ¶ 59.

- Mr. Browder "caused Hermitage to submit a letter to the Department of Justice. . . alleging that Mr. Akhmetshin and others had violated the Foreign Agent Registration Act."  Compl. ¶ 39.

Jurisdiction on the basis of those contacts is entirely precluded by the "government contacts" doctrine, which plainly bars the exercise of personal jurisdiction over a non-resident based upon efforts to persuade or influence the U.S. Government on policy matters..  *See Envtl. Research Int'l, Inc.,* 355 A.2d at 813.

Each and every one of the Complaint's allegations fall squarely within the governmental contacts exception because each involves lobbying, testifying, or engagement with Congress or U.S agencies in an effort to influence U.S. public policy.  The Complaint effectively concedes that these activities amount to an exercise of the First Amendment right to petition.  According to the Complaint, Mr. Browder's objective was to persuade the U.S. Government to pass and enforce a law that "authorized the President to impose sanctions against individuals thought to have been responsible for Magnitsky's death, those who allegedly benefited financially from his death, and those who were thought to be involved in the underlying crimes that Magnitsky purportedly discovered."  Compl. ¶ 26.  As the D.C. Court of Appeals has explained, "[t]o permit

our local courts to assert personal jurisdiction over nonresidents whose sole contact with the District consists of dealing with a federal instrumentality not only would pose a threat to free public participation in government, but also would threaten to convert the District of Columbia into a national judicial forum." *Envtl. Research Int'l, Inc.,* 355 A.2d at 813.  As such, none of the alleged conduct in the Complaint warrants the exercise of personal jurisdiction in D.C.  *See Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983) ("personal appearance before the Interior Department" to influence government action did not form the basis for personal jurisdiction under government contacts exception); *Envtl. Research Int'l, Inc.*, 355 A.2d at 812–13 (visit to the EPA to consult on grant did not form the basis for personal jurisdiction); *Robo-Team NA, Inc.,* 313 F. Supp. 3d at 24 (lobbying members of Congress, and bidding for and preforming government contracts, falls within government contacts exception); *Hayes v. FM Broad. Station WETT,* 930 F. Supp. 2d 145, 149–50 (D.D.C. 2013) (defense attorneys' interactions with the Federal Communications Commission did not form the basis for personal jurisdiction); *Ralls Corp.,* 920 F. Supp. 2d at 31 (submission to and meeting with the Committee on Foreign Investment in the United States did not establish personal jurisdiction); *Gibbons & Co. Inc. v. Roskamp Inst.*, 2006 WL 2506646, at *3 (D.D.C. Aug. 28, 2006) (drafting of funding proposal and meeting and speaking with Congressional officials in the District did not constitute sufficient contacts by the defendant with the District  to support exercise of personal jurisdiction and is protected by governmental contacts exception); *Atlantigas Corp.*, 290 F. Supp. 2d at 44–45 (locating an office in D.C. with sole function of working with FERC, other regulatory agencies, and members of Congress and congressional committees, in connection with federal regulatory and legislative matters is protected by the government contacts exception and failed to establish personal jurisdiction).

The result is the same notwithstanding the Complaint's assertion that Mr. Browder "engaged numerous lobbying and public relations firms" as "part of that campaign" for the Magnitsky Act.  Compl. ¶ 23.  The same protections apply to the hiring of agents to lobby the federal government as to lobbying the federal government oneself.  *Hayes*, 930 F. Supp. 2d at 150 (rejecting argument that "hiring an agent to petition the federal government subjects one to jurisdiction in the District, even if personally petitioning would not").  Thus, none of the Complaint's alleged activities establish jurisdiction under D.C. Code § 13-423(a)(1) or (4).

### C. Appearances on Television, on the Radio, and at Events Do Not Confer Jurisdiction.

The Complaint also states that "[i]n his purported capacity as an expert on Russian finances, politics, and intelligence, Browder has appeared dozens of times on television programs, on radio segments, at think tank events, and at NGO gatherings in Washington D.C." Compl. ¶ 61.  These allegations are insufficient to establish jurisdiction under D.C. Code § 13-423(a)(1), (3) or (4) for several reasons.

First, the mere act of appearing on a radio or television show that is accessible to residents in the District of Columbia is insufficient to establish personal jurisdiction, even if the harm of the allegedly defamatory statement is felt in D.C.  Courts have uniformly held that such appearances do not constitute the acts of engaging in or soliciting business in the District of Columbia, nor do they amount to engaging in a persistent course of conduct in the District. *See, e.g., McFarlane v. Esquire Magazine,* 74 F.3d 1296, 1300 (D.C. Cir. 1996) ("[W]riting an article for a publication that is circulated throughout the nation, including the District, hardly constitutes doing or soliciting business, or engaging in a persistent conduct, *within* the District"); *Hourani v. Psybersolutions LLC,* 164 F. Supp. 3d 128, 138 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017).

