# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RINAT AKHMETSHIN,

                Plaintiff,

     v.

WILLIAM BROWDER,

                Defendant.

Case No. 18-01638 (EGS)

## MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Michael Tremonte (*pro hac vice*)
Michael W. Gibaldi (*pro hac vice*)
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
mtremonte@shertremonte.com
mgibaldi@shertremonte.com

Kim Sperduto (D.C. Bar No. 416127)
SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, N.W., Suite 1250
Washington, D.C. 2006
(202) 408-8900
ksperduto@stglawdc.com

*Attorneys for Plaintiff Rinat Akhmetshin*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 3

ARGUMENT ........................................................................................................................... 13

I. THE COURT HAS SPECIFIC JURISDICTION OVER BROWDER BECAUSE BROWDER'S DEFAMATORY STATEMENTS CAUSED TORTIOUS INJURY WITHIN THE DISTRICT OF COLUMBIA .................................................................. 13

    A. Browder's Defamatory Statements Caused Tortious Injury Within the District of Columbia, Where Akhmetshin Resides and Works ................................ 14

    B. Browder's Other Contacts with the District of Columbia Satisfy the "Plus Factors" Requirement of § 13-423(a)(4) ...................................................... 15

    C. This Court's Exercise of Specific Jurisdiction Over Browder Comports with the Due Process Clause ................................................................................. 23

    D. In the Alternative, the Court Should Order Limited Jurisdictional Discovery ........... 24

    E. Permitting Browder to Escape the Reach of this Court Would Effectively Grant Browder Total Immunity for His Tortious Actions .................................... 25

II. THE COMPLAINT STATES A CLAIM FOR DEFAMATION UNDER THE LIBERAL PLEADING STANDARD OF FED. R. CIV. P. 8(a)(2) ................................. 26

    A. Browder's Statements Concerning Akhmetshin Are Entirely False .......................... 27

    B. Browder's Statements Are Actionable Statements of Fact ........................................ 29

    C. Browder's Statements Accusing Akhmetshin of Serving as a Russian Spy Were Made Negligently, or Alternatively, with "Actual Malice" ........................................ 36

    D. The Complaint Properly Alleges All Other Elements of a Defamation Claim........... 44

    E. In the Alternative, the Court Should Grant Akhmetshin Leave to Replead His Defamation Claim ..................................................................................... 44

CONCLUSION ........................................................................................................................ 46

# TABLE OF AUTHORITIES

Cases

*Abbas v. Foreign Policy Grp., LLC*,
   975 F. Supp. 2d 1 (D.D.C. 2013) ................................................................ 31

*Atherton v. D.C. Office of Mayor*,
   567 F.3d 672 (D.C. Cir. 2009) ......................................................... 26, 27

*Bechtel & Cole v. Graceland Broad. Inc.*,
   18 F.3d 953 (D.C. Cir. 1994) ...................................................................... 19

*Belizan v. Hershon*,
   434 F.3d 579 (D.C. Cir. 2006) .................................................................... 45

*Blodgett v. Univ. Club*,
   930 A.2d 210 (D.C. 2007) ........................................................................... 26

*Bluman v. Fed. Election Comm'n*,
   800 F. Supp. 2d 281 (D.D.C. 2011) ..................................................... 18, 22

*Blumenthal v. Drudge*,
   992 F. Supp. 44 (D.D.C. 1998) ............................................................. 14, 20

*Burman v. Phoenix Worldwide Indus., Inc.*,
   437 F. Supp. 2d 142 (D.D.C. 2006) ........................................................... 24

*Calder v. Jones*,
   465 U.S. 783 (1984) .................................................................................... 23

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
   148 F.3d 1080 (D.C. Cir. 1998) .................................................................. 24

*Clyburn v. News World Commc'ns, Inc.*,
   903 F.2d 29 (D.C. Cir. 1990) ...................................................................... 39

*Cohen v. Bd. of Trustees of Univ. of D.C.*,
   311 F. Supp. 3d 242 (D.D.C. 2018) ........................................................... 26

*Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp.*,
   35 A.3d 1127 (D.C. 2012) ..................................................................... 17, 18

*Companhia Brasileira Carbureto de Calicio v. Applied Indus. Materials Corp.*,
   640 F.3d 369 (D.C. Cir. 2011) .................................................................... 17

*Companhia BrasileiraCarbureto De Calcio v. Applied Indus. Materials Corp.*,
   464 F. App'x 1 (D.C. Cir. 2012) ................................................................ 19

*Competitive Enter. Inst. v. Mann*,
    150 A.3d 1213 (D.C. 2016) ................................................................. 31

*Crane v. Carr*,
    814 F.2d 758 (D.C. Cir. 1987) ................................................. 14, 15, 23

*Crane v. N.Y. Zoological Soc'y*,
    894 F.2d 454 (D.C. Cir. 1990) ............................................................ 13

*Dameron v. Washington Magazine, Inc.*,
    779 F.2d 736 (D.C. Cir. 1985) ............................................................ 41

*Deripaska v. Associated Press*,
    282 F. Supp. 3d 133 (D.D.C. 2017) ................................................... 26

*Envtl. Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.*,
    355 A.2d 808 (D.C. 1976) ...................................................... 16, 17, 19

*Etchebarne-Bourdin v. Radice*,
    982 A.2d 752 (D.C. 2009) ........................................................... 15, 23

*Fairbanks v. Roller*,
    314 F. Supp. 3d 85 (D.D.C. 2018) ................................ 30, 31, 33, 35

*FC Inv. Grp. LC v. IFX Markets, Ltd.*,
    529 F.3d 1087 (D.C. Cir. 2008) ......................................................... 24

*Fisher v. Washington Post Co.*,
    212 A.2d 335 (D.C. 1965) .................................................................. 31

*Foman v. Davis*,
    371 U.S. 178 (1962) .......................................................................... 45

*Foretich v. Advance Magazine Publishers, Inc.*,
    765 F. Supp. 1099 (D.D.C. 1991) ..................................................... 42

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ........................................................ 29, 37, 39, 41

*Harte-Hanks Commc'ns v. Connaughton*,
    491 U.S. 657 (1989) .......................................................................... 41

*Helmer v. Doletskaya*,
    393 F.3d 201 (D.C. Cir. 2004) ........................................................... 14

*Houlahan v. World Wide Ass'n of Specialty Programs & Sch.*,
    No. CIV A 04-01161 HHK, 2006 WL 2844190 (D.D.C. Sept. 29, 2006) ........................ 41, 43

*Johnson v. Johnson Pub. Co.*,
   271 A.2d 696 (D.C. 1970) ............................................................... 44

*Jones v. Metro Prop. Grp., LLC*,
   No. 13-11977, 2014 WL 1305142 (E.D. Mich. Mar. 28, 2014) ............................ 19

*Lewy v. S. Poverty Law Ctr., Inc.*,
   723 F. Supp. 2d 116 (D.D.C. 2010) ................................................. *passim*

*Lex Tex Ltd., Inc. v. Skillman*,
   579 A.2d 244 (D.C. 1990) ........................................................... 17, 19

*Lohrenz v. Donnelly*,
   350 F.3d 1272 (D.C. Cir. 2003) ........................................................ 37

*Mallinckrodt Med., Inc. v. Sonus Pharm., Inc.*,
   989 F. Supp. 265 (D.D.C. 1998) ....................................................... 25

*Marshall v. Honeywell Tech. Sols., Inc.*,
   536 F. Supp. 2d 59 (D.D.C. 2008) ...................................................... 8

*Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
   750 F. Supp. 330 (N.D. Ill. 1990) ..................................................... 25

*Mazur v. Szporer*,
   No. CIV.A. 03-00042(HHK), 2004 WL 1944849 (D.D.C. June 1, 2004) ................... 40

*McFarlane v. Sheridan Square Press, Inc.*,
   91 F.3d 1501 (D.C. Cir. 1996) ........................................................ 44

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990) .............................................................. 30, 31, 34

*Moldea v. New York Times Co.*,
   22 F.3d 310 (D.C. Cir. 1994) ........................................................ 29, 34

*Mwani v. Bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005) ........................................................... 14

*Naartex Consulting Corp. v. Watt*,
   722 F.2d 779 (D.C. Cir. 1983) ........................................................ 19

*Ollman v. Evans*,
   750 F.2d 970 (D.C. Cir. 1984) ........................................................ 30

*Osborn v. Visa Inc.*,
   797 F.3d 1057 (D.C. Cir. 2015) ....................................................... 45

*Parsi v. Daioleslam*,
   595 F. Supp. 2d 99 (D.D.C. 2009) ..................................................... *passim*

*Pinkett v. Dr. Leonard's Healthcare Corp.*,
   No. CV 18-1656 (JEB), 2018 WL 5464793 (D.D.C. Oct. 29, 2018) ........................................ 24

*Redding v. Edwards*,
   569 F.Supp.2d 129 (D.D.C. 2008) ..................................................... 26

*Rose v. Silver*,
   394 A.2d 1368 (D.C. 1978) ..................................................... 17, 19

*Rudder v. Williams*,
   666 F.3d 790 (D.C. Cir. 2012) ..................................................... 45

*Smith v. Clinton*,
   886 F.3d 122 (D.C. Cir. 2018) ..................................................... 44

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ..................................................... 41

*Steinberg v. Int'l Criminal Police Org.*,
   672 F.2d 927 (D.C. Cir. 1981) ..................................................... 23

*Time, Inc. v. Firestone*,
   424 U.S. 448 (1976) ..................................................... 40

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ..................................................... 18

*Urban Inst. v. FINCON Servs.*,
   681 F. Supp. 2d 41 (D.D.C. 2010) ..................................................... 14

*Vasaturo v. Peterka*,
   177 F. Supp. 3d 509 (D.D.C. 2016) ..................................................... 45

*Waldbaum v. Fairchild Publ'ns, Inc.*,
   627 F.2d 1287 (D.C. Cir. 1980) ..................................................... 37, 39

*Walden v. Fiore*,
   571 U.S. 277 (2014) ..................................................... 23

*Weyrich v. New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) ..................................................... 29, 30, 34

*Wolston v. Reader's Digest Ass'n, Inc.*,
   443 U.S. 157 (1979) ..................................................... 39, 40

*Zimmerman v. Al Jazeera Am., LLC*,
   246 F. Supp. 3d 257 (D.D.C. 2017) ................................................................. 41, 43

**Statutes and Rules**

U.S. Const., amend. I ........................................................................................ 17, 18

Fed. R. Civ. P. 8 .................................................................................................... 26

Fed. R. Civ. P. 15 .................................................................................................. 45

D.C. Code § 13-423 .............................................................................. 13, 15, 16, 20

Plaintiff Rinat Akhmetshin ("Akhmetshin") respectfully submits this memorandum of points and authorities in opposition to the Motion to Dismiss the Complaint pursuant to Rule 12(b) of the Federal Rules of Civil Procedure filed by Defendant William Browder ("Browder").

## PRELIMINARY STATEMENT

This case is not about the Magnitsky Act or Russia's interference with the 2016 elections, despite the pages that Browder devotes in his motion papers to touting his lobbying efforts and his status as a leading opponent of the Russian government. The case is far simpler and narrower in scope. Over a series of days, Browder falsely claimed in public fora that Akhmetshin, a United States citizen, was engaged in treasonous criminal activity. Specifically, he identified Akhmetshin as a "Russian GRU officer," a "Russian intelligence asset," "a member of Putin's secret police," and a "shady former Soviet spy, current spy operator in Washington." Browder's widely-broadcast statements were completely false and made with utter disregard for their truth. His pursuit of fame as a critic of Putin does not grant him license to defame a perceived political rival and cannot shield him from liability for doing so. *Cf.* Jason Motlagh, *Fighting Putin Doesn't Make You a Saint*, New Republic, Dec. 31, 2015 (criticizing Browder).

The parties to this lawsuit moved in opposite directions following the collapse of the Soviet Union. Although born in the United States, Browder moved to Russia, and later renounced his U.S. citizenship; Akhmetshin was born in Russia, moved to the United States, and became a U.S. citizen. Years later, Akhmetshin and Browder found themselves on opposite sides of a debate over sanctions legislation known as the Magnitsky Act. As part of Browder's conflict with Akhmetshin, Browder investigated Akhmetshin's background and even filed a baseless complaint against Akhmetshin with the Department of Justice. As a result of these efforts, Browder is surely well aware that Akhmetshin is not a spy or other sort of intelligence operative for the Russian Federation.

