**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RINAT AKHMETSHIN,**<br><br>    Plaintiff,<br><br>  v.<br><br>**WILLIAM BROWDER,**<br><br>    Defendant. | Case No. 1:18-cv-01638-EGS |

**REPLY IN SUPPORT OF DEFENDANT'S SPECIAL MOTION
TO DISMISS UNDER THE D.C. ANTI-SLAPP ACT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................1

    I.      Plaintiff's Lawsuit Falls Within the Scope of the Anti-SLAPP Act's Intended Reach...1

    II.     The Court Should Apply the Anti-SLAPP Act Because *Mann* Renders *Abbas* Inaccurate.........................................................................................................................6

    III.    Plaintiff's Defamation Claim is Unlikely to Succeed on the Merits. .............................9

    IV.    "Targeted Discovery" Is Not Warranted.........................................................................10

CONCLUSION....................................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbas v. Foreign Policy Grp.*, 783 F.3d 1328 (D.C. Cir. 2015)..................................................1, 6

*Atlantigas Corp. v. Nisource*, 290 F. Supp. 2d 34 (D.D.C. 2003) ................................................9

*Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249 (D.D.C. 2013) ...............................................8, 9

*Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102 (D.C. Cir. 2012) ........................................................6

*Carik v. U.S. Dep't of Health & Human Servs.*, 4 F. Supp. 3d 41 (D.D.C. 2013) ..........................8

*Competitive Enter. Inst. v. Mann*, 150 A.3d 1213 (D.C. 2016) ......................................6, 7, 10, 11

*Cty. Nat'l Bank & Tr. Co. of Santa Barbara v. Helvering*, 122 F.2d 29 (D.C. Cir. 1941) .............6

*Deripaska v. Associated Press*, 2017 WL 8896059 (D.D.C. Oct. 10, 2017) .................................9

*Easaw v. Newport*, 253 F. Supp. 3d 22 (D.D.C. 2017) ..................................................................6

*Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29 (D.D.C. 2012) ........................................8, 9

*Hanna v. Plumer*, 380 U.S. 460 (1965) .........................................................................................6

*Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164 (5th Cir. 2009) .........................................8

*Libre By Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149 (D.D.C. 2018) .........................................9

*Sherrod v. Breitbart*, 843 F. Supp. 2d 83 (D.D.C. 2012) ...............................................................8

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963
   (9th Cir. 1999) ............................................................................................................................8

**INTRODUCTION**

The D.C. Anti-SLAPP Act (the "Act") was enacted in 2010 in order to encourage courts to dismiss promptly those actions that are filed "not to win the lawsuit but punish the opponent and intimidate them into silence." Comm. on Pub. Safety & the Judiciary, Council of D.C., Rep. on Bill 18-893, "Anti-SLAPP Act of 2010," at 4 (2010) (hereinafter "Committee Report"), http://dcclims1.dccouncil.us/images/00001/20110120184936.pdf. It is hard to imagine what kind of lawsuit should be subject to the Act, if not this one. While Mr. Browder recognizes that many courts in this District have refused to apply the Act following the D.C. Circuit's decision in *Abbas v. Foreign Policy Group*, 783 F.3d 1328 (D.C. Cir. 2015), he respectfully urges this Court to adopt a different approach. Plaintiff's strategic invocation of federal diversity jurisdiction should not permit him to work an effective repeal of the Act.

**ARGUMENT**

**I.   Plaintiff's Lawsuit Falls Within the Scope of the Anti-SLAPP Act's Intended Reach.**

Notwithstanding that Mr. Browder was one of dozens of individuals and entities to say, write, or publish essentially identical claims regarding Mr. Akhmetshin on July 14, 2017, Mr. Akhmetshin has chosen Mr. Browder—his longtime rival as a result of a public dispute over the Magnitsky Act, an important matter of public policy—as the one and only one person to target with a strategic suit. Mr. Browder published two comments on his Twitter account, linking to NBC News and Associated Press articles in which the headlines and bodies of the articles explicitly identified Mr. Akhmetshin's ties to Russian intelligence, and which made statements concerning Mr. Akhmetshin's background and lobbying work on behalf of Russian interests. Mr. Browder also gave one statement in Business Insider and another on the morning news program, CBS This Morning.