Second, the Complaint appears to acknowledge that Mr. Browder's occasional travel to D.C. for "think tank events" or "NGO gatherings" was part of Mr. Browder's efforts to advocate and lobby on behalf of the Magnitsky Act, and at minimum, the Complaint does not allege that such travel constituted the transaction of business separate from his Magnitsky Act advocacy. *See* Compl. ¶¶ 59-62. Courts interpreting the governmental contacts exception have consistently held that work with non-governmental organizations may fall within the governmental contacts exception if, as here, the focus is on advancing a federal policy agenda. For instance, in *United Therapeutics Corp. v. Vanderbilt Univ.*, the court found that Vanderbilt's Office of Federal Relations, which works closely with higher education associations and coalitions in D.C., was exempt from jurisdiction under the governmental contacts exception "[b]ecause the Office of Federal Relations makes clear by stating on its website that the purpose of this collaboration is to advance its policy agenda." 278 F. Supp. 3d 407, 418–19 (D.D.C. 2017); *see also Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 139 (D.D.C. 2004) (the "government contacts" exception extends "to non-resident contact with trade associations located with [in] the District of Columbia.").

In any event, occasional travel to D.C. to attend nondescript "think tank events" or "NGO gatherings" is not enough to establish a persistent course of conduct. Mr. Akhmetshin has not alleged that Mr. Browder's purported appearances at events in the District of Columbia were more than sporadic or occasional, which is insufficient to confer jurisdiction. *See Lewy v. S. Poverty Law Ctr., Inc.,* 723 F. Supp. 2d 116, 124 (D.D.C. 2010) ("Occasional travel to the District is also insufficient" to establish a persistent course of conduct); *The Urban Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 48 (D.D.C. 2010) ("[T]he Court can only conclude that three trips for meetings at which no business was successfully conducted do not

24

rise to the requisite level" of "persistent course of conduct"); *Burman v. Phoenix Worldwide Indus., Inc.,* 437 F. Supp. 2d 142, 153–54 (D.D.C. 2006) (holding that attendance by defendants' employees at "continuing education programs, seminars, and conferences" in the District, with no evidence that their attendance was regular or persistent, did not satisfy subsection (a)(4)); *Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.*, 691 F. Supp. 379, 381 (D.D.C.1987) (holding that "sporadic attendance at trade association meetings" in the District was insufficient under subsection (a)(4)).

### D.   The Court Lacks General Jurisdiction.

It would be plainly inappropriate to base jurisdiction off of a finding of general jurisdiction in this District.   General jurisdiction is appropriate only when a defendant's contacts with the forum state "are so constant and pervasive as to render [it] essentially at home in the forum State."   *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (internal citation and quotation marks omitted).   "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Id.* at 137 (internal citation and quotation marks omitted).   Under the D.C. Code, general jurisdiction is authorized "over a person domiciled in . . .  or maintaining his . . .  principal place of business in, the District of Columbia as to any claim for relief."   D.C. Code § 13-422.   "A defendant's contacts within the District under Section 13–422 must be 'continuous and systematic' in order for the defendant to be forced to defend a suit arising out of any subject matter unrelated to the defendant's activities within the District."   *Bigelow v. Garrett*, 299 F. Supp. 3d 34, 43 (D.D.C. 2018).   Importantly, the government contacts exception limits the scope of contacts that may inform a court's analysis of "continuous and systematic" contacts in the general jurisdiction context.   *Id.*

Mr. Browder lacks the constant, pervasive, or systematic contacts with the District necessary to warrant a finding of general jurisdiction.  He resides and maintains his business in the United Kingdom, not the District of Columbia.  Compl. ¶10.  Mr. Browder's so-called lobbying activities are exempt from the jurisdictional analysis under established D.C. law. *See Bigelow*, 299 F. Supp. 3d at 43.  Accordingly, there is no basis for general jurisdiction.

There is no plausible basis on which to exercise personal jurisdiction over Mr. Browder in this District.  As such, the Complaint must be dismissed pursuant to 12(b)(2).

## II.   Mr. Akhmetshin Has Failed to State a Claim.

Mr. Akhmetshin is a limited-purpose public figure, and as such must plead a plausible basis for a finding of actual malice in order to survive a motion to dismiss.  Because the Complaint contains no such allegations, dismissal is appropriate under Rule 12.

### A.   Akhmetshin Is A Limited-Purpose Public Figure.

Where a public figure brings suit for defamation, the public figure must ultimately "demonstrate by clear and convincing evidence that the defendant published the defamatory falsehood with 'actual malice' that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 280 (1964)).  This is because "speech relating to public officials and public figures, as distinct from private persons, enjoys greater protection under the First Amendment."  *Jankovic v. Int'l Crisis Grp.,* 822 F.3d 576, 584 (D.C. Cir. 2016).  As the D.C. Circuit has explained, "[s]ome individuals are public figures because they 'occupy positions of such persuasive power and influence that they are deemed public figures for all purposes,' but more commonly, private individuals become more limited-purpose public figures because they 'have thrust themselves to the forefront of particular

26

public controversies in order to influence the resolution of the issues involved.'" *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1967)).

Whether Plaintiff is a limited-purpose public figure is a "matter of law for the court to decide." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 114 (D.C. Cir. 2017) (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (en banc)). The law treats limited-purpose public figures as public figures, "but only when it comes to the particular public controversies with which they are associated." *Id.* There is a three part inquiry to determine whether a plaintiff constitutes a limited-purpose public figure. "First, the court must identify the relevant controversy and determine whether it is a public controversy. Second, the plaintiff must have played a significant role in that controversy. Third, the defamatory statement must be germane to the plaintiff's participation in the controversy." *Jankovic*, 822 F.2d at 585 (internal citations omitted).