1

Yet once the media reported Akhmetshin's presence at the widely-covered Trump Tower meeting between a Russian lawyer and high-ranking members of the Trump campaign on June 9, 2016, Browder pounced on the opportunity to smear a perceived rival. In the context of a public debate concerning Russian interference with the 2016 President election, Browder quickly accused Akhmetshin of being a "Russian GRU officer," a "Russian intelligence asset," "a member of Putin's secret police," and a "shady former Soviet spy, current spy operator in Washington." Browder's highly-charged statements constitute defamation, plain and simple.

Browder's pending motion presents no basis to prevent this case from proceeding to discovery. *First*, the Court has personal jurisdiction over Browder because Browder's statements caused tortious injury within this District to Akhmetshin, who resides and works here. In addition to his defamation of a D.C. resident, Browder has had substantial contacts with this forum, separate and apart from his extensive lobbying activities here. In any event, the Court should consider Browder's lobbying activities in conducting its personal jurisdiction analysis, notwithstanding the "government contacts" exception, because Browder renounced his United States citizenship and, therefore, enjoys no First Amendment right to petition the U.S. government. *Second*, the Complaint adequately alleges a cause of action for defamation. Browder's statements concerning Akhmetshin, which expressly and unambiguously accuse Akhmetshin of serving as a Russian spy, are false, and they are plainly actionable statements of fact. Browder cannot rely upon other news reports concerning Akhmetshin to claim, contrary to the allegations of the Complaint, that his statements were substantially true, as Browder was himself the source of nearly all these reports. Moreover, Browder made these false statements negligently and with actual malice. Although Akhmetshin is not required to prove actual malice, for the reasons discussed below, the Complaint satisfies that heightened standard. As noted, the

Complaint alleges that Browder had previously investigated Akhmetshin's background. Thus, Browder was in a unique position to know that his defamatory statements concerning Akhmetshin were false.

## FACTUAL BACKGROUND

The following facts are drawn from the Complaint, which for the purposes of this motion must be liberally viewed in Akhmetshin's favor, the Declaration of Michael Tremonte, and other documents of which this Court may take judicial notice.

### *Akhmetshin Emigrates to the United States, Launches a Successful Strategic Communications Business, and Becomes a United States Citizen*

Rinat Akhmetshin is a dual citizen of the United States and the Russian Federation, and a resident of the District of Columbia. (Compl. ¶ 9.) He emigrated to the United States from Russia in the early 1990's after the collapse of the Soviet Union, and he proudly became a United States citizen in 2009. Akhmetshin holds a PhD in bioorganic chemistry from the Catholic University of America, and he later found his niche in strategic communications and consulting in matters relating to Eurasian affairs. (*Id.* ¶ 14.) Given his fluency in Russian, his experience in Eurasia, and his contacts in that part of the world, Akhmetshin is considered an expert on the legal, political, social, and economic characteristics of many of the countries that formerly comprised the Soviet Union. (*Id.* ¶ 16.) Accordingly, American and Eurasian clients have sought Akhmetshin's assistance for strategic communications advice, and more recently lobbying services, on Eurasian affairs. (*Id.*) For instance, in 2008 and 2009, Akhmetshin worked with various U.S. agencies and the government of Kyrgyzstan to facilitate the relocation of a U.S. military base within Kyrgyzstan. (*Id.* ¶ 15.) He has also worked on matters relating to Russo-American efforts to combat the heroin trade in Afghanistan, and he has consulted in connection with private arbitration proceedings. (*Id.*)

Akhmetshin is not, and has never been, a Russian GRU officer, intelligence asset, or spy for the Russian Federation or former Soviet Union.[1] (Compl. ¶ 53.)

***Browder Leaves the United States for Russia and Renounces His United States Citizenship***

While Akhmetshin left Russia for the United States, Browder moved from the United States to Russia to make his fortune in the new Russian economy. (Compl. ¶ 18.) By all accounts, Browder proved financially successful; his hedge fund Hermitage Capital Management became one of the largest hedge funds in Russia with over $4 billion in assets under management. (*See id.*) But whereas Akhmetshin proudly sought U.S. citizenship, Browder renounced his own U.S. citizenship in 1998. (*See id.* ¶ 10.) According to reporting in the *New Yorker*, Browder did so to avoid paying taxes. *See* Joshua Yaffa, *How Bill Browder Became Russia's Most Wanted Man*, New Yorker, Aug. 20, 2018 ("A person who was friendly with Browder at the time said, 'He told me he didn't want to pay U.S. taxes.' He added, 'If there has been a consistent passion in Bill's life over the last twenty or thirty years, it is not wanting to pay taxes.'").

***Browder Lobbies To Enact the Magnitsky Act***

In 2008, Russian authorities detained Sergei Magnitsky, an auditor working for Hermitage's law firm in Russia. (Compl. ¶ 19.) Tragically, Magnitsky died in a Russian prison on or about November 16, 2009. (*Id.* ¶ 20.) Browder has publicly maintained that Russian prison guards killed Magnitsky because Magnitsky discovered that Russian government officials and members of organized crime had perpetrated a tax fraud scheme using the identities of several Hermitage portfolio companies (the "Hermitage Tax Refund Scheme"). (*Id.* ¶ 21.) The story of

---

[1]     The Russian GRU, or Main Intelligence Directorate, is the Russian Federation's foreign intelligence agency. (Compl. ¶ 53 n.1.)

Magnitsky's imprisonment and death has been widely reported, and Browder has published his own book on the subject, *Red Notice*, which claims to tell the truth about the Hermitage Tax Refund Scheme. (*Id.* ¶ 60.)

Following Magnitsky's death, Browder embarked on an extensive public relations and lobbying campaign to vindicate Magnitsky and to oppose those whom he believes contributed to Magnitsky's death in prison. (Compl. ¶ 22.) Although he had long since renounced his U.S. citizenship, Browder lobbied the U.S. government to pass legislation that would punish the perpetrators of the Hermitage Tax Refund Scheme. For instance, Browder engaged numerous lobbying and public relations firms; met with members of Congress and their staff, including Senators Benjamin Cardin and John McCain; and testified before various congressional bodies. (*Id.* ¶ 23.)

Browder's lobbying efforts culminated in the passage of the Sergei Magnitsky Rule of Law Accountability Act of 2012, Pub. L. No. 112-208, 126 Stat 1496 (2012) (the "Magnitsky Act") on December 14, 2012. (Compl. ¶ 24.) The Magnitsky Act includes factual findings that largely match Browder's version of events. (*Id.* ¶ 25.) It authorized the President to impose sanctions against individuals thought to have been responsible for Magnitsky's death, those who allegedly benefitted financially from his death, and those who were thought to have been involved in the underlying crimes that Magnitsky purportedly discovered. (*Id.* ¶ 26.)

In retaliation for the passage of the Magnitsky Act, Russia swiftly passed a law banning the adoption of Russian orphans by Americans. (Compl. ¶ 27.)

### *The Prevezon Case Pits Browder Against Akhmetshin*

On or about September 10, 2013, the U.S. Attorney's Office for the Southern District of New York commenced a civil forfeiture action against Prevezon Holdings Ltd. and

related entities ("Prevezon"), alleging that Prevezon had laundered a portion of the purportedly ill-gotten gains from the Hermitage Tax Refund Scheme through certain New York real estate. *See United States v. Prevezon Holdings Ltd, et al.*, No. 13 Civ. 6326 (S.D.N.Y.) (the "Prevezon Case"). Discovery in the Prevezon Case revealed that Browder had been a driving force behind that lawsuit, and that Browder made numerous documents available to the U.S. Attorney's Office for use in prosecuting the case.[2] (Compl. ¶ 29.)

In August 2015, Baker & Hostetler LLP, which represented Prevezon, engaged Akhmetshin as a consultant to help its attorneys review and analyze documents in connection with the Prevezon Case. (Compl. ¶ 30.) As he reviewed forensic reports, criminal filings, and other documents, Akhmetshin began to question Browder's version of events concerning the Hermitage Tax Refund Scheme and Magnitsky's death. (*Id.* ¶ 31.) Ultimately, Akhmetshin became convinced that Browder had engaged in a misleading lobbying campaign based upon numerous falsehoods. (*Id.* ¶ 32.)

On the basis of his work for Baker & Hostetler, Akhmetshin proposed the idea for a lobbying campaign that would challenge Browder's version of events and petition the U.S. government for a critical examination of the factual findings underlying the Magnitsky Act.

---

[2]     Although Browder was the catalyst behind the Prevezon Case, he actively avoided testifying under oath in that case. *See, e.g.*, Joshua Yaffa, *How Bill Browder Became Russia's Most Wanted Man*, New Yorker, Aug. 20, 2018 ("In 2015, as Browder was busy promoting his book, he expounded on the Katsyv case in television and radio interviews, but was reluctant to testify in court. Prevezon's lawyers sent process servers to issue a subpoena twice in person – first in July, 2014, as Browder was leaving a talk he had given at the Aspen Institute. He let it drop to the ground and drove off with his teen-age son. In February, 2015, outside the New York studio of 'The Daily Show,' where Browder had filmed an interview with Jon Stewart, another server tried to hand him a subpoena. He leaped out of a waiting town car and fled down Fifty-first Street."). And Judge Thomas Griesa, who presided over the Prevezon Case, lambasted Browder's efforts to avoid sitting for a deposition on the basis of "credible threats" to his safety: "THE COURT: Apparently the credible threats did not prevent him from going on The Daily Show on February 3, Fox and Friends on February 3, appearing on Sirius on February 3, going on CNBC Squawk Box on February 3, going on MSNBC on February 5, going on Greg Greenberg's program on February 6th. Apparently the threats didn't prevent him from doing that. Now why could he not have been deposed?" Tr. of Hearing at 45:2–8, *United States v. Prevezon Holdings, Ltd., et al.*, No. 13 Civ. 6326 (S.D.N.Y. Mar. 20, 2015), ECF No. 261.

(Compl. ¶ 33.) His proposal culminated in the formation of the Human Rights Accountability Global Initiative ("HRAGI"), a lobbying organization with the goal of restarting Russian adoptions in America by removing Sergei Magnitsky's *name* from the Magnitsky Act (but not repealing the law itself). (*See id.* ¶ 34.) As a lobbyist for HRAGI, Akhmetshin attended meetings with members of Congress and their staffers throughout the spring of 2016. (*See id.* ¶¶ 35–36.) Akhmetshin also organized a screening of a documentary entitled *The Magnitsky Act. Behind the Scenes* at the Newseum in Washington, D.C. on June 13, 2016, which questioned the accuracy of Browder's narrative and raised questions as to his credibility. (*Id.* ¶ 37.) The gist of Akhmetshin's pitch was that Browder's story concerning the Hermitage Tax Refund Scheme and Magnitsky's death were false, and that Browder had committed tax fraud with Magnitsky's assistance. (*See id.* ¶ 36.)