Mr. Browder's July 14, 2017 statements are materially indistinguishable from statements Hermitage Capital Management made in its 2016 Complaint filed with the U.S. Department of Justice ("FARA Complaint")—which alleged that Mr. Akhmetshin had violated the Foreign Agents Registration Act by conducting unregistered lobbying in 2016 on behalf of the Russian government aimed at repealing and renaming the Magnitsky Act—as well as statements Mr. Browder made during a 2017 investigation by the U.S. Senate Judiciary Committee on the same topic. *See* Memorandum of Points and Authorities in Support of Defendant William Browder's Motion to Dismiss the Complaint ("Def. Rule 12 Motion to Dismiss") at 8-9. Both the FARA Complaint and Judiciary Committee investigation relied upon a robust public record regarding Mr. Akhmetshin and his lengthy history of involvement with the Russian government. *Id.* As Mr. Browder has already explained, the sources cited by Senator Grassley's various 2017 letters, and in the FARA Complaint, all pre-date or are independent of Mr. Browder's 2017 statements. *See id.* at 8-10 (summarizing, *inter alia*: (i) a 2016 Politico article claiming that Akhmetshin "used to spy for the Soviets"; (ii) a 2017 Daily Caller article alleging that Akhmetshin "was affiliated with GRU, Russia's main intelligence directorate"; (iii) a 2007 book profiling Akhmetshin as a "former Soviet Army counter-intelligence officer"; and (iv) a 2015 lawsuit describing Akhmetshin as a "pro-Russian operator" who is also a "former Soviet military counterintelligence officer").

Once Mr. Akhmetshin's attendance at the Trump Tower meeting was reported by NBC News—(a report that Mr. Akhmetshin concedes was not sourced to Mr. Browder), Plaintiff's Memorandum in Opposition to Def. Mot. to Dismiss the Complaint at 9—articles from numerous media outlets across the United States and abroad published indistinguishable statements referring to Mr. Akhmetshin's foreign intelligence links. *See* Def. Rule 12 Motion to Dismiss at 2 n.2. Mr. Akhmetshin attempts to portray this coverage as having been steered by Mr. Browder, but even a

cursory review of the coverage exposes the emptiness of that claim. Consider the following passage from an article (that does not cite or mention Mr. Browder) published by Vox, authored by Zack Beauchamp, entitled "Rinat Akhmetshin, the potential Russian spy who met with Donald Trump Jr., explained":

> Rinat Akhmetshin is a Russian-American lobbyist who, by his own admission, worked as a military counterintelligence officer for the Soviet Union before its fall.
>
> He also attended Donald Trump Jr.'s June 2016 meeting with Russian attorney Natalia Veselnitskaya, before which Trump was promised dirt on Hillary Clinton that came from the Russian government. The Trump team had, until NBC News broke the story on Friday, never mentioned that there were any other Russian nationals at the meeting.
>
> As a result, Akhmetshin is now the most speculated-about man in American politics. Veselnitskaya herself was a lawyer who had previously represented the Kremlin government but was not literally a Russian state employee. If an actual Russian spy was at the meeting, that would bring the Russian government's ties to the Trump campaign one gigantic step closer.
>
> So is Akhmetshin a Russian spy? He denies the charge, of course — but that's what any spy would do (Akhmetshin did not respond to an emailed request for comment). So all we have to go on is what's publicly available: reporting and documents on his roughly 20-year lobbying career in Washington.
>
> That record is not conclusive either way. But it does suggest that there is, at least, a plausible case that Akhmetshin was involved in Russia's election interference campaign. An April letter penned by Sen. Chuck Grassley, the Republican chair of the Judiciary Committee, accuses him of having "ties to Russian intelligence." Rep. Dana Rohrabacher, a Russia-friendly California Republican, told CNN that Akhmetshin had "international connections to different groups in Russia" and that "I would certainly not rule [him being a spy] out."
>
> And court documents uncovered by the Daily Beast allege that Akhmetshin masterminded the hack and dissemination of private documents belonging to a mining company in 2013.
>
> So while nothing is proven, the information that's come to light since Akhmetshin's attendance at the meeting was exposed on Friday morning only raises more questions about his background and motivation for being at the meeting. The furor

over Akhmetshin may turn out to a tempest in teapot—or a Category Five hurricane.[1]