As to the first prong of the inquiry, to "determine whether there is a public controversy, the court 'must examine whether persons actually were discussing some specific question,' looking to 'see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment.'" *Id.* A controversy is public if a "reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." *Id.* As of July 14, 2017, there was already an ongoing public controversy in the United States regarding the Magnitsky Act, that law's role in the bilateral U.S.-Russian relationship, its effectiveness as a policy tool, and Russia's efforts to change or repeal the law through lobbyists in the U.S. and otherwise. This controversy had been broadly covered in the press, social media, public hearings, and other public events before the reporting on Mr. Akhmetshin's involvement in the Trump Tower meeting. *See, e.g., supra* note

3.  For instance, on May 4, 2017 CNN Investigates ran an article entitled "US Congressman talks Russian money laundering with alleged ex-spy in Berlin," which detailed the role of the Magnitsky Act in US and Russian foreign policy and the positions of the advocates for and against the Act in the context of a meeting between Representative Dana Rohrabacher and Mr. Akhmetshin, to whom the article referred as an "alleged former soviet spy."[33]  In addition to the press coverage, the public dimension of the controversy was highlighted by Senator Grassley's letters requesting information from senior Executive Branch officials regarding Mr. Akhmetshin's Magnitsky Act lobbying activities, in which the Senator alleged that Mr. Akhmetshin was working on behalf of Russian interests.  *See supra* note 4.

Mr. Akhmetshin meets the second prong of the limited-purpose public figure test because he openly and aggressively thrust himself into the ongoing public controversy regarding the Magnitsky Act through his personal public efforts to repeal or otherwise undermine the Act, including but not limited to his appearances before Congress, outreach to the press, forming and lobbying for an anti-Magnitsky Act organization, organizing a public screening of an anti-Magnitsky Act film, and participating in the Trump Tower meeting, all of which are described in Mr. Akhmetshin's Complaint.  Compl. ¶¶ 32-37, 45.  Prior to this litigation, in November 2017, Mr. Akhmetshin described those efforts in testimony to the Senate Judiciary Committee.[34]  By his own accounts, Mr. Akhmetshin was not an observer or minor figure in this public controversy—he was and is one of the key players in a public campaign seeking repeal or substantial weakening of the Magnitsky Act.

---

[33] Weiss, *US Congressman talks Russian money laundering with alleged ex-spy in Berlin*, *supra* note 3.

[34] Interview of Rinat Akhmetshin Before the S. Judiciary Comm., 115th Cong. (November 14, 2017),                                        available                                        at https://www.judiciary.senate.gov/imo/media/doc/Akhmetshin%20Transcript_redacted.pdf.

Mr. Akhmetshin's involvement in this controversy, along with the question of whether he was lobbying for the Russians against the Magnitsky Act, was widely discussed in the press before the news broke about his involvement in the Trump Tower meeting.[35]  For instance, in a 2016 Daily Beast article describing how the "Kremlin has tried every trick in its playbook to have the [Magnitsky Act] repealed," a congressional staffer said that Mr. Akhmetshin appeared in Congress with former Congressman Ron Dellums and that the two stated that they were lobbying on behalf of "a Russian company called Prevezon," and asked to "delay the Global Magnitsky Act or at least remove Magnitsky from the name."[36]

There is no question that Mr. Akhmetshin "thrust" himself into the forefront of this controversy, *Jankovic*, 822 F.3d at 585, because he admits that he was the person who "proposed the idea for a lobbying campaign to educate the public and government officials" about the Magnitsky Act, actively engaged in lobbying efforts to remove Sergei Magnitsky's name from the Magnitsky Act, and otherwise oppose the act by meeting with members of Congress and their staff and organizing a screening of a documentary.  Compl. ¶¶ 32-37.  His choice to attend a meeting with the Trump Campaign at which the Magnitsky Act and Russian adoptions were allegedly the subject of discussion, further solidified his role in the controversy.[37]  At the Trump Tower meeting itself, Mr. Akhmetshin admits that he thrust himself into the conversation, or in his words, he decided that he had "to jump in with my 90 seconds" to make his case against the Magnitsky Act, including offering his own assessment to the Trump Campaign that as to the Act, "there's a constituency for that, and this would be great . . . election campaign" material.[38]  Once

---

[35] *See supra* note 3.
[36] Weiss, *Putin's Dirty Game in the U.S. Congress*, *supra* note 3.
[37] *See supra* note 2.
[38] *Supra* note 36 at 81.

the news of the Trump Tower meeting broke and captured the attention of the nation, Mr.
Akhmetshin again thrust himself into the controversy by confirming that he attended the Trump
Tower meeting and speaking to the press, further "invit[ing] attention and comment." *Jankovic,*
822 F.3d at 585.[39]

Finally, as to the third prong, the challenged statements about Mr. Akhmetshin's
background and relationship with the Russian government were germane because they were
directly related to the controversy over Mr. Akhmetshin's lobbying efforts. *See Jankovic*, 822
F.3d at 585, 589 (where controversy was broadly defined as the "progress of political and
economic reform in Serbia and the integration of Serbia into international institutions," the
Plaintiff's connections to the former Serbian president "would be relevant to understanding
[Plaintiff's] role and why he wanted to be involved in the reform effort led by Prime Minister
Djindjic."). Mr. Akhmetshin's background and relationship to the Russian government became
the subject of renewed public debate immediately following the revelation that he attended the
Trump Tower meeting, at which the Magnitsky Act was allegedly the subject of discussion. Mr.
Browder was neither the first nor only person to connect those dots—for example:

- The Associated Press article that is linked to in one of the challenged Tweets
  states that "Akhmetshin has been reported to have ties to Russian
  intelligence" and identifies him as a "well-known Washington presence,
  lobbying for Russian interests trying to undermine the allegations of a lawyer
  who died in a Russian prison and is the namesake of a U.S. sanctions law"[40];

- The NBC News article that is linked to in the other challenged Tweet refers
  to Plaintiff as "a former Soviet counterintelligence officer who is suspected
  by some U.S. officials of having ongoing ties to Russian intelligence" and
  stated that Plaintiff "had been working with Veselnitskaya on a campaign

---

[39] *See supra* note 2.
[40] Ex. B.

against the Magnitsky Act, a set of sanctions against alleged Russian human rights violators"[41];

- In the CBS This Morning interview that is alleged as one of the Complaint's defamatory statements, the segment began with a discussion of the Magnitsky Act and proceeded to draw the connection between the Act and Mr. Akhmetshin's presence at the Trump Tower meeting;[42]

- The Business Insider article that contains one of the allegedly defamatory statements identifies Plaintiff as a "Soviet military intelligence officer turned lobbyist . . . who since at least last year has been working with the lawyer, Natalia Veselnitskaya, to overturn a US law sanctioning Russians"[43];

- As a Vox article the same day explained, "Akhmetshin is now the most speculated-about man in American politics," because he was a "lobbyist who, by his own admission, worked as a military counterintelligence officer for the Soviet Union before its fall," and, "[i]f an *actual Russian spy* was at the meeting, that would bring the Russian government's ties to the Trump campaign one gigantic step closer"[44]; and, finally

- A Washington Post article published the same day noted that the "attendance of Akhmetshin, who says he holds U.S. and Russian citizenship and who has been accused by some U.S. critics of having links to Russian spy services, also appears to tie the Trump Tower meeting to a broader effort underway at the time to influence U.S. policy toward Russia," and further explained that "in the same period that he was meeting with Trump campaign officials, Akhmetshin was also orchestrating a Capitol Hill lobbying effort that coincided with one of the Kremlin's top priorities — to scale back U.S. sanctions imposed on Russia by Congress for human rights violations."[45]

The coverage summarized above demonstrates that the challenged statements are germane to the controversy and Mr. Akhmetshin's role in it. It was Mr. Akhmetshin's own confessed employment history with the Russian government that turned his presence at the Trump Tower meeting into a frenzy of media speculation about the meeting's connection, if any,

---

[41] Ex. A.

[42] Ex. D.

[43] Ex. C.

[44] Beauchamp, *Rinat Akhmetshin, the potential Russian spy who met Donald Trump Jr., explained, supra* note 2.

[45] Helderman & Hamburger, *Russian American Lobbyist Was Present at Trump Jr.'s Meeting with Kremlin-Connected Lawyer, supra* note 2.

to Russian efforts to influence the 2016 election, and change U.S. policy towards Russia, including by repealing the Magnitsky Act. The challenged statements logically followed from Mr. Akhmetshin's confessed history—indeed, the focus on Mr. Akhmetshin's identity, background, and connection to the Russian government were inescapable in the context of his having attended the Trump Tower meeting, which was publicly reported to have concerned the Magnitsky Act. For all these reasons, the three-part inquiry regarding limited-purpose public figures is satisfied.

## B. Mr. Akhmetshin Has Failed to Plead Actual Malice.

A public figure plaintiff may prevail on a defamation claim only if he offers proof that the statement was made with actual malice—that is, with "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Liberty Lobby, Inc.,* 838 F.2d at 1292 (D.C. Cir. 1988) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 280 (1964)). "The actual malice inquiry focuses on the defendant's state of mind at the time of publication." *Kahl*, 856 F.3d at 118. In other words, "a public-official or public-figure plaintiff must demonstrate that a publisher either actually knew that a published statement was false, or recklessly disregarded whether it might be false." *Id.*

The "standard of actual malice is a daunting one," and "[f]ew public figures have been able clearly and convincingly to prove that the scurrilous things said about them were published by someone with 'serious doubts as to the truth of his publication." *McFarlane v. Sheridan Square Press Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) (internal citations and quotation mark omitted). Along those lines, "[t]he 'reckless disregard' measure requires a showing higher than mere negligence; the plaintiff must prove that 'the defendant in fact entertained serious doubts as to the truth of [the] publication.'" *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1252 (D.C.

2016) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).  "The actual malice standard is not to be confused with the common law concept of 'malice,' and the standard 'is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term.'"  *Montgomery v. Risen,* 197 F. Supp. 3d 219, 259 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989)).  "The proper [inquiry] focuses on what the defendant knew about the veracity of the statements, not the defendant's motivation" for allegedly defaming the plaintiff.  *Id.*

Ultimately, "the plaintiff must show, by clear and convincing evidence, that when the defendants published the alleged defamations they were subjectively aware that it was highly probable that the story was '(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [plaintiff] had obvious reasons to doubt.'"  *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003) (citations omitted).  "[G]ood faith reliance on previously published reports in reputable sources . . . precludes a finding of actual malice as a matter of law."  *McFarlane*, 91 F.3d at 1510 (quoting *Liberty Lobby*, 838 F.2d at 1297).