### *Browder Files a Meritless Complaint Against Akhmetshin with the Department of Justice*

Akhmetshin's work on behalf of Baker & Hostetler and HRAGI put Akhmetshin on Browder's radar (*see* Compl. ¶ 38), and Browder went on the attack. As part of his concerted effort to ruin Akhmetshin's reputation, Browder submitted a letter to the Department of Justice on July 15, 2016, alleging that Akhmetshin and others had violated the Foreign Agent Registration Act by secretly working for the Russian government (the "Hermitage Letter"). (*See* Compl. ¶ 39.) The Hermitage Letter confirms that Browder had conducted a thorough investigation of Akhmetshin's background as of July 2016. Thus, Browder's letter specifically identified certain lobbying and consultancy work performed by Akhmetshin, including Akhmetshin's former work on behalf of Andrey Vavilov and Akhmetshin's role as a consultant in a legal dispute involving International Mineral Resources B.V. and Eurochem Volga-Kaliy LLC. (*Id.* ¶ 40.) The letter further reported that Akhmetshin had been involved in organizing an

attempted screening of *The Magnitsky Act. Behind the Scenes* in the European Parliament. And it reported that Akhmetshin had attended a hearing before the House Foreign Affairs Committee on June 14, 2016. (*Id.* ¶ 41.) In fact, the list of appendices at the end of the letter confirms that Browder had Akhmetshin and others followed and photographed in Brussels, Belgium and in Washington, D.C. (*See* Shube Decl., Ex. E, ECF No. 20-9 at 15.[3])

The Department of Justice has not taken any public action in response to Browder's baseless allegations in the Hermitage Letter. (*See* Compl. ¶ 42.) But it appears that Browder did pass along the Hermitage Letter to Senator Charles Grassley, who in turn wrote two letters concerning Akhmetshin – one to the Department of Justice on March 31, 2017, and another to the Department of Homeland Security on April 4, 2017. Browder litters his motion papers with references to Senator Grassley's letters, claiming repeatedly that Senator Grassley's letters somehow justify Browder's defamatory statements because they are independent from Browder. But the opening paragraph of each letter confirms that Senator Grassley wrote these letters *in direct response to, and on the basis of, the Hermitage Letter*. Indeed, the Hermitage Letter is the first attachment to each letter.[4] It is, therefore, apparent that Browder was the driving force behind Senator Grassley's letters.

---

[3]     Akhmetshin agrees with Browder that the Court may take judicial notice of the Hermitage Letter as a document upon which the Complaint relies. *See, e.g.*, *Marshall v. Honeywell Tech. Sols., Inc.*, 536 F. Supp. 2d 59, 65–66 (D.D.C. 2008).

[4]     *See* Letter from Charles E. Grassley, Chair, Committee on the Judiciary, U.S. Senate, to Dana Boente, Acting Deputy Attorney Gen., U.S. Dep't of Justice (Mar. 31, 2017), *available at* https://www.judiciary.senate.gov/imo/media/doc/2017-03-31%20CEG%20to%20DOJ%20(Anti-Magnitsky%20FARA%20violations)%20with%20attachments.pdf ("In July of 2016, Mr. William Browder filed a formal FARA complaint with the Justice Department regarding Fusion GPS, Rinat Akhmetshin, and their associates. His complaint alleged that lobbyists working for Russian interests in a campaign to oppose the pending Global Magnitsky Act failed to register under FARA and the Lobbying Disclosure Act of 1995. The Committee needs to understand what actions the Justice Department has taken in response to the information in Mr. Browder's complaint."); Letter from Charles E. Grassley, Chair, Committee on the Judiciary, U.S. Senate, to John Kelly, Sec'y, U.S. Dep't of Homeland Sec. (Apr.

***Browder Escalates His Attack and Publicly Defames Akhmetshin***

On July 14, 2017, the media reported that Akhmetshin had attended a meeting with Donald Trump, Jr. and others at Trump Tower on June 9, 2016. (Compl. ¶ 45.) Akhmetshin did not represent the Russian government or any Russian government official at the Trump Tower meeting (or anywhere else for that matter). (*Id.* ¶ 46.) Nevertheless, immediately after news of Akhmetshin's attendance broke, Browder seized upon the opportunity to smear his rival's name by calling him a Russian spy. (*Id.* ¶ 47.)

*First*, on July 14, 2017, at 5:00 a.m., Browder posted on Twitter: "Huge development in the Veselnitskaya/Trump Jr story. Russian GRU officer Rinat Akhmetshin was also present." (Compl. ¶ 48.) Browder's post contained a hyperlink to a news article published by *NBC News*. Despite Browder's unqualified statement that Akhmetshin is a "Russian GRU officer," the *NBC News* article contains no support for Browder's outrageous lie and, in fact, the stated source for NBC's reporting on Akhmetshin's background is none other than Senator Grassley's letter concerning Akhmetshin dated April 4, 2017. (*See* Shube Decl., Ex. A, ECF No. 20-5 at 5.) As noted above, Senator Grassley's letters concerning Akhmetshin rely explicitly on Browder's Hermitage Letter.

*Second*, less than two hours later, on July 14, 2017, at 6:51 a.m., Browder posted on Twitter: "Russian intelligence asset Rinat Akhmetshin confirms he was in the meeting with Trump Jr." (Compl. ¶ 49.) This time, Browder's post contained a hyperlink to a news article

---

4, 2017), *available at* https://www.judiciary.senate.gov/imo/media/doc/2017-04-04%20CEG%20to%20DHS%20 (Akhmetshin%20Information)%20with%20attachment.pdf ("In July of 2016, Mr. William Browder, the CEO of Hermitage Capital Management, filed a formal complaint with the Justice Department alleging that Mr. Akhmetshin, among others, has failed to register under the Foreign Agents Registration Act ('FARA') despite undertaking a lobbying campaign on behalf of Russian interests. The Committee is looking into the circumstances surrounding this lobbying effort and the potential FARA violations involved.").

published by the *Associated Press*. Despite Browder's unqualified statement that Akhmetshin is a "Russian intelligence asset," the *AP* story contains no support for this defamatory statement, either. (*See* Shube Decl., Ex. B, ECF No. 20-6 at 5.)

     *Third*, later that morning at 8:31 a.m., *Business Insider* published an article concerning Akhmetshin's presence at the Trump Tower meeting. The article presented Browder as a credible source of fact, reporting that Browder himself had been the one to identify Akhmetshin's presence at the Trump Tower meeting: "NBC News initially declined to name Akhmetshin as the lobbyist who attended with [Natalia] Veselnitskaya. But William Browder, the founder of the investment advisory firm Hermitage Capital who spearheaded the Magnitsky Act, told Business Insider that there was 'only one person' who fit the profile described by NBC News." (Shube Decl., Ex. C, ECF No. 20-7 at 2.) Immediately following this statement of fact, Browder was quoted as stating: "In the world of Russian intelligence, there is no such thing as a 'former intelligence officer.' So in my opinion you had *a member of Putin's secret police* directly meeting with the son of the future next president of the United States asking to change US sanctions policy crucial to Putin." (*Id.* at 3 (emphasis added).) Browder provided no support, because there is none, for this scandalous lie concerning Akhmetshin.

     *Fourth*, on July 18, 2017, Browder appeared on *CBS This Morning* to discuss the Trump Tower meeting. Purporting to explain the facts, Browder stated: "[Natalia Veselnitskaya] then hires this guy Rinat Akhmetshin, who is a – by all accounts, some kind of *shady former Soviet spy, current spy operator* in Washington." (Compl. ¶ 51 (emphasis added).) Again, Browder provided no support, because there is none, for this scurrilous accusation.

### Many News Articles Report Negative Information About Akhmetshin on the Basis of Browder's Defamatory Statements

In a clear effort to erect a shield for his own defamatory statements, Browder's moving papers cite a slew of news articles concerning Akhmetshin. (*See* Browder Mem. 2–4, nn.2–3.[5]) The purpose of these citations, it seems, is to demonstrate that Browder was simply commenting on what others were already saying. But many of these articles serve only to demonstrate Browder's pernicious influence over the coverage of Akhmetshin. All news articles cited in Browder's footnote 2 were published on or after July 14, 2017, *i.e.*, *after* Browder had already poisoned Akhmetshin's reputation with his rapid-fire Twitter posts and interview with *Business Insider*. (*See* Browder Mem. 2–3 n.2.) Indeed, many of these articles directly reference either Browder's lies about Akhmetshin or Senator Grassley's letters concerning Akhmetshin, which can be traced directly to Browder.[6] Five use photographs of Akhmetshin that are credited to

---

[5]     References to "Browder Mem. __" are to the Memorandum of Points and Authorities in Support of Defendant William Browder's Motion to Dismiss the Complaint, ECF No. 20.

[6]     *See* Terence Cullen, *Rinat Akhmetshin, lobbyist at Trump Jr. meeting, has been trying to repeal a major sanctions bill*, NY Daily News (July 15, 2017), http://www.nydailynews.com/news/politics/lobbyist-trump-jr-meeting-lifting-russia-sanctions-article-1.3326774?barcprox=true (quoting Browder as telling the *Daily News* that "Rinat Akhmetshin has been working feverishly in Washington on behalf of the Kremlin"); Isaac Arnsdorf, *Who Is the Russian Lobbyist Who Met With Donald Trump Jr.?*, ProPublica (July 14, 2017), https://www.propublica.org/article/who-is-the-russian-lobbyist-who-met-with-donald-trump-jr (quoting Browder as saying, "None of these people are carrying KGB business cards"); Brian Naylor, *Donald Trump Jr. Meeting Included Russian Lobbyist*, NPR (July 14, 2017), https://www.npr.org/2017/07/14/537219554/donald-trump-jr-meeting-included-second-russian?t=1535560131329 (reporting that "Browder was among the first to publicly identify Akhmetshin Friday morning"); Jacob Pramuk & John W. Schoen, *Who is Rinat Akhmetshin, the Russian-American lobbyist at the Donald Trump Jr. meeting?*, CNBC (July 14, 2017), https://www.cnbc.com/2017/07/14/who-is-rinat-akhmetshin-the-lobbyist-at-the-donald-trump-jr-meeting.html (reporting on the Hermitage Letter and Senator Grassley's letters concerning Akhmetshin); Ken Dilanian, Tracy Connor & Kenzi Abou-Sabe, *Rinat Akhmetshin: Who Is the Russian Lobbyist Who Met the Trump Team?*, NBC News (July 14, 2017), https://www.nbcnews.com/news/us-news/rinat-akhmetshin-who-russian-lobbyist-who-met-trump-team-n783161 (reporting Browder's Hermitage Letter); Marshall Cohen, Tal Kopan & Adam Chan, *The new figure in the Trump-Russia controversy: Rinat Akhmetshin*, CNN Politics (July 15, 2017), https://www.cnn.com/2017/07/15/politics/who-is-rinat-akhmetshin/index.html (reporting Browder's Hermitage Letter, "as picked up by Grassley").

"Hermitage Capital" – Browder's firm.[7] And other articles cited by Browder paint a much more nuanced picture of Akhmetshin, demonstrating just how unsupportable Browder's defamatory statements are.[8] As for the eight news articles in Browder's footnote 3, which predate the challenged statements in this case, three rely on Browder as a source of information,[9] one more cites to the Grassley letters,[10] and others simply report on Akhmetshin's work as a lobbyist and consultant.[11]

---

[7]     Chris Geidner, *The Russian Lawyer And The Lobbyist From The Trump Jr. Meeting Had A Busy Month In America Last Summer*, BuzzFeed News (July 14, 2017), https://www.buzzfeednews.com/article/chrisgeidner/the-russian-lawyer-and-the-lobbyist-from-the-trump-jr; Cohen *et al.*, *supra* note 6; Cullen, *supra* note 6; Andrew Higgins & Andrew E. Kramer, *Soviet Veteran Who Met With Trump Jr. Is a Master of the Dark Arts*, New York Times (July 15, 2017), https://www.nytimes.com/2017/07/15/world/europe/rinat-akhmetshin-donald-trump-jr-natalia-veselnitskaya.html; Sharon LaFraniere, David D. Kirkpatrick & Kenneth P. Vogel, *Lobbyist at Trump Campaign Meeting Has a Web of Russian Connections,* New York Times (Aug. 21, 2007), https://www.nytimes.com/2017/08/21/us/rinat-akhmetshin-russia-trump-meeting.html.

[8]     Steve LeVine, *Meet the ex-Soviet intel officer at Don Jr.'s Trump Tower meeting*, Axios (July 14, 2017), https://www.axios.com/meet-the-ex-soviet-intel-officer-at-don-jrs-trump-tower-meeting-1513304200-f52f2e6f-bf14-418a-a913-03b77a8c05c2.html ("Nothing I picked up in numerous intense reporting experiences with Akhmetshin over the years – in the former U.S.S.R. and the U.S. – suggested any current such relationships [with Russian intelligence]."); Zack Beauchamp, *Rinat Akhmetshin, the potential Russian spy who met Donald Trump Jr., explained*, Vox (July 14, 2017), https://www.vox.com/world/2017/7/14/15972770/rinat-akhmetshin-explained (reporting that the record of Akhmetshin's ties to Russia "is not conclusive either way"); Aidan Quigley, *Who is Rinat Akhmetshin, Former Soviet Intelligence Officer in Donald Trump Jr. Meeting?,* Newsweek (July 14, 2017), https://www.newsweek.com/who-rinat-akhmetshin-former-soviet-intelligence-officer-donald-trump-jr-637050 (noting that "Akhmetshin has been involved in a high-profile feud with American investor Bill Browder").