Another article on July 14, authored by Stephanie Kirchgaessner and published in the Guardian, had a similar take:

> Rinat Akhmetshin was not one to hide his connections to Russian intelligence.
>
> During his years working in the shadowy Washington DC world of corporate intelligence, his connections to former Russian agents were pitched as a valuable asset to private clients. Akhmetshin – who courted journalists and politicians alike – was known for speaking as candidly about his years of military service in Afghanistan as his objectives on Capitol Hill.
>
> On Friday, Akhmetshin, who is an American citizen, said that he also attended the 2016 meeting with Donald Trump Jr described as part of a Russian government attempt to undermine Hillary Clinton's election campaign. The revelation raises new questions about the purpose of the encounter, and why the president's son – who promised to be transparent about the meeting in Trump Tower – did not admit that Akhmetshin was also in the room.
>
> Akhmetshin began his career working for central Asian oligarchs who needed a helping hand in Washington for one problem or another. But in recent years, his lobbying work seemed to take on a singular focus: reversing the 2012 Magnitsky Act, a law passed by Barack Obama that infuriated Russia's president, Vladimir Putin, and was designed to punish Russia for the 2009 prison death of the Russian lawyer Sergei Magnitsky.
>
> One attorney who knows Akhmetshin and has hired him in the past said that far from being seen as pro-Putin, the Russian American lobbyist assiduously avoided politics. In his business dealings with prospective clients, however, he used his connections to Russian intelligence as a selling point.
>
> "His background and history was an asset he sold to clients, whoever came into the door. He has quite a diverse group of clients," the person said, adding: "I know he was engaged by people who wanted to get rid of Magnitsky [Act]."
>
> "He is a former GRU person for sure, but he once said there is no such thing as former," the person added with a laugh.[2]

---

[1] Def. Rule 12 Motion to Dismiss at 2 n.2 (https://www.vox.com/world/2017/7/14/15972770/ rinat-akhmetshin-explained).

[2] *Id.* (https://www.theguardian.com/us-news/2017/ jul/14/ rinat-akhmetshin-russia-intelligence-donald-trump-jr).

Mr. Akhmetshin has not sued any of the individuals or publishers listed above. Nor has Mr. Akhmetshin ever sued any other individual who has made similar or identical statements to Mr. Browder, including one reporter who has repeatedly alleged that Mr. Akhmetshin has "openly described his years as an officer in the Soviet GRU, the military intelligence arm, serving in Afghanistan."[3] Indeed, given the public record predating Mr. Browder's statements, including Mr. Akhmetshin's admitted work for Mr. Viktor Ivanov, a one-time "top aid" to Russian President Putin and "longtime veteran of Russian security services,"[4] it is fantasy to posit that Mr. Browder was the originating source of the coverage on Mr. Akhmetshin's ties to Russian intelligence. This history reveals the purpose of Mr. Akhmetshin's suit: to silence, punish, and seek discovery from a professional and political rival in an ongoing public debate over the Magnitsky Act.

D.C. adopted its Anti-SLAPP Act to ensure that the press and those engaged in public advocacy would not be "intimidated or prevented, because of abusive lawsuits, from engaging in political or public policy debates." Committee Report at 4. The Act accomplishes that objective by arming defendants like Mr. Browder "with ***substantive rights*** to expeditiously and economically dispense of litigation aimed to prevent their engaging in constitutionally protected actions on matters of public interest." *Id.* (emphasis added). This Court should apply the substantive rights that are granted to Mr. Browder by the Act, including his right to file this special motion to dismiss with substantive burdens of proof that were enacted to guard against retaliatory suits like this.

---

[3] Aidan Quigley, *Who is Rinat Akhmetshin, Former Soviet Intelligence Officer in Donald Trump Jr. Meeting?*, NEWSWEEK, July 14, 2017, https://www.newsweek.com/who-rinat-akhmetshin-former-soviet-intelligence-officer-donald-trump-jr-637050.