Failure to plausibly allege facts that support an inference of malice requires dismissal at the motion to dismiss stage.  *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 93 (D.D.C. 2018) (dismissing complaint for failure to plead actual malice); *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 143–44 (D.D.C. 2017) (dismissing complaint for failure to plead actual malice and, in the alternative, for failure to state a claim); *Hourani,* 164 F. Supp. 3d at 144 (granting motion to dismiss for failure to plead malice and applying Virginia law); *see also Boley v. Atl. Monthly Grp.,* 950 F. Supp. 2d 249, 260-63 (D.D.C. 2013) (granting Anti-SLAPP special motion to dismiss for failure to plead malice).

The Complaint is devoid of any non-conclusory allegations that Mr. Browder acted with actual malice.  Relying entirely on conclusory statements, the Complaint alleges that Mr. Browder "struck an intentionally false and injurious low blow," Compl. ¶ 1, or "falsely claimed . . . that Akhmetshin is a foreign spy," *id.* ¶ 7, *see also id.* ¶ 43, and made "false and defamatory statements about Akhmetshin knowing they were false or with reckless disregard of their falsity" *id.* ¶ 54.  Those allegations are plainly insufficient to show malice, even at the pleading stage, because they fail to provide any factual content that, if taken as true, would show that Mr. Browder subjectively doubted the veracity of his statements.  *Fairbanks,* 314 F. Supp. 3d at 93 (granting motion to dismiss and observing that plaintiff "has not plead facts sufficient to support her conclusory allegation that defendant knew the falsity of her statement").  "Threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

The Complaint does not plausibly allege any facts that Mr. Browder "actually knew" that his statements were false or "acted with reckless disregard" as to whether the statements were false.  The challenged Tweets themselves link to articles that support Mr. Browder's statements. *See supra* p. 5, 11-14, 30-31.  For instance, one of the challenged Tweets links to a NBC News story in which Mr. Akhmetshin is referred to as a "Russian-American lobbyist — a former Soviet counterintelligence officer who is suspected by some U.S. officials of having ongoing ties to Russian intelligence."  Further, both the NBC News and AP stories reference the letters sent by Senator Grassley, which had alleged that Mr. Akhmetshin was working on behalf of Russian interests.  Mr. Browder's reliance on these sources, and other previously published articles, "'precludes a finding of actual malice as a matter of law.'"  *McFarlane*, 91 F.3d at 1510 (citation omitted).  In sum, Plaintiff's conclusory allegation that Mr. Browder knew that he had no good

faith basis for making the statements is contradicted by the facts in the Complaint and the documents incorporated by reference, and the Complaint provides no factual basis on which a court could find that Mr. Browder doubted the truth of the challenged statements.

The Complaint alleges that Mr. Browder was or should have been aware of public documents which revealed that Mr. Akhmetshin had worked "hand-in-hand with various agencies of the United States," Compl. ¶ 57, but actual malice requires more. "[I]t is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt." *Jankovic,* 822 F.3d at 589. Furthermore, the fact that certain documents showed that Mr. Akhmetshin had worked with U.S. government agencies is not probative of Mr. Browder's state of mind regarding Mr. Akhmetshin's ties to the Russian government. Nothing in the Complaint suggests that Mr. Browder knew about the documents, or that he suspected (or believed) that Mr. Akhmetshin's work with U.S. government agencies meant that Mr. Akhmetshin had no prior or current ties the Russian government—after all, it is entirely plausible for a person to work simultaneously with the U.S. and Russian governments. In all events, Mr. Browder's statements were not "so inherently improbable that only a reckless person would have put [them] in circulation." *Lohrenz*, 350 F.3d at 1283 (setting a forth test for subjective doubt). The existence of such documents does not suggest that Mr. Browder's statements were "fabricated" or based on "source[s] that [plaintiff] had obvious reasons to doubt." *Id.*

Plaintiff's remaining allegations also fall short of malice. The Complaint alleges that Mr. Browder "made no effort to verify the truth of the allegations and was aware that no good faith basis existed for making them," Compl. ¶ 58, but that allegation is conclusory, and there is no general duty to investigate prior to publication. Only when a "'defendant has reason to doubt the

veracity of its source' [that] 'its utter failure to examine evidence within easy reach or to make obvious contacts in an effort to confirm a story' demonstrate reckless disregard." *Jankovic,* 822 F.3d at 590 (citing *McFarlane,* 91 F.3d at 1509 (publisher's failure to contact plaintiff or individuals with firsthand knowledge of plaintiff's alleged involvement in conspiracy did not demonstrate actual malice)).   Mr. Akhmetshin has pleaded that Mr. Browder "had been monitoring, or had caused others to monitor, Akhmetshin's activities for some time and had conducted, or had caused to be conducted, an investigation into Akhmetshin's background." Compl. ¶ 56.  The Complaint provides no plausible factual allegation that Mr. Browder doubted or had reason to doubt the outcome of his own investigation.