[9]     Sam Thielman, *Inside The Russian Lawyer's And An Accused Spy's 'Adoption' Crusade*, Talking Points Memo (July 13, 2017), https://talkingpointsmemo.com/muckraker/rinat-akhmetshin-nataliaveselnitskaya-magnitsky-act (noting that "Browder provided two photos to TPM, shown at the top of the page and below," of Akhmetshin); Isaac Arnsdorf, *FARA complaint alleges pro-Russian lobbying*, Politico (Dec. 8, 2016), https://www.politico.com/tipsheets/politico-influence/2016/12/fara-complaint-alleges-prorussian-lobbying-217776 (reporting on Browder's Hermitage Complaint); Michael Weiss, *US Congressman talks Russian money laundering with alleged ex-spy in Berlin*, CNN Politics (May 4, 2017), https://edition.cnn.com/2017/05/04/politics/rohrabacher-prevezon/index.html (quoting Browder).

[10]     Mollie Hemingway, *Top Senator: Wait, The Firm Behind Trump Dossier Was Funded By Russia?*, The Federalist (May 3, 2017) http://thefederalist.com/2017/05/03/top-senator-wait-the-firm-behind-trump-dossier-was-funded-by-russia/.

[11]     Stephanie Saul & Louise Story, *At the Time Warner Center, an Enclave of Powerful Russians*, New York Times (Feb. 11, 2015), https://www.nytimes.com/2015/02/12/nyregion/russia-time-warner-center-andrey-vavilov.html (reporting Akhmetshin's work as a "Washington operative"); Nick Rummell, *Mining Company Says Law Firm Hacked It*, Courthouse News Service (Nov. 16, 2015), https://www.courthousenews.com/mining-company-sayslaw-firm-hacked-it/ (reporting on lawsuit against Akhmetshin that was later dismissed); Michael Weiss, *Putin's Dirty Game in the U.S. Congress*, The Daily Beast (May 18, 2016), https://www.thedailybeast.com/

**ARGUMENT**

I. **THE COURT HAS SPECIFIC JURISDICTION OVER BROWDER BECAUSE BROWDER'S DEFAMATORY STATEMENTS CAUSED TORTIOUS INJURY WITHIN THE DISTRICT OF COLUMBIA**

"The jurisdictional reach of this Court is determined by looking to the District of Columbia long-arm statute and the constitutional requirements of due process." *Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp. 2d 116, 122 (D.D.C. 2010). Here, the relevant provision of the D.C. long-arm statute provides:

> A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C. Code § 13-423(a)(4). This section "provides specific jurisdiction over non-resident defendants whose tortious acts outside the District of Columbia cause injury within the District if defendants satisfy one of the three enumerated 'plus factors.'" *Lewy*, 723 F. Supp. 2d at 123.

The "plaintiff bears the burden of establishing a factual basis for asserting personal jurisdiction over a defendant." *Lewy*, 723 F. Supp. 2d at 118 (citing *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990)). However, "[t]o make such a showing, the plaintiff is not required to adduce evidence that meets the standards of admissibility reserved for summary judgment and trial; rather, she may rest her arguments on the pleadings, 'bolstered by such

---

putins-dirty-game-in-the-us-congress (reporting on Akhmetshin's lobbying work); Isaac Arnsdorf & Benjamin Oreskes, *Putin's Favorite congressman*, Politico (Nov. 23, 2016), https://www.politico.com/story/2016/11/putin-congress-rohrabacher-trump-231775 (reporting on Akhmetshin's lobbying work, and quoting Akhmetshin as saying, "Just because I was born in Russia doesn't mean I am an agent of [the] Kremlin").

affidavits and other written materials as [she] can otherwise obtain.'" *Urban Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 44 (D.D.C. 2010) (quoting *Mwani v. Bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005)) (brackets in original). Moreover, on a motion to dismiss for lack of personal jurisdiction, "a district court must resolve factual disputes in favor of the plaintiff." *Helmer v. Doletskaya*, 393 F.3d 201, 209 (D.C. Cir. 2004).

For the following reasons, the Complaint and other evidence submitted in connection with this memorandum demonstrate that the Court may exercise specific personal jurisdiction over Browder, an individual with extensive ties to the District of Columbia.

### A.   Browder's Defamatory Statements Caused Tortious Injury Within the District of Columbia, Where Akhmetshin Resides and Works

Akhmetshin easily satisfies the first element of the D.C. long-arm statute – a tortious act outside the District causing injury within the District – and Browder's motion does not argue otherwise. *First*, Browder agrees that he published the challenged statements outside the District. (*See* Browder Mem. 19–20.) *Second*, the law is clear that a defamatory injury occurs where the plaintiff resides and works – here, the District of Columbia. *See, e.g.*, *Lewy*, 723 F. Supp. 2d at 123 n.3 ("When a District of Columbia plaintiff is injured by a defamatory article published in and mailed from another state, the tortious act is considered to have occurred outside the District of Columbia and the injury is considered to have occurred inside the District of Columbia."); *Blumenthal v. Drudge*, 992 F. Supp. 44, 53 (D.D.C. 1998) (noting that location of defamatory injury in D.C. was "undisputed" where plaintiffs resided and worked in D.C.). *See also Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir. 1987) (holding that "claims in suit, libel and 'false light,' are the kind in which the injury, foreseeably, is felt with greatest force in the place where the plaintiff lives").

**B.      Browder's Other Contacts with the District of Columbia Satisfy the "Plus Factors" Requirement of § 13-423(a)(4)**

Akhmetshin also satisfies the second element of the long-arm statute, which requires proof of one or more of the "plus factors" connecting the defendant to the District: that the defendant (i) "regularly does or solicits business," (ii) "engages in any other persistent course of conduct," or (iii) "derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." D.C. Code § 13-423(a)(4). The requirement of "plus factors" is "intended to ensure that there are minimum contacts with the forum sufficient to satisfy due process concerns." *Etchebarne-Bourdin v. Radice*, 982 A.2d 752, 762 (D.C. 2009). "The claim need not arise, however, from the 'plus factors' that are imposed by subsection (a)(4) on those claim-related acts or omissions." *Id.* at 763; *see also Crane*, 814 F.2d at 763. Moreover, "[c]ourts have routinely considered *the totality of defendants' contacts* in assessing the 'plus factors' of subsection (a)(4)." *Lewy*, 723 F. Supp. 2d at 126 (emphasis added).

Browder's numerous contacts with the District of Columbia satisfy the "plus factors" element of the long-arm statute – and certainly demonstrate "more than a 'scant' connection to the forum." *Etchebarne-Bourdin*, 982 A.2d at 763 (quoting *Crane*, 814 F.2d at 763). As alleged in the Complaint, Browder has appeared in the District on numerous occasions to tell his version of events relating to the Hermitage Tax Refund Scheme. (*See* Compl. ¶¶ 23, 59(a)–(e), 61.) Apart from these contacts, none of which are subject to the narrow "government contacts" exception for the reasons discussed below, Browder has also appeared in the District on many other occasions – including, but not limited to, the promotion of his book, which he sells here.

1.       **The "Government Contacts" Exception Does Not Preclude This Court from Considering Browder's Lobbying Contacts, As Browder Renounced His United States Citizenship Long Ago**

It is undisputed that Browder has repeatedly appeared in this District to meet with government officials and to testify before factfinding bodies in connection with the Magnitsky Act. (*See* Compl. ¶¶ 23, 59(a)–(e), 61.) In his own book, *Red Notice*, Browder describes these frequent trips to the District of Columbia. *See* Bill Browder, *Red Notice* 310 (2015) ("While I was flying back and forth to Washington working the political angles . . .").[12] For instance, Browder describes an in-person meeting with Senator John McCain at the Russell Senate Office Building. *See id.* at 307–09. Browder has continued to travel to this District well after the passage of the Magnitsky Act – ostensibly for purposes of lobbying the U.S. government. On March 25, 2018, he posted on Twitter that he "was in Washington last week asking for a congressional inquiry into why US money is being used to help the Kremlin destroy their enemies[.]" (Tremonte Decl., Ex. C.)

Given his "persistent course of conduct" within this District, D.C. Code § 13-423(a)(4), it comes as no surprise that Browder tries to invoke the "government contacts" exception, a judicially-crafted exception to the D.C. long-arm statute according to which "entry into the District of Columbia by nonresidents for the purpose of contacting federal governmental agencies is not a basis for the assertion of in personam jurisdiction." *Envtl. Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808, 813 (D.C. 1976). (*See* Browder Mem. 20–23.) Browder, who long ago left this country and renounced his citizenship (apparently to avoid paying taxes), should not benefit from a rule that "finds its source in the unique character of the

---

[12]       Relevant excerpts of *Red Notice* are attached as Exhibit B to the Declaration of Michael Tremonte.

District as the seat of national government and in the correlative need for unfettered access to federal departments and agencies *for the entire national citizenry*." *Id.* (emphasis added).

While "[t]he scope of the government contacts exception is unsettled" in some respects, *Companhia Brasileira Carbureto de Calicio v. Applied Indus. Materials Corp.*, 640 F.3d 369, 371 (D.C. Cir. 2011), its underpinnings are clear. In *Rose v. Silver*, the D.C. Court of Appeals held that the First Amendment's Petition Clause, which protects the "right of the people . . . to petition the Government for a redress of grievances," U.S. Const., amend. I, provides "the *only* principled basis" for the doctrine. *See* 394 A.2d 1368, 1374 (D.C. 1978) (emphasis added); *see also Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp.*, 35 A.3d 1127, 1132–33 (D.C. 2012); *Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244, 248–49 (D.C. 1990). As the courts have reasoned, "[t]o hold that people have the right to petition their government but then to subject them to personal jurisdiction in the District of Columbia merely because they have exercised that right would pose a threat to free public participation in government." *Companhia Brasileira Carbureto De Calcio*, 35 A.3d at 1133 (internal citations and quotation marks omitted).

Given the doctrine's clear roots in the First Amendment, it follows that the scope of the government contacts exception should be limited by the scope of the First Amendment. Thus, in *Companhia Brasileira Carbureto De Calcio*, the D.C. Court of Appeals considered on a certified question from the D.C. Circuit whether a petition that "fraudulently induced unwarranted government action against the plaintiff" fell within the government contacts exception. *See* 35 A.3d at 1130. The D.C. Court of Appeals considered the scope of the First Amendment and answered that the government contacts exception does *not* exempt a *fraudulent* government

petition from the jurisdictional analysis because the First Amendment does not protect fraud. *See id.* at 1133–34.

Likewise, Browder's contacts with the U.S. government do not implicate the First Amendment because, having renounced his U.S. citizenship, Browder enjoys no First Amendment right to petition the United States government. As noted, the First Amendment enshrines certain rights of "the people." U.S. Const., amend. I. While "the people" may be broader than the citizenry, the Supreme Court has held in *United States v. Verdugo-Urquidez* that "the people" protected by the Bill of Rights, including the First Amendment, is limited to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. 259, 265 (1990). Browder quite deliberately left that national community by leaving the United States, taking up residence in another country, *affirmatively renouncing his United States citizenship*, and becoming a citizen of the United Kingdom. As Browder himself has explained, Britain is his "home" because he prefers the British legal system. While speaking at the Aspen Institute, Browder explained that he had no regrets for his decision: "And do I feel like it is a good decision? Yeah. I've been living in Britain for 29 years. The British government protects me. The rules, the laws in the society is something that I'm proud to be part of. And I still have a lot of American in me. I think you can hear it in my voice. I come here often, and I have a lot of friends here, but Britain is my home." (Tremonte Decl., Ex. D at 30:47.) When Browder renounced his citizenship, he renounced not only the responsibilities of citizenship (such as paying taxes), but also its corresponding rights. Consequently, today Browder appears before this Court as a nonresident alien, and he cannot claim to enjoy the First Amendment right to petition the United States government. *See Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 288

(D.D.C. 2011) (Kavanagh, J.) ("It is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government."), *aff'd*, 565 U.S. 1104 (2012); *Jones v. Metro Prop. Grp., LLC*, No. 13-11977, 2014 WL 1305142, at *7 (E.D. Mich. Mar. 28, 2014) ("Counter-Defendants do not cite any authority or provide any rationale in support of their contention that although they are citizens of the United Kingdom and presently non-residents of the United States, they enjoy First Amendment rights. Indeed, there is little or no case law directly supporting the proposition that First Amendment rights extend to non-resident aliens.").