[4] *See* Def. Rule 12 Motion to Dismiss at 2, 11 (citing Andrew Higgins & Andrew E. Kramer, *Soviet Veteran Who Met With Trump Jr. Is a Master of the Dark Arts*, N.Y. TIMES, July 15, 2017, https://www.nytimes.com/2017/07/15/world/europe/rinat-akhmetshin-donald-trump-jr-natalia-veselnitskaya.html.).

## II. The Court Should Apply the Anti-SLAPP Act Because *Mann* Renders *Abbas* Inaccurate.

The court in *Abbas*, relied on two fundamental premises to support its conclusion that the Act does not apply in federal diversity cases—both have "clearly and unmistakably" undermined by *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213 (D.C. 2016) (as amended Dec. 13, 2018). *See Easaw v. Newport*, 253 F. Supp. 3d 22, 35 (D.D.C. 2017) ("When a decision by the D.C. [Court of Appeals] clearly and unmistakably renders inaccurate a prior decision by the D.C. Circuit interpreting D.C. law, this Court should apply the D.C. [Court of Appeal's] more recent expression of the law."); *see also Cty. Nat'l Bank & Tr. Co. of Santa Barbara v. Helvering*, 122 F.2d 29, 33 (D.C. Cir. 1941) (if "the premise is false and [then] the conclusion falls with it.").

According to Plaintiff, "*Abbas* premised its analysis upon the Supreme Court's decision in *Shady Grove*, which falls in the *Erie* line of cases." Plaintiff's Memorandum in Opposition to Defendant's Special Motion to Dismiss the Complaint Pursuant to the D.C. Anti-SLAAP Act ("Opp.") at 7. The "'broad command of *Erie*' of course, is that 'federal courts are to apply state substantive law and federal procedural law' when sitting pursuant to their diversity jurisdiction." *See Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1107 (D.C. Cir. 2012) (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). In *Mann*, the court undermined *Abbas*' crucial assumption implicating the *Erie* doctrine: that the Act was procedural, not substantive. *See Mann*, 150 A. 3d at 1238 n.32 ("Implicit in *Abbas* is that the special motion to dismiss is only procedural in nature rendering it inapplicable in federal court sitting in diversity."). *Mann* rejected *Abbas*' assumption and instead proclaimed that the purpose of the Anti-SLAPP Act is "to create a substantive right not to stand trial and to avoid the burdens and costs of pre-trial procedures." *Id.* at 1231.

*Mann* recognized that legislative history of the Act confirms that the Act was designed to create substantive rights with regard to a defendant's ability to fend off suits designed to target

public participation. *See id.* at 1235 ("We begin with what the legislature said it was trying to accomplish: to deter SLAPPs by 'extend[ing] substantive rights to defendants in a SLAPP, providing them with the ability to file a special motion to dismiss that must be heard expeditiously by the court.'") (citing Report on Bill 18-893). Given the substantive nature of the Act (as recognized by *Mann*), the core premise of *Abbas* has clearly been undermined.

*Abbas* also assumed that the Anti-SLAPP Act's likelihood of success standard imposes greater burdens on the plaintiff than is contemplated by the allocation of burdens under the Federal Rules of Civil Procedure ("FRCP"). While Plaintiff argues that "Browder overstates the *Mann* decision," with respect to the comparison between the Act and the FRCP, Opp. at 6, *Mann* was clear on this point: "*Abbas* recognized that at the time, this court 'has never interpreted the D.C. Anti–SLAPP Act's likelihood of success standard to simply mirror the standards imposed by' Federal Rule 56. **We do so now**." *Mann*, 150 A. 3d at 1238 n.32. (internal citations omitted) (emphasis added). The court then acknowledged the weight of its decision: "This court's interpretation of the standard applicable to the special motion to dismiss under District of Columbia law will no doubt factor into future analysis of the dicta in *Abbas* concerning the applicability of the Anti–SLAPP Act in litigation brought in federal courts." *Id*.