Contrary to the unsupported supposition that Mr. Browder failed to investigate Mr. Akhmetshin's background, the allegations in the Complaint and the documents incorporated by reference support Mr. Browder's subjective belief that the challenged statements were true. Specifically, the FARA Complaint submitted by Hermitage to the Justice Department, Compl. ¶ 39, states that "Mr. Akhmetshin is a former member of the Russian military intelligence services (GRU)."  Ex. E*; see also supra* p. 9.  In addition, Plaintiff offers no plausible allegations as to why Mr. Browder should have doubted the widely published allegations about Mr. Akhmetshin, including the information in the Grassley letters and the dozens of nearly identical statements made before, or published contemporaneously with Mr. Browder's statements in July of 2017. *See supra* notes 2-4. In fact, Mr. Browder's good faith reliance on these previously published reports "precludes a finding of actual malice as a matter of law."  *McFarlane,* 91 F.3d at 1510 (quoting *Liberty Lobby, Inc.*, 838 F.2d at 1297).

Finally, Mr. Akhmetshin's attempts to paint Mr. Browder as motivated by ill-will also fail to establish actual malice.  The Complaint accuses Mr. Browder of identifying "Akhmetshin

as a rival and a threat," "embark[ing] on a campaign to undermine" Mr. Akhmetshin and "as mak[ing] these false and defamatory statements in bad faith, as part of a deliberate effort to damage Akhmetshin's reputation." Compl. ¶¶ 38, 43, 55. This characterization of Mr. Browder is false, but even if it were true, it is insufficient to plead actual malice. "Even 'ill will toward the plaintiff or bad motives are not elements of actual malice' . . . Only when the evidence of ill will or bad motive is also probative of a 'willingness to publish *unsupported allegations* is it suggestive of actual malice.'" *Jankovic,* 822 F.3d at 590–91; *see Tavoulareas,* 817 F.2d at 795–96 (an adversarial stance between parties is insufficient to show malice where "the reporter conducted a detailed investigation and wrote a story that is substantially true"); *Parsi v. Daioleslam,* 890 F. Supp. 2d 77, 90 (D.D.C. 2012) ("[C]aselaw resoundingly rejects the proposition that a motive to disparage someone is evidence of actual malice"). Mr. Akhmetshin has not alleged any facts to suggest that Mr. Browder was willing to publish unsupported allegations. To the contrary and as previously noted, Mr. Browder's allegations were supported by a wealth of public materials that predated the allegedly defamatory statements at issue. Those materials contain similar (if not identical) allegations to the statements that are at the heart of the Complaint, and would have provided a good faith basis for the statements at issue.

For the reasons set forth above, the Complaint sets forth no plausible factual basis that could support a finding that Mr. Browder knew that his published statements were false, or recklessly disregarded whether they might be. As such, Plaintiff has failed to plead actual malice, and the Complaint should be dismissed.

## III.   The Challenged Statements Are Not Actionable.

Mr. Akhmetshin alleges that references to him as a "Russian GRU officer," a "Russian intelligence asset," a "member of Putin's secret police," a "former Soviet spy," and a "current

spy operator in Washington" are false and defamatory.   Compl. ¶¶ 48–53, 58.   A careful

consideration of these references in their proper context confirms that none of them is actionable.

### A.   The Statements Are Not Actionable Under the Opinion Doctrine.

Even if this Court had jurisdiction over a properly-pleaded Complaint against Mr.

Browder, the alleged statements would be protected under the opinion doctrine.  "[A] statement

of opinion relating to matters of public concern which does not contain a provably false factual

connotation will receive full constitutional protection."  *Weyrich v. The New Republic, Inc.,* 235

F.3d 617, 624 (D.C. Cir. 2001) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990))

"[I]f it is plain that a speaker is expressing a subjective view, an interpretation, a theory,

conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the

statement is not actionable."  *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C.

2000) (citation omitted).  Additionally, "'loose, figurative, or hyperbolic' statements generally

are not actionable in defamation."  *Moldea v. New York Times Co*., 22 F.3d 310, 313 n.2 (D.C.

Cir. 1994) ("*Moldea II*") (citations omitted).

The opinion doctrine requires an analysis of "the language used, the context of the

language, and the extent to which the language can be verified."  *Abbas v. Foreign Policy Grp.,*

*LLC*, 975 F. Supp. 2d 1, 16 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.D.C. 2015).  And while the

line between opinion and fact is not always clear, courts in this jurisdiction have consistently

held that "[w]here the question of truth or falsity is a close one, a court should err on the side of

nonactionability."  *Fairbanks*, 314 F. Supp. 3d at 92 (citing *Liberty Lobby*, 838 F.2d at 1292).

Under the opinion doctrine, the statements identified in the Complaint, including Mr.

Browder's statement on CBS This Morning*,* and his statement to Business Insider, amount to

constitutionally-protected expression on matters of public concern.  The Complaint is based upon

the kinds of subjective and hyperbolic language, all of which was offered within the context of an ongoing public debate involving high-profile news reports, that courts have protected under the First Amendment.

### 1. The Business Insider Statement

Mr. Browder's quoted statement to the Business Insider, which follows in pertinent part, falls squarely within the protection of the opinion doctrine.

> "In the world of Russian intelligence, there is no such thing as a 'former intelligence officer,'" he said. "So in my opinion you had a member of Putin's secret police directly meeting with the son of the future next president of the United States asking to change US sanctions policy crucial to Putin."[46]

Viewed in its full context, that statement is plainly a subjective expression of opinion. The question whether there is such a thing as a "former intelligence officer" in Russian intelligence circles is subjective, and not susceptible to verifiable confirmation or disconfirmation. The immediately following sentence connects Mr. Browder's opinion directly to that belief—namely, *because* Mr. Browder believes that there is no such thing as a "former" Russian intelligence officer, his "opinion" is that Mr. Akhmetshin is a "member of Putin's secret police." A statement such as this, especially when it begins with the words "in my opinion," is not "sufficiently precise or verifiable to support a claim of defamation." *Rosen v. Am. Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1258 (D.C. 2012) (citation omitted). A reasonable reader would understand the gist of the statement to convey Mr. Browder's view that it was problematic for Mr. Akhmetshin to be lobbying the Trump Campaign against the Magnitsky Act given Mr. Akhmetshin's ties to the Russian Government. *Id.*

Further, Mr. Browder's use of the phrase "secret police" dramatizes the connections between Mr. Akhmetshin and the Russian government in a "loose or hyperbolic way." *See*

---

[46] Ex. C.

*Milkovich,* 497 U.S. at 21 (noting that "loose, figurative, or hyperbolic language ... would negate the impression that the writer was seriously maintaining that petitioner committed the crime"). At minimum, the statement lends itself to "multiple interpretations" which "cannot be the basis of a successful defamation action." *Rosen,* 41 A.3d at 1258 (citation omitted).

### 2.   The CBS This Morning Statement

Mr. Browder's statement on CBS This Morning that Mr. Akhmetshin was "by all accounts, some kind of shady former Soviet spy, current spy operator in Washington" also constitutes protected opinion. It is not provably false, it is subject to multiple interpretations, and it is reliant upon loose or hyperbolic language. *See Rosen,* 41 A.3d at 1258; *Buckley v. Littell*, 539 F.2d 882, 893–94 (2d Cir. 1976) (distinguishing the factual allegation that a Plaintiff was a member of the Communist Party from the statement of opinion that Plaintiff is "a fellow traveler of fascism"). While Mr. Browder might be able to verify that Mr. Akhmetshin was an unregistered foreign agent, *see Parsi v. Daioleslam,* 595 F. Supp. 2d 99, 110 (D.D.C. 2009) (holding that whether or not Plaintiffs are agents of the Iranian government was a statement of fact that can be verified), the question whether he was formerly or is currently "spy operator" would be impossible to determine, and therefore lacks a "provably false factual connection." This is particularly clear in light of Russian President Vladimir Putin's 2018 presidential decree under which all persons working for or with Russian intelligence agencies are considered "state secrets" under Russian law.[47]

---

[47]  On September 5, 2018, President Vladimir Putin signed a presidential decree making information about freelance agents working for Russian intelligence into a state secret. *See* Marc Bennetts, *Putin signed decree on freelance spies days before Skripal claims*, The Guardian (September 5, 2018) available at https://www.theguardian.com/world/2018/sep/05/putin-signed-decree-on-freelance-spies-days-before-skripal-claims.  This makes it practically impossible to determine as a factual matter whether an individual is or was connected to Russian intelligence.

### 3.   The Two Twitter Statements

The two messages sent from Mr. Browder's Twitter account identified in the Complaint also constitute protected opinion because they reflect Mr. Browder's commentary based on the AP and NBC News stories.  Both Tweets were published with hyperlinks to the news stories, thus leading the reader of the Tweets to the source of the published statements.  As the D.C. Circuit has explained, when "the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation." *Moldea II*, 22 F.3d at 317 (citation omitted).

Further, the Tweets are non-actionable under the common law privilege of fair comment. The fair comment privilege affords "legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact." *Abbas*, 975 F. Supp. 2d at 18 n.7 (quoting *Milkovich*, 497 U.S. at 13).  "The common law privilege of fair comment applies where the reader is aware of the factual foundation for a comment and can therefore judge independently whether the comment is reasonable."  *Lane v. Random House, Inc.*, 985 F. Supp. 141, 150 (D.D.C. 1995).  "Fair comments are not actionable in defamation '[b]ecause the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts.'" *Id.* (citation omitted).  Here, the Tweets represent Mr. Browder's opinions of the facts presented in the article.  Readers were free to click on the posted articles to read about Mr. Akhmetshin's history, role in the meeting and connection to the Russian government in order to draw their own conclusions as to Mr. Akhmetshin's role and identity.

41

### B.  The Challenged Statements Are Substantially True.

The D.C. Circuit recognizes that "'substantial truth' is a defense to defamation." *Moldea II.*, 22 F.3d at 318 (citations omitted).  "It is not necessary to establish the literal truth of the precise statement made.  Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." *Liberty Lobby, Inc.,* 838 F.2d at 1296 (quoting *Restatement (Second) of Torts* § 581A cmt. f (1977)).  Thus, "[a] defendant can defend against a plaintiff's defamation claim by demonstrating that the 'gist' of the statement is true or that the statement is substantially true, as it would be understood by its intended audience." *Benic v. Reuters Am., Inc.*, 357 F. Supp. 2d 216, 224 (D.D.C. 2004) (quoting *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990)); *accord Weyrich*, 235 F.3d at 627 ("We emphasize again that, to be actionable, the story must be materially false.  If the author has merely hyperbolized … that will not suffice.").

Mr. Akhmetshin has admitted in testimony before the U.S. Senate Judiciary Committee that he served in the military for the Soviet Union in a department or unit that provided support for counter-intelligence.[48]  On November 14, 2017, Mr. Akhmetshin testified that he served in the military in the Soviet Union "in a unit which provided support for Osoby, for counterintelligence unit."[49]  His previous testimony was read into the record, where he stated that "some parts" of the unit played a role in counterintelligence.[50]  Thus, at a minimum, Mr. Akhmetshin has admitted in public testimony his connection to Soviet counterintelligence.  Accordingly, the statements at issue are substantially true inasmuch as they truthfully convey the "gist" that Mr. Akhmetshin has ties to Soviet or Russian intelligence.

---

[48] *Supra* note 36.
[49] *Id.* at 19:13-20:7.
[50] *Id.* at 20:5-7.

Mr. Browder's efforts to describe Mr. Akhmetshin's role in Russian counterintelligence do not differ materially from the descriptions that Mr. Akhmetshin has himself used. Whatever sliver of daylight might exist between Mr. Akhmetshin's self-descriptions and the language used by Mr. Browder is not defamatory. The D.C. Circuit recognized in *Moldea II* that "the erroneous attribution of incremental evidence of a character flaw of a particular type which is in any event amply established by the facts is not derogatory." 22 F.3d at 319 (quoting *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1568–69 n.6 (D.C. Cir. 1984)). The media firestorm that engulfed Mr. Akhmetshin swirled around two important facts that are beyond dispute: he was at some point a self-styled Soviet counterintelligence officer suspected of ongoing ties to Russian intelligence, and he lobbies on behalf of pro-Russian interests. The particulars of his relationship with Russian intelligence are "immaterial" in light of these facts. *Liberty Lobby, Inc.,* 838 F.2d at 1296 (quoting *Restatement (Second) of Torts* § 581A cmt. f (1977)).

To the extent Plaintiff is relying upon the distinction between the former Soviet Union or Russia, or Russia's military versus its foreign intelligence services, *see* Compl. ¶ 53 & n.1, those reeds are far too thin. *See Armstrong v. Thompson*, 80 A.3d 177, 185 (D.C. 2013) (defendant's "failure to use the precise term of art to describe the agency's reaction to Mr. Armstrong's wrongdoing does not make her statement false"). The distinctions between different arms of Soviet or Russian intelligence are not significant to the American public or to Mr. Akhmetshin's reputation.

The substantial truth of the various terms Mr. Browder used to describe Mr. Akhmetshin's service in Russian counterintelligence becomes even clearer when considered in context. The Associated Press story, to which one of Mr. Browder's Tweets links, states that "Akhmetshin has been identified in media reports as a former officer in Russia's military

43

intelligence service known as the GRU."[51]   All of the challenged statements were made after Senator Grassley had published letters accusing Mr. Akhmetshin of being "reportedly a former Russian GRU counterintelligence officer specializing in active measures campaigns."[52]   These credible, well-sourced accusations by a sitting U.S. Senator lend credence to Mr. Browder's statements about Mr. Akhmetshin.  *See Boley*, 950 F. Supp. 2d at  263 (D.D.C. 2013) ("evidence corroborating [Plaintiff's] status as a former warlord, including the State Department Report and the findings of the ICE removal proceeding … suggests that [defendant's] statements were substantially true").

Thus, because Mr. Browder's statements "could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation," *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 302 (2d Cir. 1986), the Complaint should be dismissed.

## CONCLUSION

For the reasons stated above, the Court should dismiss Mr. Akhmetshin's claims against Mr. Browder with prejudice.

---

[51] Ex. B.

[52] Mar. 2017 Grassley Ltr. at 4 (observing that Mr. Akhmetshin "admitted having been a 'Soviet counterintelligence officer'" and "worked for the GRU and allegedly specializes in … subversive political influence operations often involving disinformation and propaganda"), *supra* note 4; Apr. 2017 Grassley Ltr. at 1, *supra* note 4; July 2017 Grassley Ltr. at 2, *supra* note 4.

Dated: November 30, 2018                    Respectfully submitted,

By:     /s/ Michael J. Gottlieb
        Michael J. Gottlieb (D.D.C. Bar No. 974960)
        Melissa Shube (D.D.C. Bar No. 241034)
        BOIES SCHILLER FLEXNER LLP
        1401 New York Avenue, N.W.
        Washington, D.C. 20005
        Tel: (202) 237-2727
        Fax: (202) 237-6131
        mgottlieb@bsfllp.com
        mshube@bsfllp.com

        *Attorneys for Defendant William Browder*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of November 2018, I filed the foregoing with the

Clerk of the United States District Court for the District of Columbia by using the CM/ECF

system, which system I understand has provided electronic notices to all counsel of record.


Dated: November 30, 2018                    By:    /s/ Michael J. Gottlieb
                                                   Michael J. Gottlieb