We are aware of no binding authority, and Browder cites none, that has applied the government contacts exception to a nonresident alien's government contacts with the U.S. government. *Cf. Bechtel & Cole v. Graceland Broad. Inc.*, 18 F.3d 953 (D.C. Cir. 1994) (defendant was a domestic corporation); *Naartex Consulting Corp. v. Watt*, 722 F.2d 779 (D.C. Cir. 1983) (defendants were domestic organizations); *Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244 (D.C. 1990) (defendants were Florida residents); *Rose v. Silver*, 394 A.2d 1368 (D.C. 1978) (defendants were a domestic corporation and resident); *Envtl. Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808 (D.C. 1976) (defendants were domestic corporations).[13] There is no basis for the Court to do so here.

---

[13]   In *Companhia Brasileira Carbureto De Calcio*, the defendants included both American corporations and two foreign parent companies; however, the government contacts exception did not apply for the separate reason that the government petition was fraudulent. *See* 464 F. App'x 1 (D.C. Cir. 2012) (vacating judgment of dismissal in light of D.C. Court of Appeals' holding that the government contacts exception does not cover fraudulent petitions).

### 2.      In Any Event, Browder's Non-Government Contacts Satisfy § 13-423(a)(4)

Apart from his lobbying activities, Browder has otherwise engaged in a persistent course of conduct within this District, and has derived substantial revenue from this District, including but not limited to the promotion and sale of his book and frequent media appearances. It bears emphasis that these contacts "need not be great to satisfy subsection (a)(4); they need only be sufficient to establish a real connection to the District of Columbia such that a party might expect to be subjected to jurisdiction here." *Lewy*, 723 F. Supp. 2d at 124.

Specifically, Browder traveled multiple times to the District of Columbia in 2015 to promote sales of his book, *Red Notice*. *See Blumenthal*, 992 F. Supp. at 57 (considering that defendant "solicited contributions from District residents"). He appeared at book events at the McCain Institute on February 4, 2015; at the Hudson Institute on April 29, 2015; and at the Aspen Institute on April 30, 2015. (Tremonte Decl., Exs. E–F.) A public recording of the Hudson Institute event makes clear that Browder came to this District *to sell his book*; at the conclusion of the event, he offered "to sign a book for anyone who buys one." (Tremonte Decl., Ex. E at 01:15:28.) Similarly, the event at the Aspen Institution concluded by noting that Browder would be signing books, "and our friends at Politics and Prose are selling them." (Tremonte Decl., Ex. F at 59:03.)

Apart from his book sales, Browder travels regularly to this District for media appearances. *See Blumenthal*, 992 F. Supp. at 57 (noting that defendant "engaged in a persistent course of conduct in the District of Columbia" where he "sat for an interview with C-SPAN in Washington, D.C. and visited the District of Columbia on at least one other occasion," in addition to his out-of-district contacts directed at D.C. residents). Indeed, Browder has not sat for just one interview in this District, like the defendant in *Blumenthal*; Browder has done *many*

media appearances here. Because Akhmetshin has not yet taken discovery, the following media

appearances are limited to those available in the public record.

- Browder sat for an interview with the *New Republic* at the Hay-Adams hotel for an article that was published on November 16, 2012. (Tremonte Decl. ¶ 8 & Ex. G.)

- Browder sat for an interview with *BBC News Magazine* at "a Washington hotel" for an article that was published on December 10, 2013. (Tremonte Decl. ¶ 9 & Ex. H.)

- Browder participated in a panel discussion concerning "Russia's Future" at the National Endowment for Democracy in Washington, D.C. on April 30, 2015. (Tremonte Decl. ¶ 10 & Ex. I.)

- Browder sat for an interview with *The American Interest* for an article that was published on June 16, 2016. The article shows Browder posing for a photograph outside a government building in Washington, D.C. (Tremonte Decl. ¶ 11 & Ex. J.)

- Browder sat for a television interview in Washington, D.C. with Fox News, which aired on July 26, 2017. (Tremonte Decl. ¶ 12 & Ex. K.)

- Browder sat for a television interview in Washington, D.C. with CNBC on July 27, 2017. (Tremonte Decl. ¶ 13 & Ex. L.)

- Browder sat for a podcast interview in Washington, D.C. with C-SPAN on or about July 29, 2017." (Tremonte Decl. ¶ 14 & Ex. M.)

- Browder sat for a television interview in Washington, D.C. with C-SPAN on April 27, 2018. (Tremonte Decl. ¶ 15 & Ex. N.)

- Browder sat for a television interview in Washington, D.C. with *Kasie DC* on MSNBC, which aired on July 16, 2018. (Tremonte Decl. ¶ 16 & Ex. O.)

- Browder sat for a television interview in Washington, D.C. with *Kasie DC* on MSNBC, which aired on July 23, 2018. (Tremonte Decl. ¶ 17 & Ex. P.)

- Browder sat for a television interview in Washington, D.C. with Ali Velshi on MSNBC, which aired on August 27, 2018. (Tremonte Decl. ¶ 18 & Ex. Q.)

- Browder sat for an interview in Washington, D.C. with *The American Interest* for an article that was published on November 5, 2018. In this article, Browder explains his substantial ties to this District: "What I can say is that I've had three careers so far in my life. I've had a career on Wall Street, a career in Moscow, and a career in Washington, and one deals with some really hairy characters in each place." (Tremonte Decl. ¶ 19 & Ex. R.)

21

Relatedly, Browder has taken measures in this District to squash at least one news story that he perceived to be critical of himself. In 2016, he retained a law firm with offices in this district, which sent two separate letters to NBC Universal demanding that NBC refrain from publishing an article concerning Browder. (*See* Tremonte Decl. ¶ 20 & Exs. S–U.) Browder also threatened to sue the Newseum in Washington, D.C. over its decision to screen a documentary that criticized Browder and offered a contrary narrative of the Magnitsky affair. (*See* Tremonte Decl., Ex. V ("In a phone call with FP, Browder said he would pursue legal action against the Newseum if he perceived it as backing the movie 'in any way.'").)

Finally, publicly-available evidence shows that Browder has traveled to this District on many other occasions. For instance, in his book, Browder described his attendance at "a large group dinner at Café Milano, a trendy Italian restaurant in Georgetown" with Juleanna Glover and others. *See* Bill Browder, *Red Notice* 306. He also described his travel to the District again in October 2009. *See id.* at 269. And he explained how he traveled here again in March 2010 to attend several meetings, at least one of which included only a private individual outside the government, *i.e.*, not a lobbying contact. *See id.* at 289 (describing meeting with "a top international criminal lawyer"). Following the Magnitsky Act's enactment, Browder returned to the District for a reception on April 17, 2013, and again in November 2013 for an event at a private residence in Washington, D.C. featuring Elena Servettaz, who edited another book on a topic similar to Browder's. (Tremonte Decl., Exs. W–X.) More recently, Browder traveled here on September 1, 2018, to attend a funeral. (Tremonte Decl. ¶ 24 & Ex. Y.) Additionally, Browder has served on the Advisory Council of the Kleptocracy Initiative of the Hudson Institute, which is based in the District. (*See* Tremonte Decl., Ex. E at 00:03:35.)

These contacts, some of which are entirely commercial in nature, together establish Browder's persistent course of conduct in this District, such that Browder "might expect to be subjected to jurisdiction here." *Lewy*, 723 F. Supp. 2d at 124; *see also Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927, 931 (D.C. Cir. 1981) (holding that the 'persistent course of conduct' to which the statute refers denotes connections considerably less substantial than those required to establish general, 'all purpose' jurisdiction on the basis of 'doing business' in the forum").

### C.  This Court's Exercise of Specific Jurisdiction Over Browder Comports with the Due Process Clause

Browder does not challenge the Court's exercise of specific jurisdiction under the Due Process Clause. That is because, since the Supreme Court's decision in *Calder v. Jones*, the law is clear that "a court may exercise personal jurisdiction over an out-of-state defendant who knowingly causes injury in the forum through intentional tortious conduct." *Lewy*, 723 F. Supp. 2d at 129 (citing *Calder v. Jones*, 465 U.S. 783, 789–91 (1984)). In *Calder*, the Supreme Court held that the Due Process Clause permitted a California court to exercise personal jurisdiction over defendants who had published an allegedly defamatory story concerning "the California activities of a California resident." 465 U.S. at 788. "The crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort." *Walden v. Fiore*, 571 U.S. 277, 287 (2014). This case is on all fours with *Calder*. The reputation-based effects of Browder's defamatory statements, which Akhmetshin has unquestionably suffered in this District, connect Browder to this forum.

Aside from *Calder*, evidence of the "plus factors" ensures that the exercise of personal jurisdiction in this case satisfies the constitutional standard. *See Crane*, 814 F.2d at 763; *Etchebarne-Bourdin*, 982 A.2d at 762.

**D.      In the Alternative, the Court Should Order Limited Jurisdictional Discovery**

If the Court remains unconvinced that Browder's contacts with this District satisfy § 13-423(a)(4), then the Court should permit Akhmetshin to engage in limited jurisdictional discovery. Such discovery is appropriate where, as here, the plaintiff has "'at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant.'" *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1093–94 (D.C. Cir. 2008) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998)). For instance, in *Crane*, the D.C. Circuit held that the plaintiff was "entitled to a fair opportunity to inquire into [the defendant's] affiliations with the District" to establish the "plus factors" set forth in § 13-423(a)(4). *See* 814 F.2d at 764. Similarly, Judge Boasberg recently ordered jurisdictional discovery related to the nature and extent of the defendant's business aimed at the District of Columbia. *See Pinkett v. Dr. Leonard's Healthcare Corp.*, No. CV 18-1656 (JEB), 2018 WL 5464793, at *5 (D.D.C. Oct. 29, 2018). In granting this limited jurisdictional discovery, Judge Boasberg noted that it would be "an unjust result if a defendant defeats the jurisdiction of a federal court by withholding information on its contacts with the forum." *Id.* (internal brackets, citation, and quotation marks omitted).

Akhmetshin should be afforded the same opportunity in this case. Specifically, Akhmetshin should be permitted to take discovery concerning (i) Browder's personal appearances in the District, and (ii) his book sales in the District, which he has indisputably promoted and sold here.[14] Such limited discovery would impose a minor burden on Browder,

---

[14]     Evidence of Browder's book sales in this District would establish the "substantial revenue" prong of § 13-423(a)(4), which requires only "enough revenue to indicate a commercial impact in the forum, such that a defendant fairly could have expected to be hauled into court there." *Burman v. Phoenix Worldwide Indus., Inc.*, 437 F. Supp. 2d 142, 153 (D.D.C. 2006) (internal citations and quotation marks omitted).

who presumably has easy access to this information, and would address any outstanding issues that the Court has concerning Browder's pertinent contacts with this forum.

**E.  Permitting Browder to Escape the Reach of this Court Would Effectively Grant Browder Total Immunity for His Tortious Actions**

In assessing challenges to personal jurisdiction – particularly based on statements made over the Internet – courts often take care to avoid crafting rules that would permit "nationwide jurisdiction for defamation actions." *Mallinckrodt Med., Inc. v. Sonus Pharm., Inc.*, 989 F. Supp. 265, 273 (D.D.C. 1998). That concern does not exist here, as Browder has injured Akhmetshin's reputation in this District, where Akhmetshin lives and works.