Plaintiff argues that *Mann* does not undermine *Abbas*' holding regarding the purported conflict between the Anti-SLAPP Act and Federal Rule 12. Opp. at 5. But *Mann* explained that each of the various provisions in the Anti-SLAPP Act exist to support a substantive immunity from certain types of lawsuits—as such, the fact that there might be certain procedures embedded in the law does not change that those procedures are in furtherance of a substantive state right. *See Mann*, 150 A.3d at 1231-32 (citing Committee Report at 4); *see also Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 254 (D.D.C. 2013) (citing *Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164,

169 (5th Cir. 2009) (applying the "nominally-procedural" state Anti-SLAPP law in federal diversity cases)). Separately, the manner in which the Act's special motion to dismiss allocates a "likelihood of success" burden of proof amounts to a substantive rather than procedural right under *Mann*. *See Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 n.4 (D.D.C. 2012) ("the allocation of burden of proof is substantive in nature and controlled by state law.").

Defendant does not dispute that *Mann* focused on the summary judgment standard contained in Rule 56, but that does not limit the scope of *Mann*'s holding. The purpose of the various provisions of the Anti-SLAPP Act is to erect substantive protections for defamation defendants—and all those provisions work in tandem to limit the availability of D.C. law as a tool to pursue defamation claims in suits involving public participation. Decisions prior to *Abbas* had recognized as much, and those decisions are relevant in light of *Mann*. *See, e.g.*, *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 36 n.10 (D.D.C. 2012) (citing *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972 (9th Cir. 1999) (Rule 12 and 56 provisions "can exist side by side . . . each controlling its own intended sphere of coverage without conflict.")). Given *Mann*'s holding, it would disrespect the District's sovereign interests to permit litigants to use diversity jurisdiction as a tool to circumvent the District's policy preferences that have been lawfully enacted in the Anti-SLAPP Act.

Plaintiff relies on subsequent District court cases to persuade the Court to follow *Abbas*, but those decisions are not binding given that "a decision from another Judge in this District is not controlling authority on this District." *Carik v. U.S. Dep't of Health & Human Servs.*, 4 F. Supp. 3d 41, 54 n.8 (D.D.C. 2013) (internal marks omitted).[5] Mr. Browder respectfully submits that

---

[5] While other district court decisions may be considered persuasive authority, so may other federal appellate court decisions. *See Boley*, 950 F. Supp. 2d at 254 ("While thoroughly reasoned, *3M Co.* [a prior D.D.C. opinion] conflicts with the weight of authority. Indeed, three federal circuit courts have deemed it necessary to enforce state anti-SLAPP laws in diversity actions, finding no conflict between those statutes' special motion to dismiss provisions and Federal

these decisions were incorrect. Further, certain of the subsequent decisions, including the decision of Judge Huvelle in the *Deripaska* case, recognized that refusing to apply the District's Anti-SLAPP statute "will likely promote the type of forum-shopping that *Erie* intended to avoid . . . ." *See Deripaska v. Associated Press*, 2017 WL 8896059, at *3 (D.D.C. Oct. 10, 2017); *see also Burke*, 685 F.3d at 1108 (articulating the "twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws.'") (internal marks and citation omitted). Forum shopping is precisely what has occurred in this suit, and it will continue to occur if the Act is not applied in federal diversity cases. Adhering to *Abbas* notwithstanding *Mann* will encourage litigants to bring defamation claims as federal court diversity actions in a manner that circumvents D.C.'s policy choices and allow the federal courts to be used as a tool to chill advocacy on issues of public concern.

### III. Plaintiff's Defamation Claim is Unlikely to Succeed on the Merits.

Plaintiff relies on conclusory statements to support the argument that his "defamation claim is, in fact, likely to succeed on the merits." Opp. at 9. Plaintiff claims that Mr. Browder does not deny making the challenged statements and then simply states "[t]hese assertions of fact are false and clearly defamatory." *Id*. But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to establish that Plaintiff is likely to succeed on the merits. *Libre By Nexus v. Buzzfeed, Inc*., 311 F. Supp. 3d 149, 153 (D.D.C. 2018).[6]

---

Rules of Civil Procedure 12 and 56."); *Farah*, 863 F. Supp. 2d 29 (same); *see also* Memorandum of Points and Authorities in Support of Defendant's Special Motion to Dismiss Under the D.C. Anti-SLAPP Act at 3 (noting the growing circuit split over whether Anti-SLAPP statutes may be applied in federal court and collecting cases).