If anything, the opposite concern exists here. If Browder cannot be sued here, where Akhmetshin lives, then he likely cannot be sued anywhere. The Court may take judicial notice of the fact that Browder was separately sued for defamation in London, where Browder lives, by a Russian police officer; however, Browder managed to have that case dismissed because the Russian did not live in England and, therefore, had no reputation in England to protect. *See Karpov v. Browder*, [2013] EWHC 3071 (QB) ¶¶ 138–46. For the same reasons, it is likely that Akhmetshin would be unable to sue Browder in London, where Browder lives. This Court should not apply the D.C. long-arm statute in a way that would grant Browder *carte blanche* to defame D.C. residents. *See Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 750 F. Supp. 330, 336 (N.D. Ill. 1990) ("What seems most important to me, however, is . . . the fact that if there is no jurisdiction in this district, there may be no jurisdiction anywhere in the world.").

II.     **THE COMPLAINT STATES A CLAIM FOR DEFAMATION UNDER THE LIBERAL PLEADING STANDARD OF FED. R. CIV. P. 8(a)(2)**

The Complaint adequately alleges a cause of action for defamation, which requires proof of the following four elements under D.C. law: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 104 (D.D.C. 2009) (quoting *Blodgett v. Univ. Club*, 930 A.2d 210, 222 (D.C. 2007)). Where the plaintiff is a "public figure," then the third element requires proof of "actual malice" in lieu of negligence. *See, e.g.*, *id.*

The ordinary pleading rule and the standard for pre-discovery dismissal, which unequivocally favor a plaintiff, apply equally in defamation cases such as this one. *See, e.g.*, *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140 (D.D.C. 2017) ("There is no heightened pleading standard for defamation claims in the District of Columbia."). These rules are well-settled. "A plaintiff's complaint need only provide 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to survive a motion to dismiss." *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting Fed. R. Civ. P. 8(a)(2)). "In considering a motion to dismiss, the Court should liberally view the complaint in the plaintiff's favor, accepting all factual allegations as true, and giving the plaintiff the benefit of all inferences that can be drawn therefrom." *Cohen v. Bd. of Trustees of Univ. of D.C.*, 311 F. Supp. 3d 242, 247 (D.D.C. 2018) (Sullivan, J.) (citing *Redding v. Edwards*, 569 F.Supp.2d 129, 131 (D.D.C. 2008)). Thus, even after the Supreme Court's oft-cited decisions in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*, the D.C. Circuit has held that "[a] court may not grant a

motion to dismiss for failure to state a claim even if it strikes a savvy judge that recovery is very remote and unlikely." *Atherton*, 567 F.3d at 681 (internal citation and quotation marks omitted). "So long as the pleadings suggest a plausible scenario to show that the pleader is entitled to relief, a court may not dismiss." *Id.* (internal citation and quotation marks omitted).

### A.    Browder's Statements Concerning Akhmetshin Are Entirely False

The Complaint alleges that Browder made a series of four statements which, in sum and substance, accuse Akhmetshin of serving as a Russian spy. In the span of just four days, Browder publicly labeled Akhmetshin a "Russian GRU officer," a "Russian intelligence asset," "a member of Putin's secret police," and "some kind of shady former Soviet spy, current spy operator in Washington." (Compl. ¶¶ 48–51.) The Complaint unambiguously alleges that these accusations of treason are entirely false. (*See id.* ¶ 53 ("Akhmetshin is not, and has never been, a Russian GRU officer, intelligence asset, or spy for the Russian Federation or former Soviet Union.").) These allegations, which must be accepted as true at this juncture, directly establish the falsity of Browder's statements.

Browder ignores the applicable standard of review by urging this Court to dismiss the Complaint on the grounds that Browder's statements concerning Akhmetshin were, contrary to the allegations of the Complaint, substantially true. (*See* Browder Mem. 42–44.) Browder's arguments concerning the truth of his statements are entirely inappropriate on a motion to dismiss and also meritless. For instance, Browder cites Akhmetshin's voluntary testimony before the U.S. Senate Judiciary Committee on November 14, 2017, for the false proposition that Akhmetshin has admitted "ties to Soviet or Russian intelligence." (Browder Mem. 42.) Such extrinsic evidence has no place in a motion to dismiss and, in any event, Browder completely mischaracterizes Akhmetshin's testimony. In truth, Akhmetshin vehemently denied any such ties

to Soviet or Russian intelligence during his testimony. Akhmetshin respectfully refers the Court

to the following exchange, which Browder ignores entirely:

> Q. Mr. Akhmetshin, you said in this deposition that the statement
> that you are a former Soviet Army counterintelligence officer is not
> 'exactly correct.' Is it partially correct?
> A. It's not correct at all.
> Q. Okay. What was incorrect about it?
> A. I was never a -- I was served -- I served -- let me use my words
> carefully here. I served in a unit as a Soviet soldier of the -- as an
> army -- enlisted army officer, sergeant at that time. I served in a unit
> which provided support for Osoby, for counterintelligence unit.
> Q. Have you ever served in an intelligence or counterintelligence
> capacity for the Soviet Union or the Russian Federation?
> A. I have not.
> Q. Have you ever worked with the GRU?
> A. I have never worked with GRU.
> MR. FOSTER: What was your answer to the last question? I never
> worked with?
> MR. AKHMETSHIN: *I never served with GRU.*
> BY MR. DAVIS:
> Q. Did you ever work with them informally?
> A. *I never worked with them informally.*

(Tremonte Decl., Ex. A at 20:15 – 21:13 (emphasis added).) Additionally, Browder

disingenuously asserts that his statements must be substantially true because the *Associated*

*Press* previously reported that "Akhmetshin has been identified in media reports as a former

officer in Russia's military intelligence service known as the GRU," and because Senator

Charles E. Grassley published letters stating that Akhmetshin is "reportedly a former Russian

GRU counterintelligence officer specializing in active measures campaigns." (Browder Mem.

43–44.) As described in the Factual Background section, Browder improperly uses *reporting for*

*which he served as a source* as cover for his own defamation. Senator Grassley's letters

concerning Akhmetshin, which Browder uses as a shield for his own false statements, were

based on Browder's own Hermitage Letter. And the *Associated Press* story cited by Browder, in

turn, references Senator Grassley's letters. (Shube Decl., Ex. B, ECF No. 20-6 at 11.) Browder

cannot credibly distance himself from these reports, which lead back directly to Browder himself.

Moreover, Browder fails to explain how these third-party statements, which themselves report only prior *accusations* concerning Akhmetshin, establish the *truth* of Browder's own false claims. Indeed, the *Associated Press* story, which reported only that Akhmetshin has been previously *accused* of having served in the GRU, also included that Akhmetshin had denied that claim. (Shube Decl., Ex. B, ECF No. 20-6 at 10.)

**B.    Browder's Statements Are Actionable Statements of Fact**

Browder further asserts that his statements concerning Akhmetshin are nonactionable statements of opinion. Once again, Browder misapprehends the law and the allegations in the Complaint.

The legal framework for the actionability of false statements begins with the long-established proposition that "there is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974). It is, therefore, beyond dispute that a false statement of fact is actionable. *See, e.g.*, *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001). Moreover, contrary to Browder's suggestion, "there is no wholesale exemption from liability in defamation for statements of 'opinion.'" *Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994). Indeed, "statements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false." *Id.* For instance, the Supreme Court has used the following hypothetical to illustrate actionable statements of opinion:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In

> my opinion Jones is a liar," can cause as much damage to reputation
> as the statement, "Jones is a liar."

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990). Only a pure statement of opinion,

which "cannot reasonably be interpreted as stating actual facts about an individual," is

nonactionable under the First Amendment. *See Weyrich*, 235 F.3d at 624 (internal citations and

quotation marks omitted).

To distinguish statements of fact (including implied facts) from statements of pure

opinion, courts in this jurisdiction often consider the following four factors: (1) "whether a

defendant's statement 'has a precise core of meaning for which a consensus of understanding

exists or, conversely, whether the statement is indefinite and ambiguous' and thus less likely to

carry specific factual connotations"; (2) "whether the statement can be 'objectively characterized

as true or false' or instead 'lacks a plausible method of verification'"; (3) "whether the context

would influence an average reader's perception that the challenged statement has factual

content"; and (4) whether "the broader context, including social conventions surrounding

different types of writing, . . . signals that a statement concerns fact or opinion." *Fairbanks v.

Roller*, 314 F. Supp. 3d 85, 90 (D.D.C. 2018) (quoting *Ollman v. Evans*, 750 F.2d 970, 979 (D.C.

Cir. 1984)).

Each of Browder's statements concerning Akhmetshin are actionable under these well-

settled principles of defamation law.

> **1.** **The fair comment privilege does not protect Browder's Twitter
> statements, which falsely labeled Akhmetshin a "Russian GRU
> officer" and a "Russian intelligence asset"**

Browder's first and second statements were posted on Twitter in short succession. The

first states, in full: "Huge development in the Veselnitskaya/Trump Jr story. Russian GRU

officer Rinat Akhmetshin was also present." (Compl. ¶ 48.) The second states, in full: "Russian

intelligence asset Rinat Akhmetshin confirms he was in the meeting with Trump Jr." (*Id.* ¶ 49.)

Both statements convey clear statements of fact concerning Akhmetshin – namely, that he is a

"Russian GRU officer" and a "Russian intelligence asset." Browder does not, because he cannot,

deny that these statements bear all the traditional hallmarks of fact statements; they are precise

and unambiguous, and both can be objectively characterized as either true or false. *See, e.g.*,

*Fairbanks*, 314 F. Supp. 3d at 90.

Browder claims that these statements are nonactionable because he published them along

with hyperlinks to news stories concerning Akhmetshin's attendance at the Trump Tower

meeting. (Browder Mem. 41.) Browder thus invokes the "fair comment" defense, which protects

only "the honest expression of *opinion* on matters of legitimate public interest when based upon

a true or privileged statement of fact.'" *Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1,

18 (D.D.C. 2013) (emphasis added) (quoting *Milkovich*, 497 U.S. at 13). But this defense is

entirely inapposite. Browder's statements that Akhmetshin is a "Russian GRU officer" and a

"Russian intelligence asset" are clear statements of fact, not opinion. *See Fisher v. Washington

Post Co.*, 212 A.2d 335, 337 (D.C. 1965) ("The fair comment defense goes only to opinions

expressed by the writer and does not extend to misstatements of fact."). Further, it is plain that

Browder was not *commenting* on these news articles – neither of which state that Akhmetshin is

a Russian GRU officer or intelligence asset. Browder did not use any language that even

remotely suggests he was offering an opinion based on these news articles. *See Competitive

Enter. Inst. v. Mann*, 150 A.3d 1213, 1245 (D.C. 2016) (noting that absence of "language

normally used to convey an opinion, such as 'in my view,' or 'in my opinion,' or 'I think,'" may

be "one indication of how the article would come across to the reader," even if such language

does not "automatically insulate the ensuing statements from liability"). Rather, Browder

purported to *add facts not reported in either article*, namely, that Akhmetshin is a "Russian GRU officer" and "Russian intelligence asset."

Moreover, the law is clear that context matters to distinguish fact from opinion. Here, Browder's own status as a public investigator and critic of the Russian government cannot be ignored. For example, Browder publicly filed the Hermitage Letter on July 15, 2016. (*See* Compl. ¶ 39.) This letter purported to convey *facts* that Browder had unearthed about Akhmetshin and others. (*See id.* ¶¶ 39–41.) More generally, Browder consistently promotes himself as a trustworthy source of facts about concerning Russian affairs. For instance, Browder has testified before the United States Helsinki Commission, the Tom Lantos Human Rights Commission of the U.S. House of Representatives, the Committee on Foreign Affairs, Subcommittee on Africa, Global Health, Global Human Rights, and International Organizations, of the U.S. House of Representatives, and the Senate Judiciary Committee. (*See id.* ¶ 59.) In 2015, Browder also published a book, *Red Notice*, which reports his own direct experiences in Russia and his investigation of the conduct of Russian government officials and business people. (*Id.* ¶ 60.) To elevate his status as an authoritative source of factual information concerning such matters, Browder has appeared numerous times on television programs and radio segments, at think tank events, and at NGO gatherings – in Washington D.C. and elsewhere – in his purported capacity as an expert on Russian finances, politics, and intelligence. (*Id.* ¶ 61.) Given Browder's prominence in this role and his claim to be a truthteller and expert, a reasonable reader would understand that Browder's additional statements in response to other news articles were meant to be additional statements of fact, not opinion commentary.

**2.**      **The *Business Insider* statement, which accused Akhmetshin of being "a member of Putin's secret police," is an actionable statement of fact**

Browder's third statement concerning Akhmetshin was published in *Business Insider* shortly after his two Twitter posts. Concerning Akhmetshin, Browder stated: "In the world of Russian intelligence, there is no such thing as a 'former intelligence officer.' So in my opinion you had a member of Putin's secret police directly meeting with the son of the future next president of the United States asking to change US sanctions policy crucial to Putin." (Shube Decl., Ex. C, ECF No. 20-7 at 3.)

For substantially the same reasons discussed above, Browder's statement that Akhmetshin is a "member of Putin's secret police" is actionable. Notably, like Browder's other statements, this statement carries a specific meaning and can be objectively characterized as either true or false; Akhmetshin is either a member of Putin's secret police, or he is not. *See, e.g.*, *Fairbanks*, 314 F. Supp. 3d at 90. Additionally, Browder's status as a purported source of facts is important for context. In fact, as described above in the Factual Background, the *Business Insider* article itself presents Browder as a source of facts, claiming that he had been the one to identify Akhmetshin's presence at the Trump Tower meeting. (Shube Decl., Ex. C, ECF No. 20-7 at 2–3.[15]) A reasonable person, reading statements of fact attributed to Browder followed directly by Browder's defamatory statements concerning Akhmetshin, could conclude only that Browder was purporting to convey *facts* about Akhmetshin.

---

[15]      Other news outlets similarly reported that Browder was no bystander with an opinion, but that *Browder himself* identified Akhmetshin's presence at the Trump Tower meeting. *See* Brian Naylor, Donald Trump Jr. Meeting Included Russian Lobbyist, *NPR*, July 14, 2017, https://www.npr.org/2017/07/14/537219554/donald-trump-jr-meeting-included-second-russian?t=1535560131329 ("Browder was among the first to publicly identify Akhmetshin Friday morning after an NBC News report that said that network had learned the identity of a second Russian advocate in the meeting with Trump Jr. and top aides to the Trump campaign.").

Browder cannot escape liability for this statement merely because he prefaced a factual claim with "in my opinion." The First Amendment does not exempt statements of opinion wholesale from liability in defamation. *Moldea*, 22 F.3d at 313. Rather, the First Amendment protects only "statements that cannot reasonably be interpreted as stating actual facts about an individual." *See Weyrich*, 235 F.3d at 624 (internal citations and quotation marks omitted). Thus, the statement, "In my opinion John Jones is a liar," is actionable despite the prefatory clause because it "implies a knowledge of facts which lead to the conclusion that Jones told an untruth." *Milkovich*, 497 U.S. at 18. "Simply couching such statements in terms of opinion does not dispel" their defamatory meaning and impact. *Id.* at 19. That is the case here, where Browder indisputably purported to convey "actual facts about an individual," *Weyrich*, 235 F.3d at 624, namely, that Akhmetshin is a "member of Putin's secret police." (Compl. ¶ 50.)

Nor can Browder avoid responsibility for this injurious statement by reasoning that, "because Mr. Browder believes that there is no such thing as a 'former' Russian intelligence officer, his 'opinion' is that Mr. Akhmetshin is a 'member of Putin's secret police.'" (Browder Mem. 39.) The stated basis for Browder's "opinion" is itself false, as "Akhmetshin is not, and *has never been*, a Russian GRU officer, intelligence asset, or spy for the Russian Federation or former Soviet Union." (Compl. ¶ 53 (emphasis added).) Because the "fact" upon which Browder based his "opinion" is false, and because Browder's assessment of that fact is erroneous, Browder's statement as a whole implies an actionable "false assertion of fact." *See Milkovich*, 497 U.S. at 18–19 ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.").

**3.      The *CBS This Morning* statement, which claimed that Akhmetshin is a "former Soviet spy, current spy operator in Washington," is an actionable statement of fact**

Finally, Browder made his fourth statement concerning Akhmetshin in an appearance on *CBS This Morning* on July 18, 2017. Concerning Akhmetshin, Browder stated: "[Natalia Veselnitskaya] then hires this guy Rinat Akhmetshin, who is a – by all accounts, some kind of shady former Soviet spy, current spy operator in Washington." (Compl. ¶ 51.)

This statement is also actionable. Browder did not simply call Akhmetshin "shady"; he called him a "spy" and a "spy operator." (Compl. ¶ 51.) The term "spy" is not vague or hyperbolic, as Browder baselessly asserts, but carries a rather specific meaning as "one who keeps secret watch on a person or thing to obtain information" or, more specifically, "a person employed by one nation to secretly convey classified information of strategic importance to another nation." Merriam-Webster Dictionary, *Spy*, https://www.merriam-webster.com/dictionary/spy (last visited Jan. 30, 2019). And Browder's charge is objectively either true or false; Akhmetshin is either a Russian spy, or he is not.

Browder's argument to the contrary borders on frivolous. Browder contends that his statement cannot be one of fact because, as a practical matter, Russia does not publicly identify its intelligence agents, so Browder cannot prove the truth of his statement. (Browder Mem. 40 & n.47.) That is not the law. The distinction between fact and opinion turns on whether a statement "can be *objectively* characterized as true or false," *Fairbanks*, 314 F. Supp. 3d at 90 (emphasis added) – not whether supporting the truth of the statement will prove difficult as a practical matter. *See Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 110 (D.D.C. 2009) ("[T]he 'sting of the charge' is that plaintiffs are agents of the Iranian government. This is a statement of fact. It can be verified – plaintiffs either are or are not agents of the Iranian government.").

If anything, Browder's argument demonstrates the utterly reckless nature of Browder's statements. Browder accused an American citizen of spying for a foreign government, yet he essentially concedes that he cannot prove the truth of this statement. (*See* Browder Mem. 40 (claiming that "the question whether [Akhmetshin] was formerly or is currently a 'spy operator' would be impossible to determine").) Browder's argument only raises the question: if Browder had no support for such a grave charge of criminal behavior, even treason, then why did he make the challenged statements?

### C.   Browder's Statements Accusing Akhmetshin of Serving as a Russian Spy Were Made Negligently, or Alternatively, with "Actual Malice"

Why did Browder make any of the challenged statements concerning Akhmetshin if he cannot prove them? The Complaint supplies the answer: Browder used his platform and influence to strike a low blow against a perceived rival. (*See, e.g.*, Compl. ¶ 1.) Browder made these outrageous statements without any support despite having already investigated Akhmetshin. The Complaint raises at least a plausible inference that, at a minimum, Browder purposefully avoided the truth in publishing the challenged statements. Browder's statements were, therefore, made negligently and with "actual malice."

Browder does not dispute that his statements were made negligently. Instead, he argues (i) that Akhmetshin is a limited purpose public figure, which would trigger the "actual malice" showing of fault, *see, e.g.*, *Parsi*, 595 F. Supp. 2d at 104, and (ii) that the Complaint fails to plead actual malice. (*See* Browder Mem. 26–37.) Browder is wrong on both counts. Akhmetshin is not a limited purpose public figure, but even if he were, the Complaint adequately pleads Browder's actual malice.

1. **Because Akhmetshin Did Not Thrust Himself to the Forefront of the Public Controversy Concerning Russian Interference with the 2016 Elections, Akhmetshin Cannot Be Considered a Public Figure**

The Supreme Court has defined limited purpose public figures as those who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," such that "they invite attention and comment." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).[16] Relying on *Gertz*, the D.C. Circuit has traditionally taken three steps to determine whether the plaintiff is a limited purpose public figure: *first*, "isolate the public controversy"; *second*, "analyze the plaintiff's role in it"; and *third*, determine whether the alleged defamation was "germane to the plaintiff's participation in the controversy." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297–98 (D.C. Cir. 1980). Although the *Waldbaum* inquiry is "useful," the D.C. Circuit has advised that "the touchstone remains the standard the Supreme Court set forth for classifying an individual as a public figure, namely whether an individual has assumed a role of especial prominence in the affairs of society that invites attention and comment." *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003) (internal brackets, citations, and quotation marks omitted).

Browder misapplies *Gertz* and the three *Waldbaum* elements because he misconstrues the pertinent public controversy to be the merits of the Magnitsky Act. (*See* Browder Mem. 27–28.) Browder's defamatory statements and their surrounding context make plain that the relevant public controversy was Russian interference with the 2016 Presidential election – not the merits of the Magnitsky Act. Russian interference has been the controversy since the very first reports

---

[16] Browder does not, because he cannot, claim that Akhmetshin is a "general public figure" – a category of persons limited to the "'celebrity,' his name a 'household word' whose ideas and actions the public in fact follows with great interest." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980).

on the Trump Tower meeting, even before Akhmetshin's reported participation.[17] In contrast to Russian interference with the 2016 Presidential election, inarguably one of the leading controversies in the nation today, there has been only limited public debate about the factual findings underlying the Magnitsky Act, whether the Magnitsky Act should be renamed (as Akhmetshin lobbied), or whether it should be repealed. The Magnitsky Act saga is only tangentially relevant to the Trump Tower meeting, which has generated such serious interest because the Trump campaign appeared willing to accept incriminating evidence on Hillary Clinton from the "Crown prosecutor of Russia." *See, e.g.*, Jo Becker, Adam Goldman & Matt Apuzzo, *Russian Dirt on Clinton? 'I Love It,' Donald Trump Jr. Said*, New York Times (July 11, 2017), https://www.nytimes.com/2017/07/11/us/politics/trump-russia-email-clinton.html.

It was within this context that Browder accused Akhmetshin of working as Russian spy, and his statements were newsworthy precisely because they bore on the public controversy over Russian interference. Browder's first defamatory statement on Twitter explicitly tied Akhmetshin to "the Veselnitskaya/Trump Jr story," and his second similarly referred to "the meeting with Trump Jr." (Compl. ¶¶ 48–49.) Browder's third defamatory statement purported to explain the significance of "a member of Putin's secret police directly meeting with the son of the future next president of the United States asking to change US sanctions policy crucial to Putin" – an obvious insinuation of Russian influence. (*Id.* ¶ 50.) Finally, Browder's fourth

---

[17]    Browder is entirely off-base to claim that Akhmetshin's presence at the Trump Tower meeting was the catalyst for "a frenzy of media speculation about the meeting's connection, if any, to Russian efforts to influence the 2016 election." (Browder Mem. 31–32.) The media "frenzy" over the Trump Tower meeting began one week before Akhmetshin's presence at the meeting was reported, when the initial news of the meeting between the Trump campaign and Natalia Veselnitskaya broke. *See, e.g.*, Jo Becker, Matt Apuzzo & Adam Goldman, *Trump Team Met With Lawyer Linked to Kremlin During Campaign*, New York Times (July 8, 2017), https://www.nytimes.com/2017/07/08/us/politics/trump-russia-kushner-manafort.html. Apart from the meeting, Russia's interference with the election has been a hot topic for debate even before President Trump took office.

statement concerning Akhmetshin was made on a *CBS This Morning* segment titled "The Kremlin Connection." (*See* Shube Decl., Ex. D, ECF No. 20-8.)

Once the challenged statements are placed within the proper public controversy, *i.e.*, Russian interference with the 2016 Presidential election, it becomes clear that Akhmetshin cannot be classified as a limited purpose public figure because he never "thrust" himself "to the forefront" of that controversy. *See Gertz*, 418 U.S. at 345. To satisfy the standard set forth in *Gertz*, "[t]he plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." *Waldbaum*, 627 F.2d at 1297. Under no circumstances can Akhmetshin's attendance at the Trump Tower meeting be interpreted as Akhmetshin's purposeful attempt to influence the public debate over Russian interference, as *Gertz* requires. Nor can Akhmetshin's limited public comments denying Browder's defamatory statements convert him into a public figure. *See, e.g.*, *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 32–33 (D.C. Cir. 1990) (holding that statements answering the alleged defamation are insufficient to thrust the plaintiff to the forefront of a controversy).

Instead, Akhmetshin's involuntary venture into the spotlight closely resembles those cases in which the Supreme Court determined that an individual "was dragged unwillingly into the controversy" and, therefore, could not be considered a limited purpose public figure. *See Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166 (1979). In *Gertz*, the Supreme Court held that "a reputable attorney" was not a limited purpose public figure even though he participated in a newsworthy case, as he "plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." 418 U.S. at 352. Similarly, in *Time, Inc. v. Firestone*, the Supreme Court held that a prominent

woman who sought to divorce her husband was not a limited purpose public figure because she did not "freely choose to publicize issues as to the propriety of her married life"; rather, "[s]he was compelled to go to court by the State in order to obtain legal release from the bonds of matrimony." 424 U.S. 448, 454 (1976). And in *Wolston v. Reader's Digest Association, Inc.*, the Supreme Court held that an accused Soviet spy was not a limited purpose public figure merely because he refused to appear before a grand jury investigating Soviet espionage, as his failure to appear "was in no way calculated to draw attention to himself in order to invite public comment or influence the public with respect to any issue." *See* 443 U.S. at 166–68. A constant theme drives these cases: "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Id.* at 167.

That theme holds true in this case. Akhmetshin did not become a public figure merely because he attended a private meeting that only attracted attention one year later. Indeed, in June 2016 Akhmetshin never could have imagined that the Trump Tower meeting would have placed him in the national spotlight – and in Browder's crosshairs.[18] For this reason, Akhmetshin cannot be considered a public figure, and Browder's negligence in making the challenged statements should suffice to state a claim for defamation. *See Mazur v. Szporer*, No. CIV.A. 03-00042(HHK), 2004 WL 1944849, at *4 (D.D.C. June 1, 2004) ("The allegations in the complaint do not indicate that Mazur engaged the attention of the public in an attempt to influence the resolution of the controversies at issue. Consequently, based on the allegations in the complaint,

---

[18]     Akhmetshin has consistently maintained that he was invited to the Trump Tower meeting only several hours beforehand; that he was "honestly surprised" that Veselnitskaya had secured a meeting with Donald Trump, Jr.; and that "really nothing happened" at the meeting itself. (*See* Tremonte Decl., Ex. A at 50:9 – 51:2, 96:3, 108:14–21.)

the court is unable to conclude that Mazur is a limited public figure who, thus, is required to allege actual malice in the complaint.").[19]

### 2.        In Any Event, the Complaint Pleads Browder's Actual Malice

Actual malice requires proof of "reckless disregard for truth or falsity," *i.e.*, proof "that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). "Purposeful avoidance of truth" constitutes actual malice, although a failure to investigate does not. *See Parsi*, 595 F. Supp. 2d at 106 (citing *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 692 (1989)). Moreover, evidence that the defendant harbored a grudge against the plaintiff may bolster a plaintiff's claim that the defendant purposefully avoided the truth. *See Houlahan v. World Wide Ass'n of Specialty Programs & Sch.*, No. CIV A 04-01161 HHK, 2006 WL 2844190, at \*7 (D.D.C. Sept. 29, 2006) ("Mayeur demonstrates a grudge against Houlahan, also bolstering Houlahan's claim that Defendants acted with actual malice by willfully not investigating Mayeur's claims.").

While the actual malice standard undoubtedly creates a high bar for the defamation plaintiff to clear, it is by no means insurmountable – particularly at this early juncture. In fact, other courts in this jurisdiction have held that, given the factual nature of the actual malice inquiry, a defendant's actual malice "is normally a question of fact for the jury" that cannot necessarily be resolved on a motion to dismiss. *Parsi*, 595 F. Supp. 2d at 106; *see Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 284 (D.D.C. 2017) (holding that "complaint survives

---

[19]        Akhmetshin does not fit into the "exceedingly rare" category of cases involving a "truly involuntary public figures." *See Gertz*, 418 U.S. at 345. Such cases necessarily must involve an individual who involuntarily becomes the "central figure" in a specific public controversy. *See Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 741 (D.C. Cir. 1985) (holding that air traffic controller involuntarily became public figure when an airplane crash occurred on his watch). Akhmetshin's tangential involvement in one aspect of the larger investigation into Russian interference stands in marked contrast to the facts of *Dameron*, where the air traffic controller was a central figure in the public controversy.

the preliminary obstacle that a motion to dismiss constructs, because the complaint's allegations of fact support the inference that Al Jazeera and Davies entertained serious doubts as to Sly's claims and failed to investigate these claims adequately, which, together, suffice to support a plausible finding of actual malice"); *Parsi*, 595 F. Supp. 2d at 107–08 ("A failure to investigate adequately could not alone amount to actual malice, but purposeful avoidance of the truth could. Discovery is needed, then, to determine what defendant knew at the time he made the contested statements."); *see also Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099, 1109–10 (D.D.C. 1991) (denying summary judgment motion on actual malice issue, noting that "[t]he particular reasons defendants disregarded the contrary evidence have not been fully explored on the present record").

The Complaint, along with all reasonable inferences that can be drawn therefrom, satisfies the actual malice standard. First and foremost, it is clear that Browder actually investigated Akhmetshin, so he must have entertained serious doubts about the truth of his false statements. (*See* Compl. ¶ 39.) As discussed above, Browder's Hermitage Letter purported to have performed an investigation of Akhmetshin; it specifically identified certain lobbying and consultancy work performed by Akhmetshin, and it even included photographs of Akhmetshin in Brussels, Belgium and Washington, D.C. – indicating that Browder had Akhmetshin followed.[20] (*See id.* ¶¶ 40–41, 56; Shube Decl., Ex. E, ECF No. 20-9 at 15.) Although he had investigated Akhmetshin, Browder could not have found evidence confirming his defamatory statements, as "Akhmetshin is not, and has never been, a Russian GRU officer, intelligence asset, or spy for the

---

[20]    Browder has separately bragged to *GQ* that he "has another PowerPoint presented on [Akhmetshin]." Sean Flynn, *Bill Browder, Putin Enemy No. 1*, GQ (Nov. 14, 2017), https://www.gq.com/story/bill-browder-putin-enemy-number-1.

Russian Federation or former Soviet Union." (*See* Compl. ¶ 53.) Indeed, Browder now insists that he cannot prove the truth of his defamatory statements.[21] (*See* Browder Mem. 40 ("the question whether [Akhmetshin] was formerly or is currently [a] 'spy operator' would be impossible to determine").) To the contrary, given the apparent lengths to which Browder has investigated Akhmetshin, his investigation likely uncovered Akhmetshin's prior work with U.S. government agencies. (*See* Compl. ¶ 15.) This work experience seriously undermines any suggestion that Akhmetshin is a Russian "asset," as it strains credulity to believe that the United States would have worked with Akhmetshin without having vetted him. In any event, such information could not have served as a basis to believe the truth of Browder's assertion that Akhmetshin was a Russian spy. Based on the foregoing allegations (which must be accepted as true) and evidence, the Complaint creates at least a plausible inference that Browder purposefully avoided the truth about Akhmetshin when he made the challenged statements. *See Zimmerman*, 246 F. Supp. 3d at 284; *Parsi*, 595 F. Supp. 2d at 107–08.

*Second*, the Complaint attributes an ulterior motive for Browder's statements, namely, that Browder harbored a grudge against Akhmetshin because Akhmetshin had worked on the Prevezon Case and lobbied to remove Sergei Magnitsky's name from the Magnitsky Act. (Compl. ¶¶ 4–6, 38, 43.) Allegations of Browder's grudge satisfy the actual malice standard, especially when coupled with his investigation and purposeful avoidance of the truth. *See Houlahan*, 2006 WL 2844190, at *7.

---

[21]    In addition to supporting the conclusion that the statements at issue here were made recklessly, Browder's insistence that it would be "impossible to determine" if a given individual were engaged in unlawful espionage is contradicted by the many successful investigations and prosecutions of spies by U.S. law enforcement.

In response to the well-pleaded allegations of the Complaint, Browder maintains that his reliance on other news articles about Akhmetshin precludes a finding of actual malice. (Browder Mem. 33–36.) But as noted above, *many (if not all) of those news articles trace back directly to Browder*, and others simply do not support Browder's conclusions about Akhmetshin. Browder cannot credibly claim a "good faith reliance on previously published reports in reputable sources," *see McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1510 (D.C. Cir. 1996), where either (i) he was a source of those reports about Akhmetshin, or (ii) the reports do not support Browder's defamatory statements.

### D. The Complaint Properly Alleges All Other Elements of a Defamation Claim

Browder does not dispute that the Complaint adequately alleges all remaining elements of a defamation claim. *First*, Browder does not contest that he published the statements without privilege to a third party. (The Declaration of Melissa Shube confirms that Browder posted the challenged Twitter statements under the username @Billbrowder.) *Second*, Browder does not challenge the Complaint's allegations concerning the harm that Akhmetshin has suffered. In any event, Browder's statements are actionable as a matter of law because they accuse Akhmetshin of serious criminal conduct. *See, e.g.*, *Smith v. Clinton*, 886 F.3d 122, 128 (D.C. Cir. 2018) (noting that "statements about extreme subjects, such as criminal behavior . . . or a person's suitability for his chosen profession" are defamatory *per se*); *Johnson v. Johnson Pub. Co.*, 271 A.2d 696, 698 (D.C. 1970) (holding that "to accuse one of a crime is libel per se").

### E. In the Alternative, the Court Should Grant Akhmetshin Leave to Replead His Defamation Claim

Browder requests that the Complaint be dismissed with prejudice. (Browder Mem. 44.) However, at this juncture "[d]ismissal with prejudice is the exception, not the rule, in federal practice because it 'operates as a rejection of the plaintiff's claims on the merits and [ultimately]

precludes further litigation of them.'" *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012) (alteration in original) (quoting *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006)). Dismissal with prejudice is warranted only where "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency" – an "exacting standard." *Id.* at 794–95 (internal citations and quotation marks omitted).

To the contrary, "absent futility or special circumstances (such as undue delay, bad faith, or dilatory motive), a plaintiff should have the opportunity to replead so that claims will be decided on merits rather than technicalities." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1062 (D.C. Cir. 2015) (citing *Foman v. Davis*, 371 U.S. 178, 181–82 (1962)). "The court should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), even if the Court harbors "grave doubts" about factual legitimacy of the complaint, *Vasaturo v. Peterka*, 177 F. Supp. 3d 509, 512 (D.D.C. 2016) (granting leave to replead).

Such leave to replead should be granted here, to the extent the Court concludes that Akhmetshin's defamation claim falls short of Rule 8's requirements. Any issue that Browder raises – actual malice, the circumstances surrounding his statements, substantial truth – could be cured by an amended pleading.[22]

---

[22] For instance, only after filing the Complaint in this action, counsel learned that Browder had openly declared in an email dated May 31, 2016, that he was "in a conflict with" Akhmetshin. Browder sent this email to attorneys at Kobre & Kim LLP and then forwarded it to Kyle Parker, who, in turn, forwarded the email to the private email account of State Department official Robert Otto. Otto's private emails, including this one, were hacked and publicly released online. *See* Jenna McLaughlin, Robbie Gramer & Jana Winter, *Private Email of Top U.S. Russian Intelligence Official Hacked*, Foreign Policy (July 14, 2017), https://foreignpolicy.com/2017/07/14/private-email-of-top-u-s-russia-intelligence-official-hacked/. Many news organizations, including the *New Yorker*, have reported on the substance of those emails. *See, e.g.*, Joshua Yaffa, *How Bill Browder Became Russia's Most Wanted Man*, New Yorker, Aug. 20, 2018 (quoting from hacked Otto email).

**CONCLUSION**

For the foregoing reasons, the Defendant's Motion to Dismiss the Complaint should be denied in its entirety. In the alternative, the Court should (a) permit the Plaintiff to take limited jurisdictional discovery to establish the Defendant's contacts with the District of Columbia, and/or (b) grant the Plaintiff leave to replead.

Dated:  New York, New York
       January 31, 2019

/s/ Michael Tremonte
Michael Tremonte (*pro hac vice*)
Michael W. Gibaldi (*pro hac vice*)
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
mtremonte@shertremonte.com
mgibaldi@shertremonte.com

Kim Sperduto (D.C. Bar No. 416127)
SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, N.W., Suite 1250
Washington, D.C. 2006
(202) 408-8900
ksperduto@stglawdc.com

*Attorneys for Plaintiff Rinat Akhmetshin*