[6] Plaintiff concedes that Mr. Browder was engaged in advocacy on issues of public interest. *See Atlantigas Corp. v. Nisource*, 290 F. Supp. 2d 34, 47 (D.D.C. 2003) ("When a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded . . . .") (citation omitted).

Beyond Plaintiff's conclusory allegations, the record described above and in Mr. Browder's Special Motion to Dismiss both show that Plaintiff's claim will fail on the merits. As defined by *Mann*, the likely to succeed standard requires dismissal "if the court can conclude that the claimant could not prevail as a matter of law, that is, after allowing for the weighing of evidence and permissible inferences by the jury." *Mann*, 150 A.3d at 1236. Apart from the lack of personal jurisdiction over Mr. Browder, Plaintiff's defamation claim falls squarely into the category of claims that the Anti-SLAPP Act was designed to deter. Plaintiff's decision to sue ***only*** Mr. Browder—his longtime "political rival" in the debate involving the Magnitsky Act—based on a statement that dozens of people and entities published prior to and independently from Mr. Browder, shows that the only purpose of this suit is to target and punish Mr. Browder for his public advocacy on behalf of the Magnitsky Act and penalize his decision to speak out against Russian efforts to influence U.S. policy.

Apart from undermining the goals of the Anti-SLAPP Act, Plaintiff's suit rests on statements that are not defamatory for several reasons under relevant and controlling law. *First*, Plaintiff's failure to plead actual malice is fatal given his status as a limited-purpose public figure. Def. Rule 12 Motion to Dismiss, at Section III.B. Indeed, given the context in which Mr. Browder made the statements (including publishing them in front of Congress and the DOJ), it is clear that Mr. Browder never doubted the veracity of the challenged statements. *Id.* Thus, any allegations of actual malice (even if properly alleged) would fail. *Second*, each of the challenged statements are protected by the opinion, fair comment, or substantial truth doctrines. *Id.* at Section II. For these reasons, the Complaint must be dismissed with prejudice.

## IV.   "Targeted Discovery" Is Not Warranted.

Plaintiff has pointed to no facts to establish that it "appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly

burdensome." *Mann*, 150 A.3d at 1233. Instead, Plaintiff once again relies on conclusory statements in support of his broad request for discovery, which includes all of Mr. Browder's communications about Plaintiff and "any other documents" in Mr. Browder's possession concerning Plaintiff. Opp. at 11. Rather than providing any context or argument for why these documents show that his defamation claim is likely to succeed, Plaintiff simply states that "such documents are likely to defeat the motion by showing that Browder called [Plaintiff] a Russian spy with a reckless disregard for truth." *Id*. Plaintiff's request for "any other documents" in Mr. Browder's possession concerning Plaintiff is far from the kind of "targeted discovery" request contemplated by the Anti-SLAPP Act. Instead, Plaintiff's demand shows that he seeks to chart a fishing expedition for any documents he can cobble together in support of his claim, having included none in his Complaint. Plaintiff's conclusory statements as well as his broad request are insufficient to entitle him to "targeted discovery" under the Act.

## CONCLUSION

For the reasons set forth above, the Special Motion to Dismiss must be granted, and this Court should order briefing on Defendant's fees and costs.

Dated: February 14, 2019                    Respectfully Submitted,


/s/ Michael Gottlieb
Michael Gottlieb (D.C. Bar No. 974960)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW Washington, DC 20006
Phone: 202-303-1000
Fax: 202-303-2000
mgottlieb@willkie.com

*Counsel for Defendant William Browder*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2019, I caused a true and correct copy of the foregoing to be served by electronic means, *via* the Court's ECF system, on all counsel registered to receive electronic notices.

/s/ Michael J. Gottlieb
Michael J. Gottlieb (DC Bar No. 974960)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, D.C.  20006
Telephone: (202) 303-1000
Fax: (202) 303-2000
E-mail: mgottlieb@willkie